**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------x
SHANGGANG FENG,
*on his own behalf and on behalf of others similarly*
*situated,*

                       Plaintiff,        Case No. 18-cv-12329 (RWL)

              v.

KELAI CORP
      d/b/a Jef Chinese,
FAN YANG,
JAY HUANG,
LAN "DOE," and
QIN "DOE,"

                      Defendants.
------------------------------------------------------------------x

## PLAINTIFF'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Aaron B. Schweitzer
TROY LAW, PLLC
41-25 Kissena Boulevard
Suite 110
Flushing, NY 11355
(718) 762-1324
troylaw@troypllc.com
*Attorneys for Plaintiff*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................. iii

PROPOSED FINDINGS OF FACT ..................................................................................... 1

  I.   DEFENDANTS ................................................................................................. 1

     A.  KELAI CORP ............................................................................................. 1

     B.  FAN YANG ............................................................................................... 2

     C.  JAY HUANG ............................................................................................. 6

     D.  LAN "DOE" A/K/A BAOLAN GUAN ...................................................... 8

     E.  QIN "DOE" A/K/A AIQIN YE ................................................................ 8

  II.   PLAINTIFF ................................................................................................. 9

     A.  SHANGGANG FENG ................................................................................ 9

        1.  Term of Employment ..................................................................... 9

        2.  Hiring & Wage Notices ................................................................. 9

        3.  Hours Worked ................................................................................. 14

        4.  Compensation ................................................................................. 21

PROPOSED CONCLUSIONS OF LAW ............................................................................ 24

  I.   DEFENDANTS ARE LIABLE TO PLAINTIFF AS EMPLOYERS ................. 24

     A.  APPEARING DEFENDANTS ..................................................................... 26

     B.  DEFAULTING DEFENDANTS ................................................................... 28

  II.   DEFENDANTS ARE LIABLE TO PLAINTIFF FOR UNPAID MINIMUM WAGES, UNPAID OVERTIME AND UNPAID SPREAD OF TIME ................. 29

     A.  PLAINTIFF WORKED MORE THAN FORTY (40) HOURS EACH WEEK ..................................... 29

     B.  PLAINTIFF'S SALARIES FAILED TO COMPENSATE HIM, AT TIME-AND-A-HALF OR AT ALL, FOR HIS WORK EACH WEEK IN EXCESS OF FORTY HOURS EACH WEEK ..................................... 30

     C.  PLAINTIFF'S SALARIES FAILED TO COMPENSATE HIM WITH AN ADDITIONAL HOUR'S PAY AT THE MINIMUM WAGE FOR EACH DAY HE WORKED A SPREAD OF HOURS GREATER THAN TEN (10) HOURS ..................................... 32

     D.  PLAINTIFF'S SALARIES FAILED TO COMPENSATE HIM AT OR ABOVE THE MINIMUM HOURLY WAGE ..................................... 32

     E.  METHOD OF CALCULATION (*SEE GENERALLY* DAMAGES COMPUTATION) ........................... 37

  III.   DEFENDANTS ARE LIABLE FOR LIQUIDATED DAMAGES ..................... 38

  IV.   PLAINTIFF IS ENTITLED TO PREJUDGMENT INTEREST ......................... 39

  V.   DEFENDANTS ARE LIABLE TO PLAINTIFF FOR UNFURNISHED WAGE NOTICES AND WAGE STATEMENTS ..................................... 40

**VI.    PREVAILING PLAINTIFF IS ENTITLED TO REASONABLE ATTORNEY FEES, COSTS AND EXPENSES** ................................................................................................44

**CONCLUSION** ................................................................................................................44

# **TABLE OF AUTHORITIES**

**Cases**

*Barfield v. New York City Health & Hosp. Corp.*, 537 F.3d 132 (2d Cir. 2008)......................... 25

*Bello v. Proline Pumping Corp.*, No. 22-cv-04081 (RPK) (RML), 2023 U.S. Dist. 106676 (E.D.N.Y. June 20, 2023), *report and recommendation adopted* 2023 U.S. Dist. LEXIS 125632 (July 19, 2023)................................................................................................................ 47, 48

*Bueno v. Buzinover*, No. 22-cv-02216 (PAE) (KHP), 2023 U.S. Dist. LEXIS 38154, 2023 WL 2387113 (S.D.N.Y. Mar. 7, 2023)................................................................................ 45, 46, 47

*Cajero Torres v. Sushi Sushi Holdings, Inc.*, No. 19-cv-02532 (PAE) (RWL)........................... 46

*Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Foundation Contractors, Inc.*, 699 F.3d 230, 234 (2d Cir. 2012)................................................................................ 29

*Cuchimaque v. A. Ochoa Concrete Corp.*, No. 22-cv-06136 (RPK) (RML), 2023 WL 5152336 (E.D.N.Y. July 18, 2023), *report and recommendation adopted by* Order (E.D.N.Y. Aug. 23, 2023)................................................................................................................................ 45

*D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 107 (2d Cir. 2006)...................................... 29

*Fernandez v. HR Parking, Inc.*, 407 F. Supp. 3d 445 (S.D.N.Y. 2019) ...................................... 25

*Gaskin v. Brooklyn Suya Corp.*, No. 22-cv-05648 (ENV) (LB), 2023 U.S. Dist. LEXIS 192893 (E.D.N.Y. Oct. 26, 2023) ........................................................................................ 44

*Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28 (1961)................................................... 24

*Grenawalt v. AT&T Mobility LLC*, 642 Fed. Appx. 36 (2d Cir. 2016) ...................................... 25

*Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132 (2d Cir. 1999) ............................................ 26, 27

*Hong v. White Plains, Inc.*, No. 19-cv-05018 (NSR), 2021 U.S. Dist. LEXIS 62592 (S.D.N.Y. Mar. 31, 2021)................................................................................................................... 48

*Imbarrato v. Banta Mgmt. Servs. Inc.*, No. 18-cv-05422 (NSR), 2020 U.S. Dist. LEXIS 49740, 2020 WL 1330744 (S.D.N.Y. Mar. 20, 2020) ............................................................. 46, 47

*Irizarry v. Catsimatidis*, 722 F.3d 99 (2d Cir. 2013) ................................................................ 27

*Kuebel v. Black & Decker Inc.*, 643 F.3d 352 (2d Cir. 2011)................................................... 30

*Lopez v. Royal Thai Plus, LLC*, No. 16-cv-04028 (NGG) (SJB), 2018 U.S. Dist. LEXIS 20271 (E.D.N.Y. Feb. 6, 2018) ..................................................................................................... 33, 34

*Lynch v. City of New York*, 291 F. Supp. 3d 537 (S.D.N.Y. 2018) ...................................... 28, 30

*Ochoa v. Aucay General Construction, Inc.*, No. 19-cv-03866 (ST), 2020 U.S. Dist. LEXIS 1747071, 2020 WL 9814092 (E.D.N.Y. Sep. 15, 2020) ........................................................... 31

*Perez Garcia v. Hirakegoma Inc.*, No. 17-cv-07608 (SLC), 2020 U.S. Dist. LEXIS 40637, 2020 WL 1130765 (S.D.N.Y. Mar. 9, 2020) ..................................................................... 31

*Pichardo v. El Mismo Rincon Latino Corp.*, No. 17-cv-07439 (FB) (SJB), 2018 U.S. Dist. LEXIS 134792 (E.D.N.Y. Aug. 7, 2018) ...................................................................... 33, 34

*Quiroz v. Luigi's Dolceria, Inc.*, No. 14-cv-00871, 2016 U.S. Dist. LEXIS 64662 (E.D.N.Y. May 17, 2016) .................................................................................................. 34

*Ramirez v. Lin*, 830 Fed. Appx. 672 (2d Cir. 2020) ...................................................... 41

*Romero v. Rung Charoen Sub, Inc.*, No. 16-cv-01239 (VMS), 2017 U.S. Dist. LEXIS 165494 (E.D.N.Y. Sep. 30, 2017) .............................................................................. 34, 41

*Sanchez v. E.I.G. Auto Salvage, Inc.*, No. 21-cv-08266 (PAE) (SN) ........................................ 46

*Shen v. Number One Fresco Tortillas, Inc.*, No. 16-cv-02015 (RWL), 2018 U.S. Dist. LEXIS 205609, 2018 WL 6712771 (S.D.N.Y. Nov. 16, 2018) .......................................... 42

*Stein v. Guardsmark, LLC*, No. 12-cv-04739 (JPO), 2013 U.S. Dist. LEXIS 103131, 2013 WL 3809463 (S.D.N.Y. July 23, 2013) ................................................................. 32

*Stih v. Rockaway Farmers Mkt., Inc.*, No. 22-cv-03228 (ARR) (RER), 2023 WL 2760492 (E.D.N.Y. Apr. 3, 2023) ...................................................................................... 44

*Villanueva v. 179 Third Ave. Rest Inc.*, 500 F. Supp. 3d 219 (S.D.N.Y. 2020) ........................... 42

*Yang Shen v. GJ Grp. USA Inc.*, No. 19-cv-02212 (ERK) (PK), U.S. Dist. LEXIS 171562 (E.D.N.Y. Sep. 8, 2021) ...................................................................................... 32

*Yunganaula v. Garcia*, No. 19-cv-06247 (EK) (SJB), 2021 U.S. Dist. LEIXS 151498 (E.D.N.Y. Aug. 11, 2021) ................................................................................................ 33

*Zheng v. Liberty Apparel Co., Inc.*, 355 F.3d 61 (2d Cir. 2003) ...................................... 24, 25, 26

*Zhou v. Aberdeen Dim Sum & Seafood Inc.*, No. 14-cv-02014 (VB), 2016 U.S. Dist. LEXIS 147337 (S.D.N.Y. Oct. 24, 2016) .......................................................................... 35

## Statutes

N.Y. Lab. L. § 195.1(a) ............................................................................................. 40

N.Y. Lab. L. § 198(1-b) ........................................................................................... 40

N.Y. Lab. L. § 663.1 ............................................................................................... 39

**Rules**

Fed. R. Civ. P. 54(d) ................................................................................................ 49

N.Y. C.P.L.R. § 5004 .............................................................................................. 42

S.D.N.Y. L. Civ. R. 55.2(b) .................................................................................... 29

**Regulations**

12 N.Y.C.R.R. § 146-1.2(a)(1)(i) ............................................................................. 1

12 N.Y.C.R.R. § 146-1.6 ......................................................................................... 32

12 N.Y.C.R.R. § 146-2.2(d) .................................................................................... 33

12 N.Y.C.R.R. § 146-3.5(b) .................................................................................... 31

29 C.F.R. § 785.11 .................................................................................................. 29

Plaintiff Shanggang Feng, by and through counsel, hereby submits the following proposed findings of fact and conclusions of law following trial of this matter:

## PROPOSED FINDINGS OF FACT

### I. DEFENDANTS

#### a. KELAI CORP

Jef Chinese Restaurant was during the period relevant to this lawsuit a Chinese restaurant doing business at 913 Second Avenue, New York, NY 10017, operated by Kelai Corp. *See* Dkt. No. 64 § VII(3); *see also* Tr. 11:13–25, 13:4–7; Ex. 3, Ex. 4, Ex. 6, Ex. A, Ex. A1, Ex. C; Tr. 70:18–19. During the period relevant to this lawsuit, Kelai Corp. was a covered employer under the Fair Labor Standards Act ("FLSA") and had more than $500,000.00 in gross annual revenue. *See* Ex. A1, at *D347 ("1a gross receipts or sales… [$]510,936"). Throughout the period relevant to this lawsuit, Kelai Corp's records reflect that it was wholly owned by Fan Yang, (*see* Ex. A, at *D280 (2016), D316 (2017); Ex. A1, at *D354 (2018)), but Fan Yang and Jay Huang both considered themselves equal shareholders owning 50% apiece of Kelai Corp even if they kept Jay Huang "off the books." *See* Tr. 100:8–10 (Fan Yang identifying Jay Huang as an "investor"), 100:19–101:6 (Fan Yang testifying that he was the sole shareholder "on the books," but that Jay Huang was a shareholder "off the books."), 141:16–142:13 (Jay Huang identifying himself and Fan Yang as "investors" in Kelai Corp, each contributing "about $50,000.00," and testifying that he received "50 percent in ownership" of shares of Kelai Corp). Throughout the period relevant to this lawsuit, Kelai Corp was a "large employer" within the meaning of the Hospitality Industry Wage Order ("Wage Order"). *See* 12 N.Y.C.R.R. § 146-1.2(a)(1)(i) ("Large employer" employes "eleven or more employees"); *see also* Tr. 38:14–18 (Shanggang Feng testifying that he had 10–12 coworkers in 2017 and 2018, *i.e.*, 11–13 employees total including himself), 104:21–105:2 (Fan Yang testifying, upon being confronted with his deposition testimony, that it was possible that

Kelai Corp had more than 10 employees in 2017); *see also* Ex. A, at *D285 (omitting "Number of New York State employees" in 2016 while noting $80,354.00 paid in wages), D303 (omitting "No. of Employees" in 2016), D321 (omitting "Number of New York State employees" in 2017 while noting $76,742.00 paid in wages), D340 (omitting "No. of Employees" in 2017); Ex. A1, at *D358 (omitting "Number of New York State employees" in 2018 while noting $86,948.00 paid in wages), *D377 (omitting "No. of Employees" in 2018); Ex. 5,[1] at *136–146 (listing seven tipped employees—Jichao Jia, Baomei Gao, Hui Chen, Ruzheng Qiu, Xiuhua Zhao, Zhiqiang Huang, and [Shanggang] Feng—between December 31, 2016 and January 13, 2017), 147–213 (listing same seven tipped employees between January 1, 2018 and March 31, 2018); Ex. E2, at *2–318 (listing same seven tipped employees between January 2, 2017 and December 31, 2017).

### b. FAN YANG

Shanggang Feng regarded Fan Yang to be a "boss" of Jef Chinese. *See* Tr. 39:22–24. Throughout the period relevant to this lawsuit, Fan Yang was a shareholder of Kelai Corp. *See* Ex. A, at *D280 (2016), D316 (2017); Ex. A1, at *D354 (2018)); *see also* Tr. 70:7–17. Throughout the period relevant to this lawsuit, Fan Yang was the President of Jef Chinese. *See* Ex. A, at *D273, D309; Ex. A1, at *D346; *see also* Tr. 87:10–17.

Fan Yang incorporated Kelai Corp to take over the premises of Jef Chinese restaurant from his in-laws when their restaurant's lease expired. *See* Tr. 70:20–72:1. Fan Yang only went to Jef Chinese restaurant rarely, and restricted line employees' access to him. *See* Tr. 41:9–42:3, 44:1–4, 84:13–18. However, Fan Yang spent between one and two hours every two weeks working for Kelai Corp. *See* Tr. 88:24–89:4. Further, Fan Yang, along with Jay Huang, decided to suffer and permit the existing employees of his in-laws' restaurant to keep working at Jef Chinese, and for

---

[1] *See also* Ex. E, but Ex. E redacts the names of the other employees.

the existing managers of his in-laws' restaurant, including Aiqin Ye, to keep managing Jef Chinese on their behalf. *See* Tr. 72:6–25. Fan Yang was responsible for Kelai Corp's payroll, and in exercise of his responsibilities, collected timesheets and pay records from Aiqin Ye at his [Fan Yang's] house, forwarded them to Kelai Corp's accountant, "d[id] the payroll," wrote employees' paychecks, and gave employees' paychecks to Aiqin Ye to give to the employees. *See* Tr. 73:3–6, 75:1–76:14, 85:14–25, 88:24–89:10, 108:15–19. Fan Yang signed Shanggang Feng's paychecks. *See* Ex. 4; *see also* Tr. 36:14–37:13, 39:25–40:3, 108:22–109:2. From time to time, Fan Yang conferred with Aiqin Ye regarding how to address employees' requests for leave and other issues. *See* Tr. 74:18–25. Fan Yang kept Aiqin Yin apprised of the minimum wage, and of what the employees' regular hours should be. *See* Tr. 87:18–88:17, 98:3–5, 103:16–22. Fan Yang directed Aiqin Ye to direct employees to sign their timesheets. *See* Tr. 76:15–17. Fan Yang directed Aiqin Ye to treat employees' time between 3:00 PM and 6:00 PM as nonworking time. *See* Tr. 82:6–83:7. After Jef Chinese closed due to COVID-19, Fan Yang removed those records stored on its premises to his home. *See* Tr. 78:12–20, 122:11–17; *see also* Tr. 105:3–5 (admitting to keeping and maintaining Kelai Corp's records). Fan Yang, along with his wife, Joyce Huang (Jay Huang's cousin) prepared Shanggang Feng's wage notice dated January 7, 2018. *See* Ex. C, at *D019; *see also* Tr. 110:14–11. He also prepared, in part, Shanggang Feng's wage notices dated January 24, 2017 and August 15, 2016. *See* Tr. 111:17–112:23. Fan Yang, in preparation of this lawsuit, prepared the Microsoft Excel spreadsheet that formed the basis of Exhibits 1 and B, inputting information from the TimeStation timekeeping app and other sources. *See* Tr. 94:23–96:4, 107:19–108:8. Fan Yang, along with Jay Huang, was the principal of Kelai Corp's liquor license. *See* Ex. 6.

Fan Yang is generally in-credible, having perjured himself as to a wide variety of material facts. He testified that he signed Kelai Corp's tax returns, *see* Tr. 85:7–13, but Kelai Corp's 2016, 2017, and 2018 tax returns are not signed. *See* Ex. A, at *D272 ("Officer's signature" line is blank), D273 ("Signature of authorized officer of the corporation" line is blank), D274 ("Signature of officer" line is blank), D295 ("Signature of authorized person" line is blank), D306 ("Signature of officer" line is blank), D307 ("Signature of authorized person" line is blank), D308 ("Officer's signature" line is blank), D309 ("Signature of authorized officer of the corporation" line is blank), D310 ("Signature of officer" line is blank), D320 ("Signature of authorized person" line is blank), 331 ("Signature of authorized person" line is blank), D343 ("Signature of officer" line is blank), D344 ("Signature of authorized person" line is blank); Ex. A1, at *D345 ("Officer's signature" line is blank), D346 ("Signature of authorized officer of the corporation" line is blank), D347 ("Signature of officer" line is blank), D357 ("Signature of authorized person" line is blank), D368 ("Signature of authorized person" line is blank), D381 ("Signature of officer" line is blank), D382 ("Signature of authorized person" line is blank). He testified falsely, reading from Form 8879-C, Part I, Line 1 (equals "Total Income" from Line 11 of Form 1120) that in 2018, Kelai Corp's gross annual revenue only amounted to $447,624.00. *See* Tr. 86:17–19; *see also* Ex. A1, at *D345, D347 (Line 1a, "Gross receipts or sales," reflects $510,936.00 for the calendar year 2018). For 2016 and 2017, he was perfectly capable of reading from Line 1a of form 1120. *See* Tr. 86:9–16; *c.f.* Ex. A, at *D274 ($447,002.00 in testimony, $447,002.00 on the page), D310 ($455,338.00 in testimony, $455,338.00 on the page). Fan Yang has a bachelor's degree in accounting, *see* Tr. 69:4–18, and a sixteen-year (16-year) career in banking going back to 2007. *See* Tr. 69:19–70:6. He should well know better than to substitute Total Income for Gross Receipts or Sales. Indeed, he admitted on

cross that Kelai Corp had more than $500,000.00 in gross annual revenue in 2018. *See* Tr. 96:5–21.

He testified that Baolan Guan did not serve as a substitute manager for Jef Chinese, having previously testified at deposition that she did. *See* Tr. 92:12–93:13. He attempted to explain this by saying that Baolan Guan did not have the title "manager," *see* Tr. 93:14–17, but this is a weak excuse. He consistently characterized Jay Huang as an investor despite his ownership interest being totally off the books. *See* Tr. 89:16–90:8, 100:8–10 (Fan Yang identifying Jay Huang as an "investor"), 100:19–101:6 (Fan Yang testifying that he was the sole shareholder "on the books," but that Jay Huang was a shareholder "off the books."). He testified on direct that only Aiqin Ye had authority to hire or fire employees, *see* Tr. 74:2–3, but on cross admitted that he also had that authority "from the books," even if he delegated and chose not to exercise it himself. *See* Tr. 96:25–97:1, 97:23–98:2, 102:13–20. He had previously testified at deposition that Aiqin Ye needed his permission before hiring a new employee—that he would "make the final decision." *See* Tr. 98:2–22, 103:1–15. He testified on direct that his involvement in setting employees' wages was making sure they made more than the minimum wage, but at deposition he had previously testified that he was the sole person who determined employees' salaries at Jef Chinese restaurant. *See* Tr. 98:3–16. When confronted with that deposition testimony, he claimed that it wasn't true despite having been under oath at the time. *See* Tr. 98:18–22. Fan Yang testified at trial that Kelai Corp's accountant gave him minimum wage notices to post at Jef Chinese restaurant, and that he gave those notices to Aiqin Ye to post; but at deposition he had testified that at no point after 2015 had he obtained, from an accountant or elsewhere, notices to post in the restaurant. *See* Tr. 103:23–104:15. At trial, he denied Kelai Corp's having more than ten (10) employees in 2017, before being confronted with his deposition testimony admitting there were could have been more than ten (10)

employees in 2017. *See* Tr. 104:16–105. At trial, he denied that Aiqin Ye informed him that from time to time Jef Chinese restaurant's delivery employees would make deliveries between 3:00 PM and 6:00 PM even though they weren't supposed to, despite having previously testified to such at deposition. *See* Tr. 106:9–13.

Fan Yang was unable to testify as to the reasons for certain discrepancies between the various records of Shanggang Feng's working days. *See* Tr. 124:18–127:15, 128:5–130:19; *see also infra* for a thorough recounting of the discrepancies.

Fan Yang also testified that Jay Huang was "just an investor" in Kelai Corp and wasn't involved at all in Jef Chinese's business. *See* Tr. 89:16–90:8. But at deposition, Fan Yang identified Jay Huang as a "manager" of Jef Chinese, along with himself, Baolan Guan and Aiqin Ye—and in particular, testified that Jay Huang exercised financial control and communicated with the accountant. *See* Tr. 99:5–100:18; *see also* Tr. 144:1–5, 146:7–12 (Jay Huang testifying that he did communicate with the accountant *in lieu* of Fan Yang after the birth of the latter's child). At trial, he disclaimed these statements made under oath. Fan Yang also testified at deposition that Jay Huang had advised him about whether to hire more staff or to cut existing staff, and at trial denied that any such conversation ever took place. *See* Tr. 101:7–102:8. At trial he denied that Jay Huang kept records for Kelai Corp, but at deposition he had testified that Jay Huang did keep records for Kelai Corp. *See* Tr. 105:8–25.

### c.  JAY HUANG

In addition to the above, Jay Huang was an experienced restauranteur operating multiple businesses together with various partners. *See* Tr. 90:9–12, 148:23–9. Shanggang Feng considered Jay Huang to be a "boss" of Jef Chinese. *See* Tr. 39:16–17. Jay Huang had the title "Vice President" of Kelai Corp. *See* Tr. 151:21–25. Throughout the period relevant to this lawsuit, Kelai Corp's records reflect that it was wholly owned by Fan Yang, (*see* Ex. A, at *D280 (2016), D316

(2017); Ex. A1, at *D354 (2018)), but Fan Yang and Jay Huang both considered themselves equal shareholders owning 50% apiece of Kelai Corp even if they kept Jay Huang "off the books." *See* Tr. 72:2–3, 100:8–10 (Fan Yang identifying Jay Huang as an "investor"), 100:19–101:6 (Fan Yang testifying that he was the sole shareholder "on the books," but that Jay Huang was a shareholder "off the books."), 141:16–142:13 (Jay Huang identifying himself and Fan Yang as "investors" in Kelai Corp, each contributing "about $50,000.00," and testifying that he received "50 percent in ownership" of shares of Kelai Corp). Jay Huang is Lan "Doe's" (Baolan Guan's, *see infra*) son and the cousin of another worker at Jef Chinese. *See* Tr. 39:18–21. Jay Huang is also the cousin of Fan Yang. *See* Tr. 89:18–19. Jay Huang only went to Jef Chinese restaurant rarely, including to fix the point of sale system if it broke down, and restricted line employees' access to him. *See* Tr. 41:9–42:3, 44:1–4, 151:13–20.

However, Jay Huang, along with Fan Yang, decided to suffer and permit the existing employees of Fan Yang's in-laws' restaurant to keep working at Jef Chinese, and for the existing managers of his in-laws' restaurant, including Aiqin Ye, to keep managing Jef Chinese on their behalf. *See* Tr. 72:6–25. Jay Huang, along with Fan Yang, was the principal of Kelai Corp's liquor license. *See* Ex. 6; *see also* Tr. 142:21–143:3. Jay Huang instructed Fan Yang as to how to go about incorporating Kelai Corp and obtaining a certificate of authority to collect sales tax. *See* Tr. 142:14–20. Jay Huang was the guarantor of Kelai Corp's lease of the premises of Jef Chinese restaurant. *See* Tr. 143:4–9. Jay Huang directed Aiqin Ye to comply, and how to comply, with New York's liquor law. *See* Tr. 151:7–12. Jay Huang advised Fan Yang about how to comply with New York's labor law in terms of obtaining signatures on wage notices and paying the minimum wage; and apprised Fan Yang of changes in the minimum wage rate. *See* Tr. 153:21–156:2.

Like Fan Yang, Jay Huang is less than credible. He testified that he received shares of Kelai Corp despite not being listed as a shareholder on its tax returns. *See* Tr. 142:9–13, 149:21–150:17; *c.f.* Exs. A, A1. He testified on direct that Fan Yang did not have authority to hire employees, but had previously testified at deposition that Fan Yang did have such authority. *See* Tr. 152:1–153:20. Initially at trial, he testified that the Jef Chinese restaurant was or should have been closed for delivery between 3:00 PM and 6:00 PM, but at deposition he testified that it would accept delivery orders during that time. *See* Tr. 156:17–157:7.

### d.  Lan "Doe" a/k/a Baolan Guan

Lan "Doe's" full name is Baolan Guan. *See* Tr. 13:19–22, 14:2–5. Shanggang Feng typically called her, and knew her best as, "Ah Lan." *See* Tr. 14:6–11. Baolan Guan is Fan Yang's mother-in-law. *See* Tr. 92:4–11. Together with Aiqin Ye, Baolan Guan interviewed Shanggang Feng for the position of delivery person at Jef Chinese restaurant, and following the interview decided to hire him. *See* Tr. 13:19–17:24. Together with Aiqin Ye, Baolan Guan was Shanggang Feng's immediate supervisor. *See* Tr. 40:25–41:8; 42:6–8, 43:20–25, 44:15–17, 92:12–93:13. Shanggang Feng thought about complaining, but didn't complain for fear of being fired, to Baolan Guan about only being paid for eight (8) hours per day despite working eleven (11). *See* Tr. 44:18–45:10.

### e.  Qin "Doe" a/k/a Aiqin Ye

Qin "Doe's" full name is Aiqin Ye. *See* Tr. 13:19–14:1; 72:11–20.[2] Shanggang Feng typically called her, and knew her best as, "Ah Qin." *See* Tr. 14:6–11. Together with Baolan Guan, Aiqin Ye interviewed Shanggang Feng for the position of delivery person at Jef Chinese restaurant, and following the interview decided to hire him. *See* Tr. 13:19–17:24. Together with Baolan Guan,

---

[2] The trial transcript misspells this name as "Ah Qin Ye," combining the nickname by which Shanggang Feng best knew her and her last name.

Aiqin Ye was Shanggang Feng's immediate supervisor. *See* Tr. 40:25–41:8; 42:6–8, 43:20–25, 44:15–17. Shanggang Feng thought about complaining, but didn't complain for fear of being fired, to Aiqin Ye about only being paid for eight (8) hours per day despite working eleven (11). *See* Tr. 44:18–45:10.

Fan Yang, along with Jay Huang, decided to suffer and permit the existing employees of his in-laws' restaurant to keep working at Jef Chinese, and for the existing managers of his in-laws' restaurant, including Aiqin Ye, to keep managing Jef Chinese on their behalf. *See* Tr. 72:6–25; 73:24 – 74:1. Aiqin Ye had authority to hire and fire employees of Kelai Corp, and determined employees' rates of pay and schedules. *See* Tr. 74:2–11. Aiqin Ye prepared and presented Shanggang Feng with such a wage notice to sign on August 15, 2016, six (6) days after his interview—but took it back after he signed it and did not give him a copy. *See* Tr. 15:21–17:21; *see also* Ex. C, at *D016. Aiqin Ye determined Shanggang Feng's work schedule. *See* Tr. 20:10–13. Aiqin Ye supervised Shanggang Feng, including telling him to work if he was on a meal break and work needed to be done. *See* Tr. 28:20–25. Aiqin Ye determined Shanggang Feng's pay rate and gave him a raise. *See* Tr. 32:7–9.

## II.    PLAINTIFF

### a.    SHANGGANG FENG

#### 1. Term of Employment

Shanggang Feng worked for Jef Chinese restaurant as a delivery person from August 10, 2016 through October 14, 2018. *See* Tr. 11:13–25, 13:4–14, 60:19–23; *see also* Ex. 1, *passim*; Ex. 2, at *39 (first half of October 2018); Ex. D, at *D058 (same).

#### 2. Hiring & Wage Notices

Shanggang Feng learned about the job opening at Jef Chinese restaurant through an acquaintance, and interviewed for the position with Aiqin Ye and Baolan Guan on August 9, 2016.

*See* Tr. 13:15–14:13. During Shanggang Feng's interview, Aiqin Ye and Baolan Guan did not discuss his expected schedule, base compensation (though they did inform him that he could expect to receive "some tips"), or pay frequency with him. *See* Tr. 14:14–19, 15:8–10. Despite informing him that he could expect to receive "some tips," Aiqin Ye and Baolan Guan did not inform Shanggang Feng during his interview, either verbally or in writing, that there would a tip credit taken against his wage or explain to him what a tip credit was. *See* Tr. 14:20–15:7. During his interview, Aiqin Ye and Baolan Guan did not give Shanggang Feng a document to keep setting forth his compensation, whether there would be a tip credit taken, or how often he would be paid. *See* Tr. 15:11–20.

Aiqin Ye did present Shanggang Feng with such a document to sign on August 15, 2016, six (6) days later—but took it back after he signed it and did not give him a copy. *See* Tr. 15:21–17:21, 112:24–113:3; *see also* Ex. C, at *D016. That document was riddled with both factual falsehoods and legal deficiencies. It would inform a reader that Shanggang Feng's pay rate was $7.50 per hour, and that the employer was applying a tip credit of $1.50 per hour. There are two problems with this. First, it is not unambiguous on the face of the document whether the $7.50 cent per hour rate is supposed to be net—after the application of the tip credit—or gross; though others of Defendants' records clarify that the intention was to be net (and thus the gross hourly rate would be $9.00 per hour, a rate which appears nowhere on the face of the document). *C.f.* Ex. C, at *D016; Ex. D2, at *1. Second, it is not true. Shanggang Feng's initial pay rate was $60.00 per day. *See* Ex. C, at *D016; *c.f.* Ex. D2, at *1 ($60.00 per day ostensibly derived by paying $7.50 per hour for recorded workdays each of exactly eight (8) hours); Ex. 1 (recording different numbers of hours for those same workdays); Ex. B (same); Tr. 31:10–18. It would inform a reader that Shanggang Feng would be paid every Tuesday, when in fact he was paid once every half-month for semi-

10

monthly pay periods. *See* Ex. C, at *D016; *c.f.* Ex. 2; Ex. 4, at *2 (check dated June 1, 2018; memo noting pay period of "5-15 – 5-31" 2018); Ex. D; Ex. D2; Tr. 34:12–13. It would inform a reader that Shanggang Feng would be paid $11.25 per overtime hour, *i.e.*, ($9.00 per hour – $1.50 per hour) * 1.5, despite this calculation method being expressly unlawful. *See* Ex. C, at *D016; *c.f.* 12 N.Y.C.R.R. § 146-1.4 ("When an employer is taking a credit toward the basic minimum hourly rate pursuant to section 146-1.3 of this Subpart, the overtime rate shall be the employee's regular rate of pay before subtracting any tip credit, multiplied by 1½, minus the tip credit. It is a violation of the overtime requirement for an employer to subtract the tip credit first and then multiply the reduced rate by one and one half." *I.e.*, the correct calculation method, assuming without conceding a base hourly rate of $9.00 per hour and tip credit of $1.50 per hour, would be ($9.00 per hour * 1.5) – $1.50 per hour = $12.00 per hour). Furthermore, Shanggang Feng was not paid his ostensible overtime rate even when his net recorded hours per week exceeded forty (40). *See* Ex. 1, at *D001 (recording six (6) days of work and forty-four (44) hours after deductions of ostensible break hours and after rounding to the nearest tenth of an hour between Monday, August 15, 2016 and Sunday, August 21, 2016), D003 (recording five (5) days of work and forty and one tenth (40.10) hours after deductions of ostensible break hours and after rounding to the nearest tenth of an hour between Monday, November 14, 2016 and Sunday, November 20, 2016), D012 (recording six (6) days of work and forty-six (46) hours after deductions of ostensible break hours between Monday, May 7, 2018 and Sunday, May 13, 2018); Ex. B, at *D001, D003, D012 (same); *c.f.* Ex. 2, at *29 (recording six (6) days of work at eight (8) hours apiece after deducting ostensible break hours, *i.e.*, forty-eight (48) hours, between Monday, May 7, 2018 and Sunday, May 13, 2018; but paying $8.00 per hour for each hour including the eight (8) recorded overtime hours, yielding a flat $64.00

per day for each workday); Ex. D, at *D048 (same).[3] Not that Shanggang Feng had an opportunity

to review the document before he had to get back to work—he spent about thirty (30) seconds

signing it before returning it to Aiqin Ye, and did not read it. *See* Tr. 16:21–17:1.

Subsequent wage notices are on their face plagued by many of the same falsehoods and

deficiencies as the August 15, 2016 notice, as well as some new ones. The notice dated January

24, 2017 provided for a (presumably net) pay rate of $7.50 per hour and tip credit of $3.00 per

hour (yielding a gross wage of $10.50 per hour). *See* Ex. C, at *D018. $10.50 per hour was the

2017 minimum wage for small employers in New York City, *see* 12 N.Y.C.R.R. § 146-

1.2(a)(1)(i)(b), but Kelai Corp was a large employer. *See* Tr. 38:14–18, 104:21–105:2. But

regardless of whether Kelai Corp was a large or small employer, a $7.50 net cash wage was less

than that permitted to service employees (*e.g.*, delivery people), and $3.00 per hour was greater

than the maximum tip credit permitted from service employees, in 2017. *See* 12 N.Y.C.R.R. §§

3.3(a) ("A *service employee* is an employee, other than a food service worker or fast food

employee, who customarily receives tips at or above the Tip Threshold rate listed at subdivision

(a) of section 146-1.3 of this Subpart."), 3.4(a) ("The term *food service worker* shall not include

delivery workers."); 1.3(a)(1)(i)(a) (minimum $9.15 per hour cash wage and maximum $1.85 per

hour tip credit for service employees of large employers in New York City); 1.3(a)(1)(i)(b)

(minimum $8.75 per hour cash wage and maximum $1.75 per hour tip credit for service employees

of large employers in New York City). The notice dated January 24, 2017 provided for bi-weekly

rather than Shanggang Feng's actual semi-monthly pay periods, and omitted a pay day. *See* Ex. C,

at *D018. The notice dated January 24, 2017 again calculated Shanggang Feng's ostensible

overtime pay rate wrongly. *See* Ex. C, at *D018 (($10.50 per hour – $3.00 per hour) * 1.5 = $11.25

---

[3] Exhibits 2, D, and D2 are missing records for the second halves of August and November 2016.

per hour; the correct method and result, assuming without conceding that the hourly rate and tip credit inputs were correct, would have been ($10.50 per hour * 1.5) – $3.00 per hour = $12.75 per hour).

The notice dated January 7, 2018 omitted to say whether it was given at hiring or before a change in pay rate. *See* Ex. C, at *D019. It provided for a (presumably net) pay rate of $8.00 per hour and tip credit of $4.00 per hour (yielding a gross wage of $12.00 per hour). *See* Ex. C, at *D018. $12.00 per hour was the 2018 minimum wage for small employers in New York City, *see* 12 N.Y.C.R.R. § 146-1.2(a)(1)(i)(b), but Kelai Corp was a large employer. *See* Tr. 38:14–18, 104:21–105:2. But regardless of whether Kelai Corp was a large or small employer, an $8.00 net cash wage was less than that permitted to service employees, and $4.00 per hour was greater than the maximum tip credit permitted from service employees, in 2018. *See* 12 N.Y.C.R.R. §§ 1.3(a)(1)(i)(a) (minimum $10.85 per hour cash wage and maximum $2.15 per hour tip credit for service employees of large employers in New York City); 1.3(a)(1)(i)(b) (minimum $10.00 per hour cash wage and maximum $2.00 per hour tip credit for service employees of large employers in New York City). The notice dated January 7, 2018 provided for bi-weekly rather than Shanggang Feng's actual semi-monthly pay periods, and omitted a pay day. *See* Ex. C, at *D018. The notice dated January 7, 2018 again calculated Shanggang Feng's ostensible overtime pay rate wrongly. *See* Ex. C, at *D018 (($12.00 per hour – $4.00 per hour) * 1.5 = $12.00 per hour; the correct method and result, assuming without conceding that the hourly rate and tip credit inputs were correct, would have been ($12.00 per hour * 1.5) – $4.00 per hour = $14.00 per hour).

Most egregiously, however, Shanggang Feng was not given, and did not sign, the wage notices dated January 17, 2017 and January 7, 2018; his signatures were forged by someone else (who, moreover, misspelled his first name with variations of "Shenggang," with an "e," as opposed

13

to "Shanggang" with an "a"). *See* Ex. C, at *D018 (employee name above "Print Employee Name" line spelled "Shang Gang Feng;" signature above "Date" line spelled "sheng gang Feng"), D019 (employee name above "Print Employee Name" line spelled SHANG GANG FENG" in what appears to be the same handwriting as "FAN YANG" above Preparer's Name and Title" line; signature above "Employee Signature" line spelled "Sheng gang Feng"). *See* Tr. 32:14–34:11.

Shanggang Feng did not have prior knowledge of the federal and state laws governing minimum wages and maximum hours from restaurant delivery jobs he worked before working at Jef Chinese restaurant, and did not gain any such knowledge while working at Jef Chinese restaurant. *See* Tr. 17:25–20:5; *see also* Tr. 37:14–39:1. At his last job before working at Jef Chinese restaurant, Shanggang Feng worked forty (40) hours per week for $1,200.00 per month ($1,200.00 per month * 12 months per year / 52 weeks per year = $276.92 per week), and was given the impression that his pay would be higher at Jef Chinese restaurant. *See* Tr. 18:19–19:22. In the event, it was ($60.00 per day * 5 days per week = $300.00 per week), but nonprovision of notice concealed that this superior offer was not a lawful offer. *See* Tr. 43:7–19 ("At that time, I didn't know there was an issue with my pay…. I didn't know I had an issue with my pay because I didn't know the New York State law.").

### 3. Hours Worked

At Jef Chinese restaurant, Shanggang Feng typically worked five (5) days per week, from about 11:00 AM through about 10:00 PM. *See* Tr. 20:6–9, 14–16; *see also* Ex. 1 (Time Station clock-in and clock-out records, reflecting times in no earlier than 10:00 AM, no later than 2:21 PM, on average 11:09 AM, and most commonly 11:00 AM; and reflecting times out no earlier than 8:15 PM, no later than 10:54 PM, on average 9:37 PM, and most commonly 10:00 PM); Ex. B (same); Ex. 2 (handwritten time and pay records); Exs. D, D2 (same); Ex. 5 (tip-out records showing days worked); Exs. E, E2 (same); demonstrative (setting the information from Exs. 1 and

14

B, Exs. 2, D, and D2, and Exs. 5, E, and E2, *inter alia* side by side for ease of comparison; reflecting no fewer than four (4), no more than (6), and on average and most commonly five (5) days per week). There was no time between his arrival and departure times when Shanggang Feng was completely relieved from work. *See* Tr. 20:17–21:4. Even between the lunch and dinner rushes (*i.e.*, between about 3:00 and about 6:00 PM), Shanggang Feng was required to remain on call to deliver orders, because he was the only delivery person on staff; in between deliveries, he would do side work amounting to between 1 and 2 hours per day. *See* Tr. 21:5–22:3, 23:8–24:2 (on October 13, 2018, left restaurant at about 4:00 PM to deliver order to Thomas Hasslewander by 4:08 PM), 24:3–12 (Danielle Loeser placed an order at 4:58 PM for delivery by 5:30 PM), 24:13–25 (on October 11, 2018, left restaurant at about 4:00 PM to deliver order to Mara Gruen by 4:12 PM), 25:1–9 (on October 9, 2018, Alexis D. placed on order at 1:45 PM for delivery by 3:30 PM and it was so delivered), 25:10–20 (on October 9, 2018, Ezinne A. placed an order at 3:30 PM for delivery by 5:14 PM and it was so delivered), 25:21–26:5 (on October 14, 2018, Danielle Feldman placed an order at 3:36 PM for delivery by 5:21 PM and it was so delivered), 26:6–14 (on October 9, 2018, Jerry Chang placed on order at 5:44 PM for delivery by 6:45 PM and it was so delivered), 26:15–23 (on October 14, 2018, Alberto Riveron placed an order at 4:06 PM for delivery by 5:51 PM and it was so delivered), 26:24–27:4 (on October 11, 2018, Laura Le placed an order for delivery by 6:17 PM and it was so delivered), 27:5–14 (on October 14, 2018, a customer who would be paying by cash placed an order for rush delivery by 5:40 PM), 27:15–28:8 (side work), 58:18–59:19 (side work), 45:22–48:19; *see also* Ex. 3.[4] Shanggang Feng had about five (5) to eight (8) minutes to eat a single meal each day, which meal Aiqin Ye could and did interrupt if there was work to be done. *See* Tr. 28:9–25.

---

[4] Shanggang Feng threw away most of the receipts that had come into his possession, and all of those from before October 9, 2018, shortly after they came into his possession, for seeming lack of utility. *See* Tr. 62:13–17, 63:22–64:4.

Shanggang Feng's work days and working times were recorded, variously, on the TimeStation app by Fan Yang—*see* Exs. 1, B; *see also* Tr. 95:16–18, 106:1–8—and by Shanggang Feng by hand, *see* Exs. 2, D, D2, Tr. 29:1–30:8; his working days are also reflected in Defendants' tip-out records (the TimeStation app also purports to record tips). *See* Exs. 5, E, E2; *see also* demonstrative. During the periods they cover, these records are less than perfectly consistent with each other about which days Shanggang Feng worked. On August 20, 21, and 28, and December 15 and 29,[5] 2016, and on January 14,[6] 2018, the TimeStation app reflects that Shanggang Feng worked and received tips, but the tip-out records reflect that he did not receive tips. *See* demonstrative. On August 26, September 15,[7] and December 13, 14, and 19, 2016, July 1, 2017, and February 16, 2018, the tip-out records reflect that Shanggang Feng received tips, but the TimeStation app does not reflect that Shanggang Feng worked or received tips. *See id.* On October 11, 2016 and January 11, 2017, the handwritten time records reflect that Shanggang Feng worked, and the tip-out records reflect that he received tips, but the TimeStation app does not reflect that he worked or received tips. *See id.* On October 12, 2016, the handwritten time records reflect that Shanggang Feng worked, and the TimeStation records reflect that he worked and received tips, but the tip-out records do not reflect that he received tips.[8] *See id.* On August 15 and December 11, 2017, and April 26,[9] May 24,[10] June 11[11] and 21,[12] July 3,[13] 10,[14] and 15,[15] and October 8,[16]

---

[5] The record for December 29, 2016 is missing from Exhibits 5 and E.
[6] The record for January 14, 2018 is missing from Exhibits 5 and E.
[7] September 15, 2016's tip-out record is out of order. It appears in Ex. 2, at *17 and in Ex. E, at *D075.
[8] The tip-out record that appears in Ex. 2, at *58, and in Ex. E, at *D116 says on its face that it is for October 12, 2017. A completely different tip-out record for October 12, 2017 appears at Ex. E2, at *239.
[9] The record for April 26, 2018 is missing from Exhibits 5 and E.
[10] The record for May 24, 2018 is missing from Exhibits 5 and E.
[11] The record for June 11, 2018 is missing from Exhibits 5 and E.
[12] The record for June 21, 2018 is missing from Exhibits 5 and E.
[13] The record for July 3, 2018 is missing from Exhibits 5 and E.
[14] The record for July 10, 2018 is missing from Exhibits 5 and E.
[15] The record for July 15, 2018 is missing from Exhibits 5 and E.
[16] The record for October 8, 2018 is missing from Exhibits 5 and E.

2018, the handwritten time records reflect that Shanggang Feng worked, but the TimeStation app does not reflect that he worked or received tips, and the tip-out records do not reflect that he received tips. *See id.* The handwritten time records and tip-out records have long *lacunae* in them: the handwritten time records from August 1 through September 15, from October 15 through 31, and from November 16 through December 31, 2016, from July 1 through 15, 2017, and from January 1 through March 15, 2018 (*see* Exs. 2, D, D2); the tip-out records from August 1 through 15, 2016, from June 1 through 15, 2017, and from April 1 through October 15, 2018. *See* Exs. 5, E, E2. Nevertheless, it is generally apparent that from August 10, 2016 through February 26, 2017, Shanggang Feng usually worked Mondays through Fridays; that from February 27, 2017 through March 12, 2017, Shanggang Feng usually worked Mondays through Thursdays and Sundays; that from March 13, 2017 through October 14, 2018, Shanggang Feng usually worked Mondays, Tuesdays, Thursdays, Saturdays, and Sundays. *See id.*

Defendants' TimeStation and tip-out records are likewise less than perfectly consistent in recording Shanggang Feng's tips, and from time to time where they are consistent, that consistency is achieved by fudging the addition of Shanggang Feng's cash and credit card tips in the tip-out records, as follows (*see* demonstrative; *c.f.* Exs. 1, B; Exs. 5, E, E2):

| Date | Exhibits 1, B | Exhibits 5, E, E2 |
|---|---|---|
| August 16, 2016 | $80.90 | $62.91 |
| August 17, 2016 | $72.20 | $85.70 |
| August 18, 2016 | $70.45 | $51.60 (but $3.75 cash + $47.90 card = $51.65) |
| August 20, 2016 | $32.15 | $0.00 |
| August 21, 2016 | $70.07 | $0.00 |
| August 22, 2016 | $57.27 | $23.97 |
| August 23, 2016 | $76.95 | $52.33 |
| August 24, 2016 | $48.45 | $52.46 |
| August 25, 2016 | $70.55 | $62.45 |
| August 26, 2016 | $0.00 | $61.55 |
| August 28, 2016 | $44.65 | $0.00 |
| August 29, 2016 | $88.12 | $75.22 |

| | | |
|---|---|---|
| August 30, 2016 | $72.77 | $65.77 |
| August 31, 2016 | $72.04 | $58.24 |
| September 6, 2016 | $45.16 | $43.16 |
| September 15, 2016 | $0.00 | $58.46 |
| October 3, 2016 | $55.70 | $5.57 |
| October 11, 2016 | $0.00 | $39.92 |
| October 12, 2016 | $72.28 | $0.00 |
| October 27, 2016 | $98.87 | $98.87<br>(but $18.72 + $90.15 = $108.87) |
| November 2, 2016 | $43.07 | $43.67 |
| November 23, 2016 | $64.86 | $64.86<br>(but $8.10 + $57.26 = $65.36) |
| December 5, 2016 | $57.52 | $57.52<br>(but $16.85 + $41.67 = $58.52) |
| December 12, 2016 | $86.16 | $48.62 |
| December 13, 2016 | $0.00 | $86.16 |
| December 14, 2016 | $0.00 | $53.43 |
| December 15, 2016 | $53.43 | $0.00 |
| December 19, 2016 | $0.00 | $59.75 |
| December 29, 2016 | $63.15 | $0.00 |
| December 30, 2016 | $48.79 | $48.79<br>(but $39.14 + $9.62 = $48.76) |
| January 2, 2017 | $79.92 | $79.92<br>(but $44.57 + $23.35 = $69.92) |
| January 11, 2017 | $0.00 | $39.30<br>(but $8.65 + $31.65 = $40.30) |
| January 12, 2017 | $69.85 | $30.55 |
| January 17, 2017 | $84.18 | $84.18<br>(but $65.75 + $18.35 = $84.10) |
| January 30, 2017 | $67.68 | $67.48 |
| January 31, 2017 | $110.98 | $110.98<br>(but $65.96 + $46.02 = $111.98) |
| February 17, 2017 | $37.18 | $27.18 |
| February 22, 2017 | $43.57 | $43.57<br>(but $38.07 + $4.50 = $42.57) |
| March 5, 2017 | $94.15 | $94.15<br>(but $85.08 + $8.07 = $93.15) |
| March 9, 2017 | $56.33 | $56.33<br>(but $45.53 + $12.80 = $58.33) |
| April 1, 2017 | $47.58 | $47.85 |
| April 3, 2017 | $69.58 | $67.58 |
| April 18, 2017 | $36.83 | $39.83 |
| April 30, 2017 | $51.45 | $51.45<br>(but $49.80 + $2.65 = $52.45) |

| May 29, 2017 | $86.55 | $86.55<br>(but $77.80 + $9.75 = $87.55) |
|---|---|---|
| June 17, 2017 | $47.77 | $47.77<br>(but $42.02 + $4.75 = $46.77) |
| June 25, 2017 | $66.19 | $66.19<br>(but $75.09 + $11.10 = $86.19) |
| July 1, 2017 | $0.00 | $62.74 |
| July 2, 2017 | $41.30 | $41.13 |
| July 3, 2017 | $69.51 | $68.51 |
| July 18, 2017 | $44.68 | $44.86[17] |
| October 12, 2017 | $88.65 | $32.76 (Ex. E, at *D116)<br>OR<br>$88.65 (Ex. E2, at *239) |
| December 12, 2017 | $70.00 | $22.00 |
| January 13, 2018 | $43.35 | $40.35 |
| January 14, 2018 | $57.40 | $0.00 |
| February 16, 2018 | $0.00 | $89.11 |
| February 17, 2018 | $0.00 | $74.15 |
| February 18, 2018 | $0.00 | $48.28 |
| February 19, 2018 | $0.00 | $81.23 |
| February 20, 2018 | $0.00 | $71.57 |
| February 22, 2018 | $0.00 | $68.86 |
| February 24, 2018 | $0.00 | $49.16 |
| February 25, 2018 | $0.00 | $55.87 |
| February 26, 2018 | $0.00 | $63.72 |
| February 27, 2018 | $0.00 | $58.61[18] |

Shanggang Chen's handwritten time records did not record his hours accurately or precisely. Shanggang Chen's handwritten time records are only precise to the nearest hour. *See* Exs. 2, D, D2; *c.f.* Exs. 1, B (TimeStation records precise to the minute). In terms of accuracy, from August 10, 2016 through December 15, 2017, Aiqin Lin and Baolan Guan required Shanggang Chen, on pain of termination, to record that he worked only from 11:00 AM through 3:00 PM and from 6:00 PM through 10:00 PM, and eight (8) hours per day, even though he worked between 3:00 PM and 6:00 PM and worked eleven (11) hours per day; from December 16, 2017

---

[17] Beginning at about this time, the tip-out records stop differentiating between cash and credit tips and simply give the daily total.
[18] The tip records end on March 31, 2018.

through October 14, 2018, Shanggang Chen stopped recording that he didn't work between 3:00 PM and 6:00 PM, but was still required to record that he only worked eight (8) hours per day rather than eleven (11). *See* Exs. 2, D, D2; *see also* Tr. 30:9–25, 55:3–56:8. Throughout Shanggang Chen's employment, the TimeStation records are a mixture of days where he was recorded timing out during the midday, and days when he was not. *See* Exs. 1, B. And throughout his employment, on those days when he was not recorded as timing out during the midday, Fan Yang would manually and as a matter of course, without specific or personal knowledge of Shanggang Chen's hours, deduct three (3) hours from the recorded time. *See id.*; *see also* Tr. 94:15–22, 95:23–4, 130:20–132:3. Like the handwritten timesheets, the TimeStation records stop recording midday times in and times out, but after November 28, 2016. *See id.*

Setting aside those weeks whose records are marked by *lacunae* (*i.e.*, the weeks beginning August 8, 15, 22, and 29, September 5 and 12, October 10, 17, 24, and 31, November 14, 21, and 28, December 5, 12, 19, and 26, 2016; June 26, July 3 and 10, 2017; and January 1, 8, 15, 22, and 29, February 5, 12, 19, and 26, and March 5 and 12, 2018), and including as working time "clocked-out" or deducted midday hours, the handwritten time records show that Shanggang Chen worked between forty-four (44) and sixty-six (66) hours per week, on average fifty-four and sixty-five hundredths (54.65) hours per week and most commonly fifty-five (55) hours per week. *See* Exs. 2, D, D2; *see also* demonstrative. Subtracting out the clocked-out and deducted hours revises those figures down to between thirty-two (32) and forty-eight (48) hours per week, on average thirty-nine and seventy-six hundredths (39.76) hours per week and most commonly forty (40) hours per week—which illustrates nicely the point of the *faux* three-hour break and automatic three-hour deduction of hours: reducing nearly to nothing, but not managing to eliminate entirely, Shanggang Chen's recorded overtime. *See id.*; *see also* demonstrative. Setting aside those same

weeks, the handwritten time records show that Shanggang Chen worked a spread of hours greater than ten (10) hours at least four (4), at most six (6), on average five (5), and most commonly five (5) days per week. *See id.*; *see also* demonstrative.

Similarly, including clocked-out and deducted hours, the TimeStation records reflect that Shanggang Chen worked at least thirty and twenty-two hundredths (30.22) hours per week, at most sixty-four and five hundredths (64.05) hours per week, on average fifty and thirty-one hundredths (50.31) hours per week, and most commonly fifty-two and ninety-seven hundredths (52.97) hours per week. *See* Exs. 1, B; *see also* demonstrative. Subtracting back out the clocked-out and deducted hours, they like the handwritten time records reflect a sharp reduction: least twenty-one and thirty hundredths (21.30) hours per week, at most forty-six (46.00) hours per week, on average thirty-six and four hundredths (36.04) hours per week, and most commonly thirty-seven and ninety hundredths (37.90) hours per week. *See id.*; *see also* demonstrative. The TimeStation records reflect that Shanggang Chen worked a spread of hours greater than ten (10) hours at least zero (0), at most six (6), on average four (4), and most commonly five (5) days per week. *See id.*; *see also* demonstrative.

### 4. Compensation

Shanggang Chen started his employment at a salary of $60.00 per day. *See* Tr. 31:10–18, 132:25–133:2 ("Q. It would be fair to say that, in fact, Mr. Feng was paid by the day? A. Paid by the day."); *see also* Exs. 2, D, D2; Ex. C; demonstrative. From about January 1, 2018, his salary changed to $64.00 per day. *See* Tr. 31:19–32:6; *see also* Exs. 2, D, D2; Ex. C, at *D019 (wage notice dated January 7, 2018); demonstrative. Shanggang Chen calculated his daily rates by multiplying eight (8) hours per day by $7.50 per hour before January 1, 2018; and by $8.00 thereafter. *See* Tr. 30:6–8, 31:10–32:6; *see also* Exs. 2, D, D2; demonstrative. The cashier, Chen Bin, also known to Shanggang Chen as "Lawrence," would then add up the daily pay over the

course of each semi-monthly pay period, to determine Shanggang Chen's semimonthly pay. *See* Tr. 22:16, 30:4–5, 34:12–13; *see also* Ex. 2, at \*34 (64 [dollars per day worked] \* 12 [days worked in second half of July 2018] = 768 [dollars for the second half of July 2018]), 38 (11 [days worked in second half of September 2018] \* 64 [dollars per day worked] = 704 [dollars for the second half of September 2018]), 39 (10 [days worked in first half of October 2018] \* 64 [dollars per day worked] = 640 [dollars per first half of October 2018]); *see also* Ex. D, at \*D053, D057, D058 (same); Tr. 132:4–24.

Even when the above-recounted method of recorded hours recorded net hours per week in excess of forty (40) in a week, Kelai Corp did not pay Shanggang Feng time-and-a-half. *See* Tr. 88:18–20, 113:4–118:12, 120:25–121:17; *see also* Ex. 1, at \*D001 (recording six (6) days of work and forty-four (44) hours after deductions of ostensible break hours and after rounding to the nearest tenth of an hour between Monday, August 15, 2016 and Sunday, August 21, 2016), D003 (recording five (5) days of work and forty and one tenth (40.10) hours after deductions of ostensible break hours and after rounding to the nearest tenth of an hour between Monday, November 14, 2016 and Sunday, November 20, 2016), D012 (recording six (6) days of work and forty-six (46) hours after deductions of ostensible break hours between Monday, May 7, 2018 and Sunday, May 13, 2018); Ex. B, at \*D001, D003, D012 (same); *c.f.* Ex. 2, at \*29 (recording six (6) days of work at eight (8) hours apiece after deducting ostensible break hours, *i.e.*, forty-eight (48) hours, between Monday, May 7, 2018 and Sunday, May 13, 2018; but paying $8.00 per hour for each hour including the eight (8) recorded overtime hours, yielding a flat $64.00 per day for each workday); Ex. D, at \*D048 (same).[19] Defendants didn't calculate, or base Shanggang Feng's pay, on his weekly hours; they only calculated his daily and semi-monthly hours. *See* Tr. 121:18–20.

---

[19] Exhibits 2, D, and D2 are missing records for the second halves of August and November 2016.

Even though both the handwritten time records and the TimeStation records almost always recorded that Shanggang Feng worked a spread of hours greater than ten (10) hours, Shanggang Feng was never paid an additional hour's pay at the minimum wage (either with or without a tip credit being applied) for those days. *See* Exs. 2, D, D2; *see also* Tr. 118:18–119:25.

Shanggang Chen was paid partly by check, partly by cash. *See* Tr. 34:14–36:13; *see also* Exs. 2, D (recording that the following half-months were paid in the following manners:

| Half-Month | Check | Cash |
|---|---|---|
| 2d July 2017 | $600.00 | $120.00 |
| 1st August 2017 | $600.00 | $60.00 |
| 2d August 2017 | $570.00 | $90.00 |
| 1st September 2017 | $525.00 | $75.00 |
| 2d September 2017 | $600.00 | $60.00 |
| 1st October 2017 | $270.00 | $390.00 |
| 2d October 2017 | $240.00 | $480.00 |
| 1st November 2017 | $240.00 | $420.00 |
| 2d November 2017 | $240.00 | $360.00 |
| 1st December 2017 | $210.00 | $360.00 |
| 2d December 2017 | $150.00 | $570.00 |
| 2d March 2018 | $440.00 | $264.00 |
| 1st April 2018 | $424.00 | $280.00 |
| 2d April 2018 | $424.00 | $280.00 |
| 1st May 2018 | $400.00 | $304.00 |
| 2d May 2018 | $384.00 | $320.00 |
| 1st June 2018 | $400.00 | $240.00 |
| 1st August 2018 | $240.00 | $400.00 |
| 2d August 2018 | $240.00 | $464.00 |
| 1st September 2018 | $240.00 | $400.00 |

); demonstrative (same). However, the above records are not accurate. *See* Ex. 4, at *P000002 (2d half of May, 2018 paid for by check for $675.80, not for $384.00); *c.f.* Ex. 2, at *30; Ex. D, at *D049.

On March 21, May 6, and August 5, 2017, and January 6 and 20, February 12, April 7, June 2, July 2, 7, 17, and 31, August 18 and 30, and September 17, 22, 25, 27, 2018, the tips Shanggang Feng was reported as receiving, divided by the number of hours for which he was paid,

fell below the minimum threshold for the employer to claim a tip credit. *See* Exs. 1, B; *see also* demonstrative. Nevertheless, Kelai Corp did not increase Shanggang Feng's pay rate to the minimum wage for those days. *See* Exs. 2, D, D2; *see also* demonstrative; Tr. 133:23–25 ("Q. Did you always take points (sic.)[20] to make sure Mr. Feng actually made more than the applicable tip threshold in tips? A. No."). For the first half of June, 2017, both the TimeStation records and the tip-out records failed to record Shanggang Feng as receiving any tips; nevertheless, Kelai Corp did not increase Shanggang Feng's pay rate to the minimum wage for those days. *See* Exs. 1, B; Exs. 2, D, D2; Exs. 5, E, E2; *see also* demonstrative;[21] Tr. 134:1–136:6.

## PROPOSED CONCLUSIONS OF LAW

### I.    DEFENDANTS ARE LIABLE TO PLAINTIFF AS EMPLOYERS

In determining whether an employment relationship exists for purposes of the FLSA and NYLL (the standards are identical), courts evaluate the "economic reality" of the relationship, looking beyond rigid corporate constructs to consider the functional realities facing employees. *See Goldberg v. Whitaker House Coop., Inc.*, 366 U.S. 28, 33 (1961). The Second Circuit has declined to circumscribe this analysis to a precise set of factors, noting instead that a district court is "free to consider any [] factors it deems relevant to its assessment of the economic realities." *Zheng v. Liberty Apparel Co., Inc.*, 355 F.3d 61, 71–72 (2d Cir. 2003). Since the economic reality test is a "flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances," the Circuit has clarified that different sets of factors apply to different "factual

---

[20] Should be "take pains."

[21] The TimeStation records fail to reflect Shanggang Feng receiving tips for the second half of February 2018, but the tip-out records reflect that he received tips. *C.f.* Exs. 1, B; Exs. 5, E, E2; *see also* demonstrative. The TimeStation records also fail to reflect Shanggang Feng receiving tips for the second half of April 2018 or the first half of October, 2018, but the tip-out records end in March 2018. *See* Exs. 1, B; *see also* demonstrative. Needless to say, Shanggang Feng's pay rate wasn't adjusted to the minimum wage for any of these periods. *See* Exs. 2, D, D2; *see also* demonstrative.

challenges posed by particular cases." *Barfield v. New York City Health & Hosp. Corp.*, 537 F.3d 132, 141–42 (2d Cir. 2008).

In *Barfield*, the Second Circuit identified two relevant formulations of the economic reality test in its jurisprudence: (1) whether a formal employment relationship existed between the employees and a putative employer, and (2) whether an entity lacking formal control nevertheless could be considered a joint employer due to the "functional control" it exercised over workers. *Id.* at 143.

The Second Circuit has set out four core factors signifying formal control by an employer: "whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Carter*, 735 F.2d at 12 n.3 (internal citations omitted).

"Satisfying the four *Carter* factors 'may be sufficient to establish joint employment under the FLSA [but] it is not necessary to establish joint employment." *Fernandez v. HR Parking, Inc.*, 407 F. Supp. 3d 445, 456 (S.D.N.Y. 2019) (citing *Zheng*, 355 F.3d at 79, *Grenawalt v. AT&T Mobility LLC*, 642 Fed. Appx. 36, 37 (2d Cir. 2016)). Even in the absence of the formal control described by the *Carter* factors, a defendant may be characterized as an employer for FLSA purposes if he or she exercises functional control over the workers in question. In addition to the *Carter* factors, six additional factors may be indicative of functional control: "(1) whether [a defendant's] premises and equipment were used for the plaintiff's work; (2) whether the [defendants] had a business that could or did shift as a unit from one putative joint employer to another; (3) the extent to which plaintiffs performed a discrete line-job that was integral to the [defendant's] process of production; (4) whether responsibility… could pass from one

25

subcontractor to another with another without material changes; (5) the degree to which the [defendants] or their agents supervised plaintiffs' work; and (6) whether plaintiffs worked exclusively or predominantly for the defendants." *Zheng*, 355 F.3d at 72. In this context as well, the economic reality test does not depend on these or any other isolated factors, as "any relevant evidence may be examined so as to avoid having the test confined to a narrow legalistic definition." *Herman v. RSR Sec. Servs. Ltd.*, 172 F.3d 132, 139 (2d Cir. 1999).

### a. Appearing Defendants

It is undisputed that Kelai Corp was Shanggang Feng's employer. *See* Exs. 1, 2, 4, 5, C; *see also* Exs. B, D, D2, E, E2.

Fan Yang and Jay Huang both contend they did not exercise formal or functional control over employees of Kelai Corp, but both admitted either at trial, at deposition, or both, that they could. *See Herman*, 172 F.3d at 139 ("[C]ontrol may be restricted, or exercised only occasionally, without removing the employment relationship from the protections of the FLSA, since such limitations on control do not diminish the significance of its existence"). Fan Yang and Jay Huang both hired the day-to-day mangers, which is more than enough to show they had the authority to hire and fire. *See Irizarry v. Catsimatidis*, 722 F.3d 99, 114 (2d Cir. 2013) ("In [*Herman*], we emphasized that the hiring and firing of 'individuals who were in charge of [the plaintiff employees] is a strong indication of control.'") (quoting *Herman*, 172 F.3d at 140). Fan Yang's exercise of control over employees' schedules and conditions of employment was if anything greater than Catsimatidis's: Fan Yang conferred with Aiqin Ye regarding how to address employees' requests for leave and other issues; kept Aiqin Yin apprised of the minimum wage, and of what the employees' regular hours should be; directed Aiqin Ye to direct employees to sign their timesheets; and directed Aiqin Ye to treat employees' time between 3:00 PM and 6:00 PM as nonworking time. *See* Tr. 74:18–25, Tr. 76:15–17, 82:6–83:7, 87:18–88:17, 98:3–5, 103:16–

22. Fan Yang was responsible for Kelai Corp's payroll, and in exercise of his responsibilities, collected timesheets and pay records from Aiqin Ye at his [Fan Yang's] house, forwarded them to Kelai Corp's accountant, "d[id] the payroll," wrote employees' paychecks, and gave employees' paychecks to Aiqin Ye to give to the employees. *See* Tr. 73:3–6, 75:1–76:14, 85:14–25, 88:24–89:10, 108:15–19. Fan Yang signed Shanggang Feng's paychecks. *See* Ex. 4; *see also* Tr. 36:14–37:13, 39:25–40:3, 108:22–109:2. After Jef Chinese closed due to COVID-19, Fan Yang removed those records stored on its premises to his home. *See* Tr. 78:12–20, 122:11–17; *see also* Tr. 105:3–5 (admitting to keeping and maintaining Kelai Corp's records). Fan Yang, along with his wife, Joyce Huang (Jay Huang's cousin) prepared Shanggang Feng's wage notice dated January 7, 2018. *See* Ex. C, at *D019; *see also* Tr. 110:14–11. He also prepared, in part, Shanggang Feng's wage notices dated January 24, 2017 and August 15, 2016. *See* Tr. 111:17–112:23. Fan Yang, in preparation of this lawsuit, prepared the Microsoft Excel spreadsheet that formed the basis of Exhibits 1 and B, inputting information from the TimeStation timekeeping app and other sources. *See* Tr. 94:23–96:4, 107:19–108:8. Fan Yang, along with Jay Huang, was the principal of Kelai Corp's liquor license. *See* Ex. 6.

Jay Huang had the title "Vice President" of Kelai Corp. *See* Tr. 151:21–25. Jay Huang, along with Fan Yang, decided to suffer and permit the existing employees of Fan Yang's in-laws' restaurant to keep working at Jef Chinese, and for the existing managers of his in-laws' restaurant, including Aiqin Ye, to keep managing Jef Chinese on their behalf. *See* Tr. 72:6–25. Jay Huang, along with Fan Yang, was the principal of Kelai Corp's liquor license. *See* Ex. 6; *see also* Tr. 142:21–143:3. Jay Huang instructed Fan Yang as to how to go about incorporating Kelai Corp and obtaining a certificate of authority to collect sales tax. *See* Tr. 142:14–20. Jay Huang was the guarantor of Kelai Corp's lease of the premises of Jef Chinese restaurant. *See* Tr. 143:4–9. Jay

Huang directed Aiqin Ye to comply, and how to comply, with New York's liquor law. *See* Tr. 151:7–12. Jay Huang advised Fan Yang about how to comply with New York's labor law in terms of obtaining signatures on wage notices and paying the minimum wage; and apprised Fan Yang of changes in the minimum wage rate. *See* Tr. 153:21–156:2.

Fan Yang and Jay Huang attempt to pin responsibility for how Shanggang Feng was treated on Aiqin Ye. However, this is belied by Fan Yang's admissions that he directed Aiqin Ye on how to proceed with keeping Shanggang Feng's time records, and paying him. Even if it were not, supervisor knowledge of unpaid working time, and unpaid overtime, where there was a time recording system in place, has been imputed to the employer as actual or constructive knowledge. *See Lynch v. City of New York*, 291 F. Supp. 3d 537, 550–51 (S.D.N.Y. 2018)

### b. Defaulting Defendants

Baolan Guan and Aiqin Ye did not Answer the Complaint or defend themselves at trial. It is well settled that defendants who fail to file an answer or otherwise move with respect to a complaint filed, are deemed to have admitted all of the well-pleaded allegations in the complaint pertaining to liability. *D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 107 (2d Cir. 2006) ("Rule 55 tracks the ancient common law axiom that a default is an admission of all well-pleaded allegations against the defaulting part") (citation omitted). Here, Shanggang Feng, as well as Fan Yang, have testified to ample facts to show the liability of Baolan Guan and Aiqin Ye, such that they should be jointly and severally liable for the sum total of damages. *See*, Proposed Findings of Fact §§ I(d)(e), *supra*; *see also Cement & Concrete Workers Dist. Council Welfare Fund v. Metro Foundation Contractors, Inc*., 699 F.3d 230, 234 (2d Cir. 2012) (the court may award damages based upon evidence submitted through affidavits and exhibits, or by an evidentiary hearing *a la* trial). The Clerk has entered default against them under the pleaded names "Lan 'Doe'" and "Qin

'Doe.'" *See* Dkt. No. 103; *see also* Dkt. No. 1 (complaint containing claims to which no response has been made); proposed default judgment.[22]

## II.    DEFENDANTS ARE LIABLE TO PLAINTIFF FOR UNPAID MINIMUM WAGES, UNPAID OVERTIME AND UNPAID SPREAD OF TIME

### a.   PLAINTIFF WORKED MORE THAN FORTY (40) HOURS EACH WEEK

"To establish liability under the FLSA on a claim for unpaid overtime," including for unpaid hours spent working off the clock, "a plaintiff must prove that he performed work for which he was not properly compensated, and that the employer had actual or constructive knowledge of that work." *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 361 (2d Cir. 2011) (citations omitted); *see also*, 29 C.F.R. § 785.11 (where an "employer knows or has reason to believe that [an employee] is continuing to work[,] the time is working time"). Supervisor knowledge of unpaid working time, and unpaid overtime, where there was a time recording system in place, has been imputed to the employer as actual or constructive knowledge. *See Lynch v. City of New York*, 291 F. Supp. 3d 537, 550–51 (S.D.N.Y. 2018).

Here, Shanggang Feng's hours were incorrectly recorded, and inconsistently recorded. Accordingly, Shanggang Feng is entitled to establish his hours from his recollection alone. *See Kuebel*, 643 F.3d at 362. Shanggang Feng recalls working for five days per week most weeks, and the records bear that out. *ee* Exs. 1, 2, B, D, D2; *see also* demonstrative. He recalls that his workdays began and ended at 11:00 AM and 10:00 PM respectively; the records bear this out as well. *See id.*; *see also* demonstrative. The sole dispute over Shanggang Feng's hours is over whether he received a *bona fide* three-hour break each working day, during which he was totally relieved from work. *See Reich v. S. New England Telecomms. Corp.*, 121 F.3d 58, 64 (2d Cir. 1997). The records reflecting that Shanggang Feng had a *bona fide* three-hour break are belied by

---

[22] All presented pursuant to S.D.N.Y. L. Civ. R. 55.2(b).

records that he performed deliveries and was not wholly relieved from work during those three

hours; that he was told to record his break despite his belief that it was working time on pain of

termination; and that Fan Yang admitted to inserting the break into the TimeStation records where

it did not already exist, based solely on his knowledge of work rules and not on observation that

Shanggang Feng actually took any particular breaks.

    **b.  PLAINTIFF'S SALARIES FAILED TO COMPENSATE HIM, AT TIME-AND-A-HALF OR AT ALL, FOR HIS WORK EACH WEEK IN EXCESS OF FORTY HOURS EACH WEEK**

It is undisputed that Shanggang Feng was paid on a daily salary basis. *See* Tr. 31:10–18,

132:25–133:2 ("Q. It would be fair to say that, in fact, Mr. Feng was paid by the day? A. Paid by

the day."); *see also* Exs. 2, D, D2; Ex. C; demonstrative. "'There is a rebuttable presumption that

an employer's payment of a weekly salary represents compensation for the first 40 hours of an

employee's work-week; the burden is on the employer to rebut this presumption with evidence

that the employer and employee had an agreement that the employee's weekly compensation

would cover a different number of hours." *Ochoa v. Aucay General Construction, Inc.*, No. 19-cv-

03866 (ST), 2020 U.S. Dist. LEXIS 1747071, 2020 WL 9814092, at *6 (E.D.N.Y. Sep. 15, 2020).

Both the FLSA and the NYLL carry this rebuttable presumption. *See Perez Garcia v. Hirakegoma*

*Inc.*, No. 17-cv-07608 (SLC), 2020 U.S. Dist. LEXIS 40637, 2020 WL 1130765, at *8 (S.D.N.Y.

Mar. 9, 2020). Defendants are unable to rebut that presumption. Defendants kept two inconsistent

sets of time records—the TimeStation records which Fan Yang admittedly created and adjusted,

and the records they had Shanggang Feng create showing a 3-hour midday break that Shanggang

Feng is adamant was not *bona fide* and which no witness actually saw him take—and those records

are variously incomplete and inaccurate. Where there is no clear mutual understanding about

which hours the Plaintiff's salary would cover, the Defendant is unable to rebut the presumption

that a flat salary only covers the first forty hours of work per week and cannot apply the fluctuating

workweek method. *See Stein v. Guardsmark, LLC*, No. 12-cv-04739 (JPO), 2013 U.S. Dist. LEXIS 103131, 2013 WL 3809463, at *3 (S.D.N.Y. July 23, 2013).

But the Wage Order implementing the NYLL with respect to the hospitality industry (hotels and restaurants) does not even permit application of the fluctuating workweek method. *See Yang Shen v. GJ Grp. USA Inc.*, No. 19-cv-02212 (ERK) (PK), U.S. Dist. LEXIS 171562, at *22–23 (E.D.N.Y. Sep. 8, 2021) ("Unlike the FLSA and those NYLL provisions covering the non-hospitality industry, the Hospitality Wage Order contains no mechanism for rebutting the calculation based on a maximum 40-hour work week with evidence that the employee had an agreement with the employer to work more than 40 hours a week."); *see also* 12 N.Y.C.R.R. § 146-3.5(b) ("If an employer fails to pay an employee an hourly rate of pay, the employee's regular hourly rate of pay shall be calculated by dividing the employee's total weekly earnings, not including exclusions from the regular rate, by the lesser of 40 hours or the actual number of hours worked by that employee during the work week."). Under the Hospitality Industry Wage Order, then, a salaried employee is *necessarily* only compensated for the lesser of his hours worked per week or forty (40) hours per week, at his regular rate found by dividing his weekly salary by the lesser of his hours worked or forty (40) hours, and he is entitled to pay for each overtime hour at a rate 1.5 times his regular rate, and to spread of hours. *See Lopez v. Royal Thai Plus, LLC*, No. 16-cv-04028 (NGG) (SJB), 2018 U.S. Dist. LEXIS 20271, at *19 (E.D.N.Y. Feb. 6, 2018) (New York's hospitality industry regulations determine hourly wage rate by dividing weekly wages by the lesser of 40 or actual hours worked; the assumption embedded in such a calculation is that, unless evidence suggests otherwise, none of the paid wages are to be credited to overtime. Or put differently, for [P]laintiff under NYLL, the $700 he was paid was for the first 40 hours he worked; for the additional 39 overtime hours he worked, he received nothing.); *Pichardo v. El Mismo*

31

*Rincon Latino Corp.*, No. 17-cv-07439 (FB) (SJB), 2018 U.S. Dist. LEXIS 134792, at *17 (E.D.N.Y. Aug. 7, 2018) (same); *Yunganaula v. Garcia*, No. 19-cv-06247 (EK) (SJB), 2021 U.S. Dist. LEIXS 151498, at *24–25 (E.D.N.Y. Aug. 11, 2021) (same); *see also Pichardo*, at *22 ("[H]ospitality industry regulations [] credit[] an employee's weekly salary—no matter how large—to the first 40 hours of work."); *Quiroz v. Luigi's Dolceria, Inc.*, No. 14-cv-00871, 2016 U.S. Dist. LEXIS 64662, at *13–14 n.5 (E.D.N.Y. May 17, 2016) ("The hospitality industry regulations that became effective on January 1, 2011 now require that virtually all hospitality industry employees be paid on an hourly basis, and specifically prohibit employers from paying weekly salaries.") (citation omitted). This is true even for employees paid on a daily salary basis rather than a weekly or monthly or annual salary basis. *See Romero v. Rung Charoen Sub, Inc.*, No. 16-cv-01239 (VMS), 2017 U.S. Dist. LEXIS 165494, at *32–33 (E.D.N.Y. Sep. 30, 2017); *see also Lopez*, 2018 U.S. Dist. LEXIS 20271, at *18.

### c. PLAINTIFF'S SALARIES FAILED TO COMPENSATE HIM WITH AN ADDITIONAL HOUR'S PAY AT THE MINIMUM WAGE FOR EACH DAY HE WORKED A SPREAD OF HOURS GREATER THAN TEN (10) HOURS

The Wage Order entitles employees to one additional hour of pay at the minimum hourly wage when the interval between the beginning and end of an employee's workday exceeds ten (10) hours. 12 N.Y.C.R.R. § 146-1.6. Shanggang Feng worked a spread of hours greater than ten (10) hours at least some days during each week. *See* Exs. 1, 2, B, D, D2. Nevertheless, Shanggang Feng was paid a flat daily salary regardless of the number of hours. Just as this flat daily salary only compensated him for the first forty (40) hours of work each week, it did not include a spread-of-hours premium.

### d. PLAINTIFF'S SALARIES FAILED TO COMPENSATE HIM AT OR ABOVE THE MINIMUM HOURLY WAGE

To take advantage of the tip credit for FLSA purposes, the employer must satisfy two requirements: (i) the employer must have informed the employee of the tip credit provisions of Section 203(m) of the FLSA, and (ii) the employee must either have retained all tips received or participated in a permissible tip pool. *See Zhou v. Aberdeen Dim Sum & Seafood Inc.*, No. 14-cv-02014 (VB), 2016 U.S. Dist. LEXIS 147337, at *5 (S.D.N.Y. Oct. 24, 2016) (citations omitted). "The two prerequisites that the employer must fulfill to be eligible for the tip credit are strictly construed, and must be satisfied even if the employee received tips at least equivalent to the minimum wage." *Id.* at *5–6 (citations omitted). "If the employer fails to satisfy either requirement, it cannot receive credit for any tips the employee received." *Id.*, at *6 (citation omitted).

The Wage Order under the NYLL is even stricter and only allows an employer to "take a credit towards the basic minimum hourly rate… if the employee has been notified of the tip credit as required in section 146-2.2 of this Part [requiring written notice of pay rates, tip credit, and pay day]." 12 N.Y.C.R.R. § 146-1.3. "The employer has the burden of proving compliance with the notification provisions of this section." 12 N.Y.C.R.R. § 146-2.2(d).

Defendants have met neither burden here. While Defendants prepared three wage notices that purported to take a tip credit, and had Shanggang Feng sign one, none of them was furnished upon Shanggang Feng. Two of them had his signature forged. *See* Ex. C, at *D018 (employee name above "Print Employee Name" line spelled "Shang Gang Feng;" signature above "Date" line spelled "sheng gang Feng"), D019 (employee name above "Print Employee Name" line spelled SHANG GANG FENG" in what appears to be the same handwriting as "FAN YANG" above Preparer's Name and Title" line; signature above "Employee Signature" line spelled "Sheng gang Feng"). *See* Tr. 32:14–34:11. All three were variously deficient or false on their face.

The first notice would inform a reader that Shanggang Feng's pay rate was $7.50 per hour, and that the employer was applying a tip credit of $1.50 per hour. There are two problems with this. First, it is not unambiguous on the face of the document whether the $7.50 cent per hour rate is supposed to be net—after the application of the tip credit—or gross; though others of Defendants' records clarify that the intention was to be net (and thus the gross hourly rate would be $9.00 per hour, a rate which appears nowhere on the face of the document). *C.f.* Ex. C, at *D016; Ex. D2, at *1. Second, it is not true. Shanggang Feng's initial pay rate was $60.00 per day. *See* Ex. C, at *D016; *c.f.* Ex. D2, at *1 ($60.00 per day ostensibly derived by paying $7.50 per hour for recorded workdays each of exactly eight (8) hours); Ex. 1 (recording different numbers of hours for those same workdays); Ex. B (same); Tr. 31:10–18. It would inform a reader that Shanggang Feng would be paid every Tuesday, when in fact he was paid once every half-month for semi-monthly pay periods. *See* Ex. C, at *D016; *c.f.* Ex. 2; Ex. 4, at *2 (check dated June 1, 2018; memo noting pay period of "5-15 – 5-31" 2018); Ex. D; Ex. D2; Tr. 34:12–13. It would inform a reader that Shanggang Feng would be paid $11.25 per overtime hour, *i.e.*, ($9.00 per hour – $1.50 per hour) * 1.5, despite this calculation method being expressly unlawful. *See* Ex. C, at *D016; *c.f.* 12 N.Y.C.R.R. § 146-1.4 ("When an employer is taking a credit toward the basic minimum hourly rate pursuant to section 146-1.3 of this Subpart, the overtime rate shall be the employee's regular rate of pay before subtracting any tip credit, multiplied by 1½, minus the tip credit. It is a violation of the overtime requirement for an employer to subtract the tip credit first and then multiply the reduced rate by one and one half." *I.e.*, the correct calculation method, assuming without conceding a base hourly rate of $9.00 per hour and tip credit of $1.50 per hour, would be ($9.00 per hour * 1.5) – $1.50 per hour = $12.00 per hour). Furthermore, Shanggang Feng was not paid his ostensible overtime rate even when his net recorded hours per week exceeded forty (40). *See* Ex. 1, at *D001

34

(recording six (6) days of work and forty-four (44) hours after deductions of ostensible break hours and after rounding to the nearest tenth of an hour between Monday, August 15, 2016 and Sunday, August 21, 2016), D003 (recording five (5) days of work and forty and one tenth (40.10) hours after deductions of ostensible break hours and after rounding to the nearest tenth of an hour between Monday, November 14, 2016 and Sunday, November 20, 2016), D012 (recording six (6) days of work and forty-six (46) hours after deductions of ostensible break hours between Monday, May 7, 2018 and Sunday, May 13, 2018); Ex. B, at *D001, D003, D012 (same); *c.f.* Ex. 2, at *29 (recording six (6) days of work at eight (8) hours apiece after deducting ostensible break hours, *i.e.*, forty-eight (48) hours, between Monday, May 7, 2018 and Sunday, May 13, 2018; but paying $8.00 per hour for each hour including the eight (8) recorded overtime hours, yielding a flat $64.00 per day for each workday); Ex. D, at *D048 (same). Not that Shanggang Feng had an opportunity to review the document before he had to get back to work—he spent about thirty (30) seconds signing it before returning it to Aiqin Ye, and did not read it. *See* Tr. 16:21–17:1.

The two subsequent wage notices are on their face plagued by many of the same falsehoods and deficiencies as the August 15, 2016 notice, as well as some new ones. The notice dated January 24, 2017 provided for a (presumably net) pay rate of $7.50 per hour and tip credit of $3.00 per hour (yielding a gross wage of $10.50 per hour). *See* Ex. C, at *D018. $10.50 per hour was the 2017 minimum wage for small employers in New York City, *see* 12 N.Y.C.R.R. § 146-1.2(a)(1)(i)(b), but Kelai Corp was a large employer. *See* Tr. 38:14–18, 104:21–105:2. But regardless of whether Kelai Corp was a large or small employer, a $7.50 net cash wage was less than that permitted to service employees (*e.g.*, delivery people), and $3.00 per hour was greater than the maximum tip credit permitted from service employees, in 2017. *See* 12 N.Y.C.R.R. §§ 3.3(a) ("A *service employee* is an employee, other than a food service worker or fast food

35

employee, who customarily receives tips at or above the Tip Threshold rate listed at subdivision (a) of section 146-1.3 of this Subpart."), 3.4(a) ("The term *food service worker* shall not include delivery workers."); 1.3(a)(1)(i)(a) (minimum $9.15 per hour cash wage and maximum $1.85 per hour tip credit for service employees of large employers in New York City); 1.3(a)(1)(i)(b) (minimum $8.75 per hour cash wage and maximum $1.75 per hour tip credit for service employees of large employers in New York City). The notice dated January 24, 2017 provided for bi-weekly rather than Shanggang Feng's actual semi-monthly pay periods, and omitted a pay day. *See* Ex. C, at *D018. The notice dated January 24, 2017 again calculated Shanggang Feng's ostensible overtime pay rate wrongly. *See* Ex. C, at *D018 (($10.50 per hour – $3.00 per hour) * 1.5 = $11.25 per hour; the correct method and result, assuming without conceding that the hourly rate and tip credit inputs were correct, would have been ($10.50 per hour * 1.5) – $3.00 per hour = $12.75 per hour).

The notice dated January 7, 2018 omitted to say whether it was given at hiring or before a change in pay rate. *See* Ex. C, at *D019. It provided for a (presumably net) pay rate of $8.00 per hour and tip credit of $4.00 per hour (yielding a gross wage of $12.00 per hour). *See* Ex. C, at *D018. $12.00 per hour was the 2018 minimum wage for small employers in New York City, *see* 12 N.Y.C.R.R. § 146-1.2(a)(1)(i)(b), but Kelai Corp was a large employer. *See* Tr. 38:14–18, 104:21–105:2. But regardless of whether Kelai Corp was a large or small employer, an $8.00 net cash wage was less than that permitted to service employees, and $4.00 per hour was greater than the maximum tip credit permitted from service employees, in 2018. *See* 12 N.Y.C.R.R. §§ 1.3(a)(1)(i)(a) (minimum $10.85 per hour cash wage and maximum $2.15 per hour tip credit for service employees of large employers in New York City); 1.3(a)(1)(i)(b) (minimum $10.00 per hour cash wage and maximum $2.00 per hour tip credit for service employees of large employers

36

in New York City). The notice dated January 7, 2018 provided for bi-weekly rather than Shanggang Feng's actual semi-monthly pay periods, and omitted a pay day. *See* Ex. C, at *D018. The notice dated January 7, 2018 again calculated Shanggang Feng's ostensible overtime pay rate wrongly. *See* Ex. C, at *D018 (($12.00 per hour – $4.00 per hour) * 1.5 = $12.00 per hour; the correct method and result, assuming without conceding that the hourly rate and tip credit inputs were correct, would have been ($12.00 per hour * 1.5) – $4.00 per hour = $14.00 per hour).

### e. METHOD OF CALCULATION (*SEE GENERALLY* DAMAGES COMPUTATION)

In the attached computation of damages, Shanggang Feng's employment is broken into weekly periods. Each week is assigned a number of workdays based on the maximum number of workdays recorded for that week across Exhibits 1/B, 2/D/D2, and 5/E/E2. Due to deficiencies in Defendants' record-keeping, and due to Shanggang Feng's recollection that he worked an eleven-hour (11-hour) day (backed up by Defendants' records showing an arrival time on or around 11:00 AM and a departure time on or around 10:00 PM each day), the number of hours each week is found by multiplying the number of workdays each week by eleven (11) hours per day. And because Defendants' records and Shanggang Feng's recollection show that Shanggang Feng left each workday more than ten (10) hours after he arrived, the days per week his spread of hours exceeded ten (10) hours is equal to the number of workdays each week. Based on Shanggang Feng's recollection and Defendants' records and admissions, Shanggang Feng is considered to have been paid a daily salary of $60.00 through December 31, 2017, and $64.00 thereafter. Shanggang Feng's weekly salary is found by multiplying his daily salary by the number of workdays per week. Shanggang Feng's regular hourly wage is calculated by dividing his weekly salary by forty (40) hours per week, pursuant to both the Wage Order's instructions and the rebuttable and unrebutted presumption.

The "Minimum Wage Shortfall / Week" under the FLSA and NYLL is calculated as follows. If the Regular Hourly Wage is greater than or equal to the Minimum Hourly Wage,[23] the Minimum Wage Shortfall / Week is zero dollars ($0.00). If the Regular Hourly Wage is less than the Minimum Hourly Wage, the Regular Hourly Wage is subtracted from the Minimum Hourly Wage; then multiplied by the lesser of the Hours / Week or forty (40) hours per week.

The "Overtime Shortfall / Week" under the FLSA and NYLL is calculated as follows. If the Hours / Week are less than or equal to forty (40), the Overtime Shortfall / Week is zero dollars ($0.00). If the Hours / Week are greater than forty (40): forty (40) hours are subtracted from the Hours / Week; the result obtained is multiplied by the greater of the Minimum Hourly Wage and the Regular Hourly Wage; and the result obtained is further multiplied by 1.5.

The "Spread of Hours Shortfall / Week" under the NYLL is calculated by multiplying the Days / Week Spread of Hours > 10 Hours by the Minimum Hourly Wage.

Plaintiffs are entitled to relief under whichever statute provides greater relief. See *Romero*, 2017 U.S. Dist. LEXIS 165494, at *30. In each case, that is the NYLL, due to the higher minimum wage.

Under the NYLL, Shanggang Feng seeks $16,964.00 in unpaid minimum wages; $28,957.50 in unpaid overtime; and $6,475.00 in unpaid spread-of-hours.

## III.    DEFENDANTS ARE LIABLE FOR LIQUIDATED DAMAGES

NYLL mandates liquidated damages equal to unpaid wages awarded to an employee, unless the employer can show that they acted in good faith. To establish subjective good faith, an employer must show that it took active steps to ascertain the dictates of the statute and then comply

---

[23] Because the preponderance of the evidence is that Kelai Corp had more than ten (10) employees, the large employer minimum wage is used for 2017 and 2018; there is only one minimum wage under the Wage Order for 2016. *See* 12 N.Y.C.R.R. § 146-1.2.

with them. *Ramirez v. Lin*, 830 Fed. Appx. 672, 674–75 (2d Cir. 2020). Here, Defendants took active steps to inform themselves of the dictates of the NYLL, including seeking the advice of an accountant, but nonetheless willfully continued to pay Shanggang Feng a monthly salary that did not include overtime or spread of time. That Shanggang Feng agreed to be paid in this matter is not a defense. *See* N.Y. Lab. L. § 663.1.

Liquidated damages are equal to the sum of unpaid minimum wages, in unpaid overtime, and unpaid spread-of-hours, to wit, $52,396.50.

## IV.    PLAINTIFF IS ENTITLED TO PREJUDGMENT INTEREST

"[L]iquidated damages under the NYLL are considered punitive in nature, thus enabling a plaintiff to recover both liquidated damages and prejudgment interest." *Villanueva v. 179 Third Ave. Rest Inc.*, 500 F. Supp. 3d 219, 243 (S.D.N.Y. 2020) (collecting cases). "Accordingly, Plaintiff[] here [is] eligible to recover pre-judgment interest on their state law claims, the rate for which is nine percent per annum as provided by N.Y. C.P.L.R. § [5004]." *Id.*; *see also* N.Y. C.P.L.R. § 5004.

"'The Court has discretion to choose a reasonable date from which prejudgment interest should accrue.' … courts 'often choose the midpoint of the plaintiff's employment within the limitations period.'" *Villanueva*, 500 F. Supp. 3d at 243 (quoting *Shen v. Number One Fresco Tortillas, Inc.*, No. 16-cv-02015 (RWL), 2018 U.S. Dist. LEXIS 205609, 2018 WL 6712771, at *14 (S.D.N.Y. Nov. 16, 2018)).

The midpoint of Shanggang Feng's employment (which ran from August 10, 2016 through October 14, 2018) is September 12, 2017. Prejudgment interest is therefore calculated from the week beginning September 11, 2017, as that is the week containing September 12, 2017, on a principal of $52,396.50, at a rate of nine percent (9%) *per annum*. As of this writing, that amounts to $29,473.03, but this will need to be adjusted at the time of the issuance of judgment to account

for the passage of time (as well as any judgments the Court might make that effect the amount of the principal).

## V.    DEFENDANTS ARE LIABLE TO PLAINTIFF FOR UNFURNISHED WAGE NOTICES AND WAGE STATEMENTS

The NYLL provides that an employee who is not provided within ten business days of his or her first day of employment a notice, in writing in English and in the employee's primary language, containing: the rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; allowances, if any, claimed as part of the minimum wage, including tip, meal, or lodging allowances; the regular pay day designated by the employer…; the name of the employer; any "doing business as" names used by the employer; the physical address of the employer's main office or principal place of business, and a mailing address if different; and the telephone number of the employer may recover in a civil action damages of $50.00 for each work day that the violations occurred, not to exceed a total of five thousand dollars $5,000.00. N.Y. Lab. L. §§ 195.1(a), 198(1-b). Plaintiff was made to sign, but was not provided with any such notice. Further, such notices were both legally deficient and factually misleading.

The NYLL further provides that an employee who is not provided a statement with every payment of wages listing: the dates of work covered by that payment of wages; name of employee; name of employer; address and phone number of employer; rate or rates of pay and basis thereof, whether paid by the hour, shift, day, week, salary, piece, commission, or other; gross wages; deductions; allowances, if any, claimed as part of the minimum wage; and net wages shall recover in a civil action damages of two hundred fifty dollars $250.00 for each work day that the violations occurred, not to exceed a total of five thousand dollars $5,000.00. N.Y. Lab. L. §§ 195.3, 198(1-d). No such statements were provided.

"Courts have held that a plaintiff has standing to bring wage statement and notice claims when the defendant's failure to provide the statutorily-required wage information is linked to the defendant denying plaintiff his or her lawful wage." *Gaskin v. Brooklyn Suya Corp.*, No. 22-cv-05648 (ENV) (LB), 2023 U.S. Dist. LEXIS 192893, at *16–23 (E.D.N.Y. Oct. 26, 2023) (discussing Article III standing as it relates to WTPA claims, noting that cases dismissing WTPA claims for lack of standing "do not foreclose the possibility of litigating wage statement and notice claims in federal court," that "several explicitly recognize that downstream consequences stemming from an employer's statutory violations can confer standing," that standing can be had where "the statutory violation is not alleged to give rise solely to an informational injury, but rather is tied to the concrete monetary harm of underpayment," and recommending that Plaintiff's not be dismissed for lack of standing )[24] (citations and internal quotation marks omitted).

When "[t]he gravamen of the complaint is that the denial of plaintiff's statutory right to these documents caused plaintiff to fail to realize that defendants were deducting certain benefits from his wages, resulting in his underpayment," courts have ruled that plaintiffs sufficiently demonstrated 'a tangible injury resulting from the violation' to establish Article III standing. *Stih v. Rockaway Farmers Mkt., Inc.*, No. 22-cv-03228 (ARR) (RER), 2023 WL 2760492, at *7 (E.D.N.Y. Apr. 3, 2023) (plaintiff alleged that failure to provide him with proper wage notices injured him by "denying him the right to be adequately apprised of the terms and conditions of his employment," including allowances defendants purported to claim against his salary); *see also Cuchimaque v. A. Ochoa Concrete Corp.*, No. 22-cv-06136 (RPK) (RML), 2023 WL 5152336, at *5 (E.D.N.Y. July 18, 2023), *report and recommendation adopted by* Order (E.D.N.Y. Aug. 23, 2023).

---

[24] As of this writing, Judge Vitaliano has not ruled one way or the other on Magistrate Judge Bloom's Report and Recommendation.

Other courts have held more expansively. In *Bueno v. Buzinover*, No. 22-cv-02216 (PAE) (KHP), 2023 U.S. Dist. LEXIS 38154, 2023 WL 2387113 (S.D.N.Y. Mar. 7, 2023), Judge Engelmeyer declined to follow Magistrate Judge Parker's recommendation that WTPA claims be dismissed for lack of standing even though the complaint "was unspecific as to the downstream injuries that resulted from the alleged statutory violations." *Id.*, at *2. The court reasoned that "such allegations are not necessary to supply standing" because the WTPA is meant to "empower[] employees to advocate for themselves" and "[d]enying an employee such notices… can impinge on an employee's interests not only in being paid what is owed, but also in being able to advocate for the receipt of proper pay." *Id.*, at *2–3 (citing *Imbarrato v. Banta Mgmt. Servs. Inc.*, No. 18-cv-05422 (NSR), 2020 U.S. Dist. LEXIS 49740, 2020 WL 1330744, at *8–9 (S.D.N.Y. Mar. 20, 2020)). The court therefore concluded that "by alleging that they were not furnished the statutorily required notices, plaintiffs have asserted a concrete and particularized injury sufficient to confer standing for their WTPA wage notice and wage statement claims." *Id.*, at *3.

Judge Engelmeyer went on to observe that, consistent with the reasoning the court employed in *Bueno*, "multiple courts in this District [the United States District Court for the Southern District of New York] have exercised jurisdiction over such claims, without requiring a specific showing as to the downstream impact on the plaintiff of the non-provision of the required notice." *Bueno*, 2023 WL 2387113, at *3 (collecting cases) . And additionally, that His Honor had "exercised jurisdiction over wage statement and wage notice claims in two recent trials involving such claims." *Id.* (citing *Sanchez v. E.I.G. Auto Salvage, Inc.*, No. 21-cv-08266 (PAE) (SN); *Cajero Torres v. Sushi Sushi Holdings, Inc.*, No. 19-cv-02532 (PAE) (RWL)).

In *Bello v. Proline Pumping Corp.*, No. 22-cv-04081 (RPK) (RML), 2023 U.S. Dist. 106676 (E.D.N.Y. June 20, 2023), Magistrate Judge Levy relied upon a different theory, which

was adopted by Judge Kovner after review for clear error. *See id.*, *report and recommendation adopted* 2023 U.S. Dist. LEXIS 125632 (July 19, 2023). The court held that "the bare assertion that [plaintiffs] never received their statutorily required wage statements and notices" was sufficient for standing purposes." *Id.*, at *28 (citing *Bueno*, 2023 WL 2387113; *Imbarrato*, 2020 WL 1330744). Because the plaintiffs had also asserted claims for wage theft in the same complaint, and "the sole allegation" was not "failure to furnish statutorily mandated notices and statements absent the companion allegations of wage theft," the court reasoned that "the downstream harm" was "evident on the face of the pleadings." *Id.* This is similar to Judge Róman's reasoning in *Hong v. White Plains, Inc.*, No. 19-cv-05018 (NSR), 2021 U.S. Dist. LEXIS 62592 (S.D.N.Y. Mar. 31, 2021). *See id.*, at *8–9 ("The Amended Complaint clearly alleges that Hong has suffered an injury (non-payment of statutorily required wages) traceable to the conduct of his employers and redressable by an award in his favor. That gives him standing to sue entities or persons alleged to have been his employers for relief under the FLSA and NYLL.").

Here, Shanggang Feng alleged and proved, *a la Stih*, *supra*, that Defendants never furnished any notice of their use of tip credit. Shanggang Feng not being furnished wage notices and wage statements also deprived him of notice as to whether Defendants intended to compensate him according to the fluctuating work week method and for his daily salaries to include pay at 1.5 times a regular hourly rate for overtime and an extra hour's pay at the New York minimum wage for each day their spreads of hours exceeded ten hours, which would be sufficient injury under *Bueno* and *Bello*, *supra*.

Accordingly, Shanggang Feng is entitled to $50.00 per workday in damages for failure to provide wage notices, up to a cap of $5,000.00, and $250.00 per workday in damages for failure to provide wage statements, up to a cap of $5,000.00. *See* damages computation.

## VI.    PREVAILING PLAINTIFF IS ENTITLED TO REASONABLE ATTORNEY FEES, COSTS AND EXPENSES

A prevailing plaintiff is entitled to reasonable attorney's fees, costs, and expenses under the FLSA and NYLL. 29 U.S.C. § 216(b); NYLL § 198(1-a). Should judgment be entered in Plaintiffs' favor, Plaintiffs will move for an award of same under Rule 54(d) of the Federal Rules of Civil Procedure. Fed. R. Civ. P. 54(d).

## <u>CONCLUSION</u>

For the above-stated reasons, the Court should find in favor of Plaintiff on each question of liability and damages before it.

Dated: Flushing, NY
      October 11, 2021

                      Respectfully submitted,
                      TROY LAW, PLLC

                      */s/ Aaron B. Schweitzer*
                      Aaron B. Schweitzer
                      41-25 Kissena Boulevard
                      Suite 103
                      Flushing, NY 11355
                      (718) 762-1324
                      troylaw@troypllc.com
                      *Attorneys for Plaintiff*