UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X
SHANGGANG FENG,
on his own behalf and on behalf of others
similarly situated,

                      Plaintiff,

        - against -

KELAI CORP, D/B/A JEF CHINESE,
FAN YANG, JAY HUANG, LAN "DOE"
and QIN "DOE,"

                    Defendants.
-----------------------------------------------------------------X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
DOC #:_____
DATE FILED:_ 3/29/2024

18-CV-12329 (RWL)

**DECISION AND JUDGMENT**

**ROBERT W. LEHRBURGER, United States Magistrate Judge.**

Plaintiff SHANGGANG FENG ("Plaintiff" or "Feng") brought this action against Defendants KELAI CORP ("KELAI"), FAN YANG ("Yang"), JAY HUANG ("Huang"), LAN DOE ("Lan"), and QIN DOE ("Qin"), for violations of the Fair Labor Standards Act (the "FLSA") and the New York Labor Law (the "NYLL") in connection with his employment at Jef Chinese Restaurant located at 913 Second Avenue, New York, New York ("Jef Chinese" or the "Restaurant"). Although ostensibly filed as a class action, Plaintiff did not move for class or collective certification. Accordingly, the case proceeded based solely on Feng's individual claims. The Court held a two-day bench trial at which three witnesses testified: Feng, Yang, and Huang. Feng has moved for default judgment against the two "Doe" Defendants (Lan and Qin), who did not appear in the case. This decision and judgment constitutes the Court's findings of fact and conclusions of law and resolves both the issues for trial and motion for default judgment.

**FACTS[1]**

## A.    Witness Credibility

Before setting forth the facts, the Court comments briefly upon the credibility of the three witnesses who testified at trial.  Overall, Plaintiff Feng was highly credible.  He testified by video from Hong Kong, but the Court was able to look directly at the witness while he was testifying.  He was calm, relaxed, and betrayed no signs of dissembling.  He testified consistently throughout the material parts of his testimony and did so despite being subject to cross-examination in which counsel repeatedly posed variations on the same question in an apparent effort to elicit inconsistent testimony.  Attempts to impeach Feng with prior deposition testimony were largely unsuccessful.

In contrast, Defendant Yang was not credible.  His direct testimony on key issues repeatedly was impeached on cross-examination.  For example, he testified falsely about Kelai's gross income in 2018, which surpassed the $500,000 threshold for FLSA applicability.[2]   On direct examination, he testified that Aiqin Ye (the real name of

---

[1] The facts are drawn from the trial record.  "Tr." refers to the transcript of proceedings at Dkts. 94 and 96.  The Court also has considered the parties' post-trial briefing, which includes the following documents:  Plaintiff's Proposed Findings Of Fact And Conclusions Of Law at Dkt. 105 ("Pl. FFCL"); Plaintiff's Memorandum Of Law In Support Of Motion For Attorney's Fees And Costs" at Dkt. 108 ("Pl. Fees Mem."); the Declaration Of John Troy In Support Of Motion For Attorney's Fees And Costs at Dkt. 107 ("Troy Decl."); Defendants' Response To Plaintiff's Proposed Findings Of Fact And Conclusions Of Law at Dkt. 116 ("Def. Resp."); Defendants' Proposed Findings Of Fact And Conclusions Of Law at Dkt. 110 ("Def. FFCL"); and Plaintiff's Response To Defendants' Proposed Findings Of Fact And Conclusions Of Law at Dkt. 115 ("Pl. Resp.").

[2] More specifically, Yang was asked to state the amount of Kelai's gross sales in 2016, 2017, and 2018 based on information in Kelai's tax returns that Yang had before him.  For 2016 and 2017, Yang's testimony was consistent with the information in Kelai's returns, both of which indicated gross income in amounts below the $500,000 threshold. (Compare Tr. 86:9-16 with Ex. A at D274 and D310 (identifying Kelai's gross income as

Defendant Qin "Doe," known to Feng as "Ah Qin" (Tr. 13:21-14:1), and referred to herein as "Qin"), was in charge of hiring and firing employees (Tr. 74:2-3), but on cross admitted that he, Yang, also had authority to hire employees, even if he delegated and chose not to exercise it himself.  (Tr. 96:25-97:1, 97:23-98:2, 103:12-15.)  He also was impeached with earlier deposition testimony that Qin needed his permission before hiring a new employee and that Yang would "make the final decision" (Tr. 97:7-14, 98:2-22, 103:1-15), just as he made the final decision to fire an employee.  (Tr. 103:3-6.)

In another instance of impeachment on a material fact, Yang testified on direct that his involvement in setting employee wages was limited to making sure they made more than the minimum wage, while repudiating as untrue his previous deposition testimony that he was the sole person who determined employee salaries at the Restaurant.  (Tr. 98:3-22.)  Similarly, while testifying at trial that Kelai's accountant had given Yang minimum wage notices to post at the Restaurant, which Yang then gave to Qin to post, Yang testified at deposition that he had not obtained notices to post in the Restaurant.  (Tr. 103:23-104:15.)  With respect to a pivotal issue, at trial Yang denied that Qin informed him that from time to time the Restaurant's delivery employees would make deliveries between the hours of 3:00 p.m. and 6:00 p.m., and was impeached with his deposition testimony to the contrary.  (Tr. 106:9-107:11.)

---

$447,002.00 in 2016, and $455,338.00 in 2017).  For 2018, however, Yang testified that Kelai's gross income in 2018 was $447,624.00, when in fact that amount was the net income figure, not the gross income figure of $510,936.00.  (Compare Tr. 86:17-19 with Tr. 5-21 and Ex. A1 at D345, D347.)  From the Court's perspective, Yang's errant testimony was not just an innocent mistake, particularly given his ability to accurately carry out the same exercise for 2016 and 2017, and the fact that he has both a bachelor's degree in accounting (Tr. 69:4-18) and a 16-year career in banking.  (Tr. 69:9-70:6.)

Huang, Yang's cousin (Tr. 89:18-19), was considerably more credible than Yang. Feng puts forth purported instances in which Huang was impeached, but a proper reading of the trial transcript shows otherwise.  For instance, Feng asserts that Huang testified on direct that Yang did not have authority to hire employees, but had previously testified at deposition that Yang did have such authority.  (Pl. FFCL at 8.)  Huang's trial testimony, however, was that if Yang wanted to fire or hire someone, he would have to go through Qin.[3]  (Tr. 147:15-18.)  On cross examination, Huang explained further that Yang "in principle" could hire employees, but he would still go through Qin based on the "chain of command" and because Qin knew "what people she needs."  (Tr. 153:8-20.)

As another example, Feng points to Huang's testimony at deposition and trial about the extent to which the Restaurant did business between 3:00 p.m. and 6:00 p.m. (Pl. FFCL at 8.)   Huang's testimony, though evasive, was not entirely inconsistent.  At deposition, Huang answered "yes" when asked if the Restaurant would still accept delivery orders, even though it expected fewer of them during the period between 3:00 and 6:00 p.m..  (Tr. 156:23-157:3.)  At trial, when asked whether the Restaurant "was open to accept delivery orders between 3:00 and 6:00 p.m.," Huang answered that "[t]echnically the restaurant was closed for delivery or should be closed."  (TR. 156:17-20.)  To be sure, Huang's answer at trial was less than forthcoming and did him no favors, but it did not directly answer the question asked.  That the Restaurant "technically" was closed or "should" have been closed is not incompatible with the fact that the Restaurant

---

[3] On cross examination, Feng's counsel misrepresented the record to Huang by asking him to recall that on direct he testified that Yang did not have authority to hire employees. (Tr. 152:1-3.)

did accept delivery orders nonetheless.  As explained further below, the evidence well establishes that the Restaurant did accept and execute delivery orders during the 3:00 p.m. to 6:00 p.m. window.

## B.     Kelai And Operation Of The Jef Chinese Restaurant

Kelai is a New York corporation.  (Pretrial Order Stipulation, Dkt. 64 §VII(2).) During the time relevant to this case, Kelai Corp operated the Restaurant.  (*Id.* §VII(3).) In 2020, the Restaurant closed due to nearby competition and the Covid-19 pandemic. (78:12-15, 86:23-87:9; *see also* Tr. 141:10-13, 144:4.)  Throughout the relevant time period, according to Feng, Kelai employed 11 to 13 employees.  (Tr. 38:14-18.)  No credible testimony contradicted Feng on the number of the Restaurant's employees.

According to Kelai's records, defendant Yang is its sole owner.  (*See* Ex. A at D280, D316; A1 at D354.)  However, both Yang and defendant Huang each invested $50,000 in Kelai and considered themselves to be equal shareholders of half the company, even though Huang was not identified as such on Kelai's tax returns.  (Tr. 100:19-101:6, 141:16-142:13, 150:4-17.)  Yang held the title of President, and Huang Vice-President.  (Ex. A at D273, D309; Ex. A1 at D346; Tr. 87:10-17, 151:24-25.)

Yang incorporated Kelai in order to take over the Restaurant from his wife's parents when their lease for the Restaurant expired.  (Tr. 70:20-72:1.)  Yang and Huang made the decision to retain the then-current employees and managers of the Restaurant, including Qin.  (Tr. 72:4-25.)  Yang rarely visited the Restaurant; he went once or twice a year during Christmas and Chinese New Year. (Tr. 41:9-21, 84:13-18.)  He devoted one to two hours every two weeks working for Kelai.  (Tr. 88:24-89:3.)  During the relevant

time period, he worked for Bank of America full time as a small business banker.  (Tr. 73:7-23.)

Qin was in charge of hiring and firing employees, determining their rates of pay, and setting their schedules.  (Tr. 74:2-11.)  But Yang was responsible for Kelai's payroll in that he collected timesheets and pay records from Qin, forwarded them to Kelai's accountant to calculate withholding, "d[id] the payroll," wrote and signed employees' paychecks (including Feng's), and gave those paychecks to Qin to give to the employees. (Tr. 36:14-37:13, 39:25-40:3, 73:3-6, 75:1-76:14, 85:14-25, 89:4-10, 108:15-109:2; *see* Ex. 4.)  Yang sometimes conferred with Qin regarding how to address employees' requests for leave and other issues.  (Tr. 74:18-25.)  Yang kept Qin apprised of the minimum wage, and of what the employees' regular hours should be.  (Tr. 88:2-17, 98:3-5, 103:16-21.)  Yang directed Qin to treat employees' time between 3:00 p.m. and 6:00 p.m. as free time (Tr. 82:6-83:7), and also instructed her to direct the employees to sign their time sheets.  (Tr. 76:15-17.)   After the Restaurant closed in 2020, Yang stored the Restaurant's files and records at his home.  (Tr. 78:16-20, 122:11-17.)  Yang also took part in preparing Feng's wage notices dated August 15, 2016, January 24, 2017, and January 7, 2018.  (Tr. 110:14-25, 111:17-112:20; *see* Ex. C at D019.)

Huang's involvement with the Restaurant was less than Yang's, being largely advisory and getting the Restaurant started.  In addition to being a fifty-percent investor in Kelai, Huang served as a guarantor of Kelai's lease for the Restaurant.  (Tr. 143:4-9.) Huang directed Yang to incorporate Kelai and obtain a certificate of authority to collect sales tax.  (Tr. 142:14-20.)  Both Yang and Huang are identified as principals of Kelai on its liquor license (Ex. 6), and Huang directed Qin to comply, and how to comply, with New

York's liquor law.  (Tr. 151:7-12.)  Huang told Yang to comply with New York's labor law; that a wage acknowledgment form needed to be signed, and that the minimum wage needed to be met.  (Tr. 153:21-154:2; 155:2-10.)  Huang provided advice to Yang about staffing levels (Tr. 101:7-102:8); and, at one point, to help Yang after the birth of Yang's child, Huang provided annual sales and expense information, but not payroll information, to Kelai's accountant.  (Tr. Tr. 144:1-15, 146:7-12, 156:3-16.)  Huang only went to the Restaurant a handful of times, such as when the point-of-sale computer system needed fixing.  (Tr. 41:17-21, 151:13-20.)  Apart from his ownership interest in Kelai, Huang owns a ramen restaurant, a coffee shop, and a deli.  (Tr. 141:2-5.)

Huang denied having any role in managing the Restaurant.  (Tr. 144:18-20.)  Yang testified similarly but was impeached with his deposition testimony that besides Qin and Lan, only he and Huang were managers.  (Tr. 99:5-9.)  Huang, however, had no authority to hire or fire employees (Tr. 144:21-145:2) and no role in determining employee work schedules or wage rates.   (145:13-17, 147:19-22.)   Huang testified that he did not maintain any employee records (Tr. 145:24-25), although Yang testified to the contrary at his deposition.  (Tr. 105:15-21.)  Huang had no role in making sure employees received their pay or wage notices.  (Tr. 147:23-148:3.)  Huang does not know how employee tips were given or recorded; and before litigation discovery, he had never seen any employee time records.  (Tr. 148:7-14.)

## C.    Feng's Employment At The Restaurant

Feng worked for the Restaurant as a delivery person from August 10, 2016, through October 14, 2018, when he quit.  (Tr. 11:13-25, 13:4-14, 60:19-23, 65:7-9.)  Feng considered each of Yang and Huang to be a "boss" of the Restaurant.  (Tr. 39:16-40:3.)

Feng's direct supervisors, however, were Qin and Baolan Guan – the full name of Defendant Lan "Doe," known to Huang as "Ah Lan," and referred to herein as "Lan."[4]  (Tr. 13:19-22, 14:2-11, 40:25-41:8, 42:6-8, 43:20-25, 44:15-17, 92:12-93:13.)  Qin determined Feng's work schedule and pay rate.  (Tr. 20:10-13, 32:7-9.)  And, Feng would go to Qin or Lan if he had any issue regarding his schedule or pay.  (Tr. 42:6-8, 43:20-25, 44:17-20.)  Feng did not have access to any "bosses" other than Qin and Lan.  (Tr. 43:24-44:4.)

Feng interviewed for his position with, and was hired by, Qin and Lan on August 9, 2016.  (Tr. 13:15-14:13, 17:22-24.)  During the interview, neither Qin nor Lan discussed Feng's work schedule, base compensation, or frequency of pay.  (Tr. 14:14-15:10.)  Although informing Feng that he could expect to receive some tips, Qin and Lan did not inform him that there would be a tip credit taken against his wage or even explain what a tip credit was.  (Tr. 14:17-15:7.)  They also did not give him a document setting forth his compensation, how he would be paid, or whether a tip credit would be taken.  (Tr. 15:11-20.)

### D.    The Restaurant's Records

Feng's workdays and working times were recorded variously by three different means.  One was the clock-in-clock-out timekeeping system called TimeStation (the "TimeStation records").  (*See* Exs. 1 and B; *see also* Tr. 94:23-95:1.)  Another consisted of time and pay records handwritten by Feng (the "Handwritten Records").  (*See* Exs. 2, D, and D2; Tr. 29:1-30:8.)  And the third were records reflecting tips received (the "Tip-Out records").  (*See* Ex. 5, E, and E2.)  The three sets of records are far from fully

---

[4] Lan is Yang's mother-in-law.  (Tr. 92:4-11.)

consistent with each other; some records reflect a particular figure, while others record a different figure or none at all, and there are multi-week gaps in the Handwritten and Tip-Out records.  (*See* Tr. 122:4-130:19.)  Feng's counsel has submitted a demonstrative synthesizing information about Feng's hours from all three sources (the "Demonstrative"). (Dkt. 105-27.)   Defendants did not comment on or question the accuracy of the Demonstrative in their post-trial submissions.  (*See* Def. Resp.)

Not all the records are as they seem.  Feng's Handwritten records did not record his hours precisely as they are rounded to the nearest hour.  More significantly, they are not accurate.  From the start of his employment through December 15, 2017, Feng's supervisors, Qin and Lan, required Feng – on pain of termination – to record that he worked from only 11:00 a.m. through 3:00 p.m. and from 6:00 p.m. through 10:00 p.m., for a total of eight hours per day; and, from December 16, 2017 through the end of his employment, Feng stopped recording that he did not work between 3:00 p.m. and 6:00 p.m. but was still required to record that he worked only eight hours per day rather than eleven.  (*See* Ex. 2; Tr. 30:9-25, 55:3-56:8.)  In fact, however, as discussed below, Feng worked during the 3:00 p.m. to 6:00 p.m. period for a total of eleven hours per day.

The TimeStation records too are not fully trustworthy.  The TimeStation records reflect a mix of days when Feng was recorded timing out during the afternoon, and days when he was not.  (*See* Ex. 1.)  Throughout his employment, on days when he was not recorded as having timed out during the afternoon, Yang manually – without regard to the actual hours worked by Feng – deducted three hours from the recorded time.  (Tr. 95:23-96:4, 130:20-132:3.)   From November 28, 2016 to the end of his employment, the

TimeStation records do not reflect any afternoon in-and-out times.  (*See* Ex. 1, Demonstrative.)

### E.    Hours Worked By Feng

Feng typically worked at the Restaurant five days per week between the hours of 11:00 a.m. and 10:00 p.m. – eleven hours a day – for a total of 55 hours per week.  (Tr. 20:6-9, 14-16; *see also* Demonstrative.)  He was the Restaurant's only delivery person (Tr. 21:7, 47:21-25), although the Restaurant sometimes used temporary delivery workers on the weekends   (Tr. 83:10-16.)  There was no time between his arrival and departure times when Feng was completely relieved from work.  (Tr. 20:17-21:4.)  Even between the lunch and dinner rushes – approximately 3:00 p.m. to 6:00 p.m. – Feng was required to remain on call to deliver orders as he was the only delivery person on staff.  (Tr. 21:5-22:3, 47:11-20; *see also* Tr. 22:1-3 (testifying that the Restaurant accepted orders during the 3:00 p.m. to 6:00 p.m. period).)  A collection of delivery receipts retained by Feng from the week before his last day demonstrates that he made deliveries during the 3:00-6:00 p.m. period.  (Ex. 3; *see also* Tr. 21:5-27:14 (Feng's testimony confirming the particular deliveries).)  When he was not making deliveries, Feng performed other work – such as slicing onions, packing sauces, cutting up cardboard (for packaging deliveries), and wiping windows and doors, and more – for a total of between one and two hours a day. (Tr. 21:16-21, 27:15-28:8, 58:24-59:10.)  On a typical day, Feng had five to eight minutes to eat a single meal, which Qin could and did interrupt if there was work to be done.[5]  (Tr. 28:9-25.)

---

[5] Defendants find incompatible the notion that Feng worked the hours he claims, yet only one to two hours each day was devoted to his side tasks.  (Def. FFCL at 9.)  The Court

As mentioned above, Yang was impeached with respect to whether the Restaurant accepted deliveries between 3:00 p.m. and 6:00 p.m.  (Tr. 106:9-107:11.)  None of his, or Huang's, testimony called into question Feng's testimony that he was required to make deliveries during the 3:00-6:00 p.m. period, that Feng did in fact make deliveries during that period, and that Feng did non-delivery work when he was not making deliveries. Defendants also did not question the authenticity of the invoices, or the information they contained, that Feng kept from his last week of work that corroborate his having made deliveries during the 3:00-6:00 p.m. period.

Instead, Defendants accuse Feng of manufacturing a lawsuit.  They note that Feng kept only invoices from his last week of work and did not keep any invoices other than those showing that he made deliveries between 3:00 and 6:00 p.m.  (Def. FFCL at 11.) They also point out that Feng saw an attorney about a potential lawsuit only two days after his last day of work.  (*Id*.)  Feng's actions do seem strategic, but so what?  He did not typically keep delivery receipts as there seemed to be no purpose to retaining them.[6]

---

finds nothing amiss.  Feng did not testify that he never had down time during his hours of being on the clock; nor was there any reason why he would need to do so to support his claims.  Rather, he testified that he was required to be on duty during all hours in the event that delivery orders came in.  (Tr. 20:21-21:21.)  *See Aquino v. Uber Technologies, Inc.* 671 F. Supp.3d 338, 347 (S.D.N.Y. 2023) ("The time that an employee spends waiting for work assignments is compensable if the waiting time is spent primarily for the benefit of the employer and his business.") (internal quotation marks and citation omitted).

[6] At trial, Defendants asked for a finding that Feng spoliated evidence – by discarding receipts other than those from the 3:00 to 6:00 p.m. period for his last week of work – and an adverse inference that Feng did not actually make deliveries during the 3:00 to 6:00 p.m. period and only made deliveries in that time period during his last week of work to manufacture evidence.  (Tr. 64:9-65:3.)  For reasons explained in the text above, the Court finds no basis to conclude that Feng spoliated evidence and no basis for the adverse inference Defendants request.

(Tr. 62:13-17, 63:22-64:4.)  Near the end of his employment at the Restaurant, however, Feng may have contemplated litigation, retained receipts of his afternoon deliveries as proof, and consulted a lawyer.  None of that, however, casts doubt on the fact of his having made deliveries and doing other work during the 3:00-6:00 p.m. period.  Had Defendants called into question whether Feng actually made the deliveries reflected in the receipts introduced into evidence, or offered proof that Feng had engineered fake delivery orders, perhaps Defendants would have a point.  But they did not do so and did not otherwise undermine Feng's testimony and the supporting evidence.

## F.    Feng's Compensation

From the start of his employment to the end of 2017, Feng was paid at the rate of $60.00 per day, plus tips.  (Tr. 31:10-18, 132:25-133:2; *see also* Exs. 2, D, D2.)  His pay was raised to $64.00 per day, plus tips, starting January 1, 2018. (Tr. 31:19-32:6; *see also* Pl. FFCL Exs. 2, D, D2, and C at D019.)  Put another way, before January 1, 2018, Feng was paid $7.50 per hour, plus tips, for an eight-hour day, even on days when his working time exceeded eight hours, and then at a rate of $8.00 per hour starting January 1, 2018.  (*See* Tr. 31:10-32:6.)  He was paid semi-monthly.  (Tr. 34:12-13; *see also* Tr. 29:10 (testifying he was paid every two weeks).)  He received his pay partly by check and partly by cash.  (Tr. 34:14-15, Tr. 35:17-36:6; *see also* Pl. FFCL Ex. 2.)  Tips were paid in cash.  (Tr. 54 14-16, 77:1-5.)

Notwithstanding Kelai's not paying Feng for the 3:00-6:00 p.m. time period, there were still some weeks where Feng's hours, not including that period, exceeded 40 hours, primarily due to Feng's having worked six, instead of five, days those particular weeks. (*See, e.g.*, Ex. 1 at D001 and Demonstrative (week of August 15, 2016 – six days of work

for total of 44 hours), D012 and Demonstrative (week of May 7, 2018 – six days of work for total of 46 hours); *see also* Tr. 110:15-112:18.)  Even then he was paid a daily rate of $60 before January 1, 2018, and $64.00 after that date.  (*Compare* 2B at ECF4 with ECF5; *see* Tr. 31:10-32:6.)  Defendants did not calculate or base Feng's pay on his weekly hours; instead, they only calculated his daily and semi-monthly hours.  (Tr. 121:18-20.)  In short, Feng was paid the same daily, and effectively hourly, rate regardless if he worked in excess of 40 hours a week.  (*See* Tr. 88:18-20 (Yang testifying that the company never paid overtime).)  At times, Feng thought about complaining to supervisors Qin and Lan about being paid for only eight hours of work despite working eleven hours a day.  He did not complain, however, for fear of being fired if he did.[7]  (Tr. 44:18-45:10.)

Other aspects of Kelai's compensation of Feng also fell short.  Feng was not paid for an additional hour on days where he worked in excess of ten hours (so-called "spread-of-hours" pay), which was most every day.  (Tr. 118:18-119:25.)  On some days, tips Feng was reported as receiving, divided by the number of hours for which he was paid, fell below the minimum threshold for the employer to claim a tip credit.  (*See* Ex. 1; Demonstrative.)  Kelai, however, did not increase Feng's pay rate to the minimum wage for those days.  (*See* Ex. 2; Demonstrative; Tr. 133:23-25 ("Q. Did you always take [pains] to make sure Mr. Feng actually made more than the applicable tip threshold in tips? A. No.").)  For the first half of June 2017, both the TimeStation records and the Tip-Out records did not record Feng as receiving any tips.  (Tr. 134:1-135:5.)  Kelai did not

---

[7] Although Feng understood, consistent with common sense, that being paid the same amount for eleven hours of work as for eight hours was suspect, he was not familiar with New York State laws governing minimum wages, overtime pay, and the like.  (Tr. 19:23-20:5, 37:14-39:1.)

increase Feng's pay rate to the minimum wage for those days.  (Tr. 135:24-136:6.)  Feng

was not asked and did not testify as to whether he actually received tips for the first half

of June 2017 or other time periods where the records do not reflect his receiving any tips.[8]

More likely than not he did receive tips as he testified that he made approximately $70 to

$80 in tips per day.  (Tr. 54:8-9.)

## G.    Hiring And Wage Notices

The trial record includes three hiring and wage notices concerning Feng's wages:

one dated August 15, 2016 (the "2016 Notice"), one dated January 24, 2017 (the "2017

Notice"), and the third dated January 7, 2018 (the "2018 Notice").

Five days after he started work, Qin prepared and presented Feng with the 2016

Notice to sign, but took it back after Feng signed it and did not give him a copy.  (Tr.

15:21-17:21; Ex. C at D016.)  The 2016 Notice was ambiguous and incorrect.  It indicates

that Feng's pay rate was $7.50 per hour and that $1.50 per hour was being applied as a

tip credit.  (Ex. C at D016.)  The notice does not, however, specify whether $7.50 was

Feng's net pay or gross pay after applying the $1.50 tip credit.  Other records do, however,

indicate that Feng's gross pay was to be $9.00 per hour before deduction of the tip credit.

(Ex. D2 at 1.)  The 2016 Notice is incorrect because Feng was paid $60 per day,

regardless of the number of hours he actually worked.  (Tr. 31:10-18; *compare* Ex. C at

D016 with Exs. 1 and B.)  It also is incorrect in other respects, including, for instance, that

---

[8] Further demonstrating inconsistency in the records, the TimeStation records do not reflect any tips paid to Feng for the second half of February 2018 while the Tip-Out records do reflect his receiving tips during that time. (*See* Exs. 1, 5, Demonstrative.) The TimeStation records also do not reflect Feng receiving tips for the second half of April 2018 or the first half of October 2018, but the Tip-Out records end in March 2018. (*See* Ex. 1, Demonstrative.)

14

it indicates weekly payment every Tuesday even though Feng in fact was paid once every half-month (*compare* Ex. C at D016 with Exs. 2, 4 at 2, D, D2, and Tr. 34:12-13), and incorrectly calculates the overtime rate,[9] which, in any event, Feng was not paid, as discussed above.

The 2017 and 2018 Notices similarly were deficient, having some of the same, and additional, deficiencies as the 2016 Notice. (*See* Ex C at D018, D019.) For example, the 2017 Notice indicates a tip credit of $3.00 per hour and a net cash wage of $7.50 (being $10.50 gross net wage minus a $3.00 tip credit), even though the minimum net cash wage permitted under New York law for delivery employees was higher than $7.50 and the maximum tip credit was less than $3.00.[10] (*See* Pl. FFCL Ex. C at D018.) The 2017 Notice also incorrectly calculates Feng's ostensible overtime rate and omits any specific pay day. (*See id.*) The 2018 Notice similarly indicates a net cash wage below

---

[9] The 2016 Notice indicates an overtime rate of $11.25 per hour (calculated as ($9.00 per hour - $1.50 per hour) * 1.5), even though the correct calculation would set an overtime rate of $12.00 per hour (i.e., ($9.00 per hour * 1.5) - $1.50 per hour). *See* N.Y.C.R.R. § 146-1.4 ("When an employer is taking a [tip] credit toward the basic minimum hourly rate … the overtime rate shall be the employee's regular rate of pay before subtracting any tip credit, multiplied by 1 ½, minus the tip credit. It is a violation of the overtime requirement for an employer to subtract the tip credit first and then multiply the reduced rate by one and one half.").

[10] *See* 12 N.Y.C.R.R. §§ 146-3.3(a) ("A service employee is an employee, other than a food service worker or fast food worker employee, who customarily receives tips at or above the Tip Threshold rate listed at subdivision (a) of section 146-1.3 of this subpart"); 146-3.4 ("The term food service worker shall not include delivery workers" thus making a food delivery worker a service employee covered by §3.3(a) and the Tip Threshold rate); § 146-1.3(a)(1)(i)(a) (for 2017, minimum $9.15 per hour cash wage and maximum $1.85 per hour tip credit for service employees of large employers in New York City); 146-1.3(a)(1)(i)(b) (for 2017, minimum $8.75 per hour cash wage and maximum $1.75 per hour tip credit for service employees of small employers in New York City).

the maximum and a tip credit exceeding the permitted threshold for 2018,[11] incorrectly calculates Feng's ostensible overtime rate, and omits any specific pay day.   (*See* Ex. C at D019.)

Most egregiously, however, Feng was not given – and did not sign – the 2017 and 2018 Notices; his signatures were written by someone else.  (Tr. 32:14-34:11; *see* Ex. C at D018, D019.)

### JURISDICTION

The Court has subject matter jurisdiction under 28 U.S.C. § 1331 and the FLSA, 29 U.S.C. § 216, and supplemental jurisdiction over plaintiffs' state law claims under 28 U.S.C. § 1367(a).

### THRESHOLD ISSUES

The Court first addresses two threshold issues:  which Defendants were Feng's employer, and whether Kelai had gross sales sufficient to trigger application of the FLSA.

### A.    Employer

The FLSA and NYLL generally require employers to pay a prescribed minimum wage as well as a premium overtime rate to employees who work more than forty hours in a workweek.[12]  29 U.S.C. § 207(a)(1); NYLL § 232; 12 N.Y.C.R.R. § 142-2.2; *see also*

---

[11] The 2018 Notice indicates a net cash rate of $8.00 per hour and a tip credit of $4.00 per hour (Ex. C at D019), even though the New York regulations set a $10.85 minimum per hour cash wage and a maximum $2.15 tip credit for large employers, and a  $10.00 minimum per hour case wage and a maximum $2.00 tip credit for small employers in New York City.  12 N.Y.C.R.R. §§ 146-1.3(a)(1)(i)(a) and (b).

[12] The FLSA enumerates certain categories of employees who are "exempt" from the overtime and minimum wage requirements.  29 U.S.C. § 213.  Because none of those exemptions apply here, the Court does not discuss them.

*Jacobs v. New York Foundling Hospital,* 577 F.3d 93, 96 (2d Cir. 2009) (per curiam).  An employer who fails to pay in accordance with the FLSA is "liable to the employee" for unpaid minimum wages, unpaid overtime compensation, and other damages.  29 U.S.C. § 216(b).  Employers are similarly liable under the NYLL.  *Ramos v. Guaba Deli Grocery Corp.*, No. 20-CV-4904, 2021 WL 5563714, at *5 (S.D.N.Y. Nov. 29, 2021) ("Under both the FLSA and NYLL, personal liability may be imposed on employers for wage and hour violations").  The Court therefore must first determine which Defendants, if any, were Feng's employer.

### 1.     Framework For Assessing Employer Status

Under the FLSA's broad definition, an employer is "any person acting directly or indirectly in the interest of an employer in relation to an employee."  29 U.S.C. § 203(d). The NYLL is similarly broad, defining employer as "any person, corporation, limited liability company, or association employing any individual in any occupation, industry, trade, business or service."  NYLL § 190(3).  Courts generally interpret the definition of employer under both statutes coextensively.  *Gao v. Savour Sichuan Inc.*, No. 19-CV-2515, 2024 WL 664718, at *16 (S.D.N.Y. Feb. 16, 2024); *see also Weng v. New Shanghai Delux Corp.*, 19-CV-9596, 2022 WL 5434997, at *4 (S.D.N.Y. Oct. 7, 2022) ("courts in this district have applied the same tests to determine whether an individual constitutes an employer under the FLSA and the NYLL"); *Hart v. Rick's Cabaret International, Inc.* 967 F. Supp.2d 901, 924 (S.D.N.Y. 2013) ("there appears to have never been a case in which a worker was held to be an employee for purposes of the FLSA but not the NYLL (or vice versa)").  Moreover, "[a]n individual may simultaneously have multiple 'employers,'" such that "'all joint employers are responsible, both individually and jointly, for compliance with all of the applicable provisions of the [FLSA].'"  *Martin v. Sprint United Management Co.*,

273 F. Supp.3d 404, 421 (S.D.N.Y. 2017) (quoting 29 C.F.R. § 791.2(a)).  The same is true under the NYLL.  *Id.* at 422; *see Pineda v. Masonry Construction, Inc.*, 831 F. Supp.2d 666, 686 (S.D.N.Y. 2011) (finding three entities and one individual joint and severally liable as employers under both FLSA and NYLL).

In determining whether an employment relationship exists, courts evaluate the "economic reality" of the relationship, looking beyond rigid corporate constructs to consider the functional realities facing employees.  *Goldberg v. Whitaker House Co-op., Inc.*, 366 U.S. 28, 33 (1961); *Irrizary v. Catsimatidis*, 722 F. 3d 99, 104 (2d Cir. 2013).  Since the economic reality test is a "flexible concept to be determined on a case-by-case basis by review of the totality of the circumstances," different sets of factors may apply to different "factual challenges posed by particular cases." *Barfield v. New York City Health and Hospitals Corp.*, 537 F.3d 132, 141–42 (2d Cir. 2008).

In *Barfield*, the Second Circuit identified two relevant formulations of the economic reality test: (1) whether a formal employment relationship existed between the employees and a putative employer, and (2) whether an entity lacking formal control nevertheless could be considered a joint employer due to the "functional control" it exercised over workers.  *Id.* at 143.  To assess whether an individual has the requisite formal control over employees, the Second Circuit has identified four core factors: "whether the alleged employer (1) had the power to hire and fire employees, (2) supervised and controlled employee work schedules or conditions of employment, (3) determined the rate and method of payment, and (4) maintained employment records." *Carter v. Dutchess Community College*, 735 F.2d 8, 12 (2d Cir. 1984) (internal citations omitted).  "No one of the four factors standing alone is dispositive."

*Herman v. RSR Secret Services Limited*, 172 F.3d 132, 139 (2d Cir. 1999).

"Satisfying the four *Carter* factors 'may be sufficient to establish joint employment under the FLSA [but] it is not necessary to establish joint employment." *Fernandez v. HR Parking, Inc.*, 407 F. Supp.3d 445, 456 (S.D.N.Y. 2019) (citing *Zheng v. Liberty Apparel Co., Inc.* 355 F.3d 71, 79 (2d Cir. 2003), and *Greenawalt v. AT&T Mobility LLC*, 642 Fed. Appx. 36, 37 (2d Cir. 2016)).  Even in the absence of the formal control described by the *Carter* factors, a defendant may be characterized as an employer for FLSA purposes if he or she exercises functional control over the workers in question. *Zheng*, 355 F.3d at 72.  The Second Circuit has declined to circumscribe this analysis to a precise set of factors, noting instead that a district court is "free to consider any [] factors it deems relevant to its assessment of the economic realities."  *Id*. at 71-72; *accord Irrizary*, 722 F. 3d at 105.

### 2.    Employer Status Of Kelai, Yang, And Huang

Feng has established, and Defendants do not dispute, that Kelai was Feng's employer.  The Defendants do dispute, however, whether individual Defendants Yang and Huang were Feng's employers.

The preponderance of evidence proves that Yang was one of Feng's employers. Yang had the power to hire and fire employees, exercised control over employees' schedules and conditions of employment, and maintained the Restaurant's records to some extent, particularly after the Restaurant closed.  As noted above, Yang was impeached with his own deposition testimony that manager Qin needed his permission before hiring a new employee and that Yang would "make the final decision" (Tr. 97:7-14, 98:3-22, 103:1-15), just as he made the final decision to fire employees.  (Tr. 103:3-6.) Yang's attempt to pin the relevant decision-making on Qin does not absolve him of having

the requisite operational control; "[a] person who exercises operational control over a business, including with respect to the conditions of employment ... cannot insulate himself from liability by inserting a manager into his relationship with an employee." *Keawsri v. Ramen-Ya Inc.*, No. 17-CV-2406, 2021 WL 3540671, at *6 (S.D.N.Y. Aug. 10, 2021).

Yang conferred with Qin regarding how to address employees' requests for leave and other issues; kept Qin apprised of the minimum wage, and of what the employees' regular hours should be; directed Qin to instruct employees to sign their timesheets; and directed Qin to treat employees' time between 3:00 p.m. and 6:00 p.m. as nonworking time. (*See* Tr. 74:18–25, Tr. 76:15–17, 82:6–83:7, 87:18–88:17, 98:3–5, 103:16–22.) Yang "d[id] the payroll," and in exercise of his payroll responsibilities, collected timesheets and pay records from Qin, forwarded them to Kelai's accountant, wrote employees' paychecks (including Feng's), and gave those paychecks to Qin to give to the employees. (*See* Tr. 36:14-37:13, 39:22-40:3, 73:3–6, 75:1–76:14, 85:14–25, 88:24– 89:10, 108:15-109:2, Ex. 4.)   After the Restaurant closed, Yang removed its records stored on its premises to his home. (*See* Tr. 78:12–20, 122:11–17; *see also* Tr. 105:3– 5 (admitting to keeping and maintaining Kelai Corp's records).)   Further, Yang, in part, prepared Feng's wage notices (*See* Ex. C at D019; Tr. 110:14-112:23.)   In short, each of the four *Carter* factors apply to Yang and demonstrate that he was Feng's employer.

Feng has not, however, proven by a preponderance of the evidence that Huang was one of his employers.   Huang was essentially a "passive" investor who had little involvement with the Restaurant.   *See Camara v. Kenner*, No. 16-CV-7078, 2018 WL 1596195, at * 7 (S.D.N.Y. March 29, 2018) (individuals were not employers where they

were merely "passive investors" with no role in the "day-to-day operations" of any of the restaurant chain's stores). He rarely visited the Restaurant and was "completely detached from the daily operations." *See Gao*, 2024 WL 664718, at *17 (although an owner and corporate officer, defendant was not employer as he was "completely detached from the daily operations of the restaurant"); *see also Chen v. Lilis 200 West 57th Street Corp*., No. 19-CV-7654, 2023 WL 2388728, at *5 (S.D.N.Y. March 7, 2023) ("Courts have routinely held that company investors or founders with similarly limited day-to-day involvement in the company's operations are not personally liable for the company's FLSA violations" and collecting cases). Neither his formal title as Vice President of Kelai or Feng's referring to him with the informal title of "boss" makes Huang an employer. *See Wing Chan v. Xifu Food, Inc.*, No 18-CV-5445, 2020 WL 5027861, at *5 (E.D.N.Y. Aug. 5, 2020), *R. & R. adopted*, 2020 WL 5027147 (E.D.N.Y. Aug. 25, 2020) (concluding that an individual known by a store employee as "the boss" who had an ownership interest in the store and who was only present at the store occasionally to deliver ingredients and materials was not an employer); *Camara*, 2018 WL 1596195, at *6 ("For an individual to be an employer, there must be more than just evidence that the individual is an owner or officer of a company") (cleaned up).[13]

Feng points to several other indicia he claims demonstrate Huang was his employer. Those include Huang's having agreed to retain the employees of the Restaurant when he and Yang acquired it from Yang's in-laws; being identified as a

---

[13] This opinion uses a "(cleaned up)" parenthetical to indicate that internal quotation marks, brackets, citations, emphases, or combinations thereof have been omitted from the quoted source. Any further alterations or emphases added to the quoted source by this Court are noted in a separate parenthetical.

principal on Kelai's liquor license; instructing Yang how to incorporate Kelai and obtain a certificate of authority to collect sales tax; serving as guarantor of the Restaurant's lease; fixing the time-keeping system when it failed; directing Qin to comply, and how to comply, with New York's liquor law; and advising Yang of changes in the minimum wage rate and how to comply with New York's labor law for obtaining signatures on wage notices and paying the minimum wage.  (Pl. FFCL at 26-28.)

None of those acts separately or together, show that Huang possessed control, formally or functionally, over the Restaurant's operations "in a manner that relate[d] to [Feng's] employment."   *See Irrizary*, 722 F. 3d at 109.  Rather, they merely show "incidental indicia of control" that are insufficient to create and employer-employee relationship.  *See* Gao, 2024 WL 664718, at *16 (quoting *Hart*, 967 F. Supp.2d at 926); *Lilis 200 West 57th Corp.*, 2023 WL 2388728, at *5 ("an owner's general involvement in managing the business, such as by negotiating its leases or supervising its operation, has little or nothing to do with a plaintiff's employment and therefore does not bear on whether the business owner is an 'employer'"); *Camara*, 2018 WL 1596195, at * 7 (owner and founder was not employer of delivery workers where they had "no involvement in supervising delivery personnel" and did "not make hiring or firing decisions with regard to delivery personnel").

The evidence at trial fell well short of establishing that Huang either formally or functionally controlled Feng's status as an employee.  Indeed, Huang exhibited less involvement with the Restaurant's employees than individuals who were deemed not to be employers in other cases.  *See*, *e.g.*, *Tapia v. Blch 3rd Ave. LLC*, No. 14-CV-8529, 2016 WL 4581341, at *3, 8 (S.D.N.Y. Sept. 1, 2016) (concluding that part owner who was

"involved in the general management" of the restaurant, came to the restaurant daily, gave instructions to managers and supervised staff, and reviewed payroll records each week was not an employer), *aff'd* 906 F.3d 58 (2d Cir. 2018); *Salinas v. Starjem Restaurant Corp.*, 123 F. Supp.3d 442, 463-65 (S.D.N.Y. 2015) (concluding that majority shareholder who sometimes gave bussers directions, who typically visited the restaurant every day it was open, who was considered a "boss" by plaintiffs, and who signed employee paychecks was not an employer).

Under the totality of the circumstances, the "economic reality" is that Huang was not Feng's employer.

## B.  Interstate Commerce

The FLSA additionally has an interstate commerce requirement.  The FLSA defines "commerce" to mean "trade, commerce, transportation, transmission, or communication among the several States or between any State and any place outside thereof."  29 U.S.C. § 203(b).  The interstate commerce requirement can be met on either an individual or enterprise basis.  *Jai Fu Chen v. New 9th Ave Pearl On Sushi Inc.*, No. 14-CV-580, 2015 WL 3947560, at *3 (S.D.N.Y. June 29, 2015).  Under individual coverage, plaintiffs may establish that they were personally "engaged in commerce or in the production of goods for interstate commerce" within the meaning of the FLSA.  "In making this determination, the court must 'focus on the activities of the employees and not on the business of the employer.'"  *Xelo v. Mavros*, No. 03-CV-3665, 2005 WL 2385724, at * 4 (*quoting Mitchell v. Lublin, McGaughy and Associates*, 358 U.S. 207, 211 (1959)).  Here, Feng "does not and cannot make a claim for individual coverage under the FLSA.  For the relevant period, plaintiff worked as a deliveryman for Chinese take-out

food for [the Restaurant].  Because he did not produce any food, nor did the food that he delivered cross state lines, he was thus not 'engaged in commerce or in the production of goods for interstate commerce' within the meaning of the FLSA."  *Xi Dong Gao v. Golden Garden Chinese Restaurant, Inc.*, No. 13-CV-4761, 2014 WL 8843301, at *5 (E.D.N.Y. Dec. 16, 2014).

An enterprise is "engaged in commerce or in the production of goods for commerce" if (1) it "has employees engaged in commerce or in the production of goods for commerce" or "has employees handling, selling, or otherwise working on goods or materials that have been moved in or produced for commerce by any person" and (2) its "annual gross volume of sales made or business done is not less than $500,000 (exclusive of excise taxes at the retail level that are separately stated)."  29 U.S.C. § 203(s)(1)(A)(i)-(ii).  Feng has proven that during his employment, Kelai met the FLSA's enterprise requirement for 2018 but not earlier years.  Kelai's gross sales during 2018 were $510,936.  (Ex. A1 at D345, D347.)  Kelai's gross sales during 2016 and 2017 were less than $500,000.  (*Id.*)  As discussed below, Feng primarily grounds his claims and the damages he seeks in the NYLL.  Accordingly, for liability and damages, it is irrelevant that the enterprise sales threshold for the FLSA is satisfied for only one of the three calendar years he worked at Kelai.

With respect to the other interstate commerce prong, the Court reasonably infers from the nature of its business as a restaurant located in New York City that Kelai handled goods, such as food and other supplies, that originated outside of New York and regularly traveled through interstate commerce.  *See Cabrera v. Canela*, 412 F. Supp.3d 167, 174 (E.D.N.Y. 2019) ("To decline to make reasonable inferences of interstate commerce in

cases like this would frustrate the FLSA's remedial purpose and would give employers perverse incentives to default in FLSA actions, where plaintiff workers may lack specific information about their employers' distribution networks.  The Court refuses to handicap working men and women in such a manner.").  In short, the interstate commerce requirement of the FLSA is satisfied in this case.

### FAILURE TO PAY REQUISITE WAGES

Feng contends that he was not properly paid a minimum wage, did not receive pay for overtime in excess of 40 hours per week, and was not paid as required by law for days on which he worked more than ten hours.  The Court agrees on all counts.

### A.   Burdens

Under the FLSA, an employee bears the burden of proving that he was not properly compensated by their employer for the employee's work. *Daniels v. 1710 Realty LLC*, 497 Fed. App'x 137, 139 (2d Cir. 2012).  "Where an employer's payroll records are inaccurate or incomplete, courts apply a burden-shifting scheme to determine whether an employee has established that he was underpaid, and what damages he suffered." *Marcelino v. 374 Food, Inc.*, No. 16 Civ. 6287, 2018 WL 1517205, at *15 (S.D.N.Y. March 27, 2018).  In such instances, "an employee has carried out his burden if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference."  *Kuebel v. Black & Decker Inc.*, 643 F.3d 352, 362 (2d Cir. 2011) (quoting *Anderson v. Mount Clemens Pottery Co.*, 328 U.S. 680, 687 (1946)). The Second Circuit has noted that this burden "is not high" and may be satisfied through an employee's "estimates based on his own recollection." *Id.* at 362.

If an employee satisfies this initial showing, "the burden then shifts to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 456 (2016) (internal quotation marks and citation omitted). "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result may only be approximate." *Gonzalez v. Masters Health Food Service Inc.*, No. 14 Civ. 7603, 2017 WL 3835960, at *16 (S.D.N.Y. July 27, 2017) (quoting *Kuebel*, 643 F.3d at 362); *see also Hosking v. New World Mortgage, Inc.*, 570 F. App'x 28, 32 (2d Cir. 2014) (noting "that the employee's burden of proving damages under the FLSA is minimal, particularly when the employer does not keep records").

The NYLL applies a similar framework to unpaid compensation claims and expressly provides that "where an employer fails to 'keep adequate records or provide statements of wages to employees as required' by the statute, the employer 'shall bear the burden of proving that the complaining employee was paid wages, benefits and wage supplements.'" *Gamero v. Koodo Sushi Corp.*, 272 F. Supp.3d 481, 498 (S.D.N.Y. 2017) (quoting NYLL § 196-a(a)).

Here, Defendants produced multiple sets of records, including records from the TimeStation system, Tip-Out records, and Handwritten records. As set forth above in the discussion of facts, however, those records suffer from gaps in time, inconsistencies with each other, and factually inaccurate information, particularly regarding the number of hours worked by Feng. Accordingly, Feng may meet his burden based on his recollections, while Defendants must respond with evidence of the precise amount of

26

work that Feng performed or evidence negating the reasonable inferences drawn from Feng's testimony.  Feng has amply met his burden in all respects, including the fact that he worked eleven hours per day and through the 3:00 to 6:00 p.m. afternoon period. Defendants offered nothing credible or sufficient to undermine, let alone negate, Feng's recollections.  Moreover, Feng's testimony was corroborated by receipts and by Yang's testimony during cross-examination.  (*See* Tr. 21:5-27:14, 106:9-107:11.)

**B.    Unpaid Minimum Wage**

The FLSA and the NYLL each require an employer to pay not less than a statutorily set minimum wage for each hour of work.  See 29 U.S.C. § 206(a)(1); NYLL § 652(1); 12 N.Y.C.R.R. § 146-1.2.b.   A plaintiff is entitled to damages under only one statute. *Gamero*, 272 F. Supp.3d at 498 ("an employee may not receive a 'double recovery' of back wages under both the FLSA and the NYLL") (internal quotation marks removed) (quoting *Hernandez v. Jrpac Inc.*, No. 14 Civ. 4176, 2016 WL 3248493, at *31 (S.D.N.Y. June 9, 2016)).   "The federal minimum wage," however, "does not preempt the state minimum wage, . . . and a plaintiff may recover under whatever statute provides the highest measure of damages."  *Wicaksono v. XYZ 48 Corp.*, No. 10-CV-3635, 2022644, at *3 (S.D.N.Y. May 2, 2011), *R. & R. adopted*, 2011 WL 2038973, at *1 (S.D.N.Y. May 24, 2011); *see also Gamero*, 272 F. Supp.3d at 498 (the Court has discretion to award Plaintiffs damages under "the statute providing the greatest amount of relief").

Assessing whether an employee has been properly paid requires determination of their "regular" rate of pay, which can then be compared to the statutory minimum wage. *Java v. Aguila Bar Restaurant Corp.*, No. 16-CV-6691, 2018 WL 1953186, at *10 (S.D.N.Y. April 25, 2018) ("Under both the FLSA and NYLL, once the Court determines

the 'actual number of hours worked' per week and calculates the 'regular rate' based on those hours, the 'regular rate' is then compared to the statutorily-imposed minimum wage to determine whether the employee has been underpaid").  The New York Hospitality Wage Order (the "Wage Order"), which applies in this case, provides that where "an employer fails to pay an employee an hourly rate of pay, the employee's regular hourly rate of pay shall be calculated by dividing the employee's total weekly earnings, not including exclusions from the regular rate, by the lesser of 40 hours or the actual number of hours worked by that employee during the work week."[14]  12 N.Y.C.R.R. § 146-3.5(b).

Feng was paid a daily rate – $60, later raised to $64, per day – not an hourly rate. The Wage Order thus controls here.  *See Lopez v. Royal Thai Plus,* LLC, No. 16-CV-4028, 2018 WL 1770660, at *1, 7 (E.D.N.Y. Feb. 6, 2018) (applying Wage Order where Plaintiff was paid $100 a day); *R. & R. adopted*, 2018 WL 1770555 (E.D.N.Y. Apr. 12, 2018); Romero *v Rung Charoen Sub, Inc.*, No. 16-CV-1239, 2017 WL 4480758, at *10 (E.D.N.Y. Sept. 30, 2017) (same).

Whether or not an employee was a "tipped" employee also affects the determination of the employee's minimum wage.  Under "'[b]oth the FLSA and the NYLL,'" an employer may "'pay a tipped worker a cash wage that is lower than the statutory

---

[14] Under the FLSA, the "regular rate" of pay is determined by "dividing an employee's total remuneration for employment (except statutory exclusions) in any workweek by the total number of hours actually worked." *Romero v. Anjdev Enterprises.*, Inc., No. 14-CV-457, 2017 WL 548216, at *10 (S.D.N.Y. Feb. 10, 2017) (alteration omitted) (citing 29 C.F.R. § 778.109).   Moreover, under both the FLSA and NYLL, there is a rebuttable presumption that an employer's payment of a weekly salary represents compensation for the first 40 hours of an employee's workweek.  *Perez Garcia v. Hirakegoma Inc.*, No. 17-CV-7608, 2020 WL 1130765, at *8 (S.D.N.Y. March 9, 2020) (quoting *Pinovi v. FSS Enterprises, Inc.*, No. 13-CV-2800, 2015 WL 4126872, at *4 (S.D.N.Y. July 8, 2015).  Here, Defendants have not presented any evidence sufficient to rebut that presumption.

minimum wage, provided that the cash wage and the employee's tips, taken together, are at least equivalent to the minimum wage[,]'"; "'[t]his allowance against the minimum cash wage is known as a 'tip credit.'" *Gamero*, 272 F. Supp.3d at 500 (quoting *Inclan v. New York Hospital Group, Inc.*, 95 F.Supp.3d 490, 497 (S.D.N.Y. 2015)).  An employer may not take a tip credit unless (1) "such employee has been informed by the employer of the [tip credit] provision[ ]"; and (2) "all tips received by such employee have been retained by the employee." 29 U.S.C. § 203(m)(2)(A)(ii).  The tip-credit provision is strictly construed, "and must be satisfied even if the employee received tips at least equivalent to the minimum wage." *Zhou v. Aberdeen Dim Sum and Seafood Inc.*, No. 14-CV-2014, 2016 WL 6238651, at *2 (S.D.N.Y. Oct. 24, 2016) (quoting *Chung v. New Silver Palace Restaurant*, Inc., 246 F. Supp.2d 220, 228-29 (S.D.N.Y. 2002)); *accord Jrpac*, 2016 WL 3248493, at *23).  Under both the FLSA and the NYLL, the burden is on the employer to show that they have complied with the tip credit requirements.  *Valle v. Gordon Chen's Kitchen LLC*, 254 F. Supp.3d 665, 672-73 (S.D.N.Y. 2017).

Under the NYLL, notice of the tip credit must be in writing and provided both in English and the employee's primary language.   12 N.Y.C.R.R. § 146-2.2(a); *accord Inclan*, 95 F. Supp.3d at 498.  Moreover, once an employer has provided written notice of the tip credit, the employer must obtain "acknowledgement of receipt signed by the employee," which must "be kept on file for six years." 12 N.Y.C.R.R. § 146-2.2(c).  "'Courts in and outside of this District 'have interpreted the notice provision to require at the very least notice to employees of the employer's intention to treat tips as satisfying part of the employer's minimum wage obligations.'" *Jrpac*, 2016 WL 3248493, at *23 (quoting

*Copantitla v. Fiskardo Estiatorio, Inc.*, 788 F. Supp.2d 253, 287 (S.D.N.Y. 2011) (internal citations and quotation marks omitted)).

Here, no tip credit may be applied in favor of Defendants.  Qin informed Feng that he would receive some tips, but did not inform him about the tip credit.  (Tr. 14:17-15:7.)  The 2016 Notice presented to Feng – several days after he started and for which he did not receive a copy – contained factually incorrect information:  it misrepresented Feng's rate of pay as hourly rather than daily; and, it did not clearly indicate how the tip credit would be applied.   The 2017 and 2018 Notices also contained incorrect information; indicated net cash wage and tip credit amounts exceeding the permitted threshold; and, in any event, were not signed by Feng.  Accordingly, the Court will not apply a tip credit in determining the minimum wages due to Feng.[15]

Without the benefit of the tip credit, Defendants did not pay Feng the minimum wage required under the NYLL.  Under the Wage Order, Feng's regular rate of pay is determined as follows.  His weekly salary is the product of his daily salary multiplied by the number of workdays per week.  That salary is deemed to cover only the first 40 hours worked during the week.  His regular rate of pay is then calculated by dividing his weekly salary by 40.  So, for example, during the period he was earning $60 per day, and for the weeks he worked 55 hours per week, his regular rate of pay was $7.50 per hour ($60 x 5 days / 40 hours).  For weeks he worked four days for a total of 44 hours, his regular rate

---

[15] With respect to the second prerequisite for taking the tip credit, the proof at trial was not definitive.  On one hand, some of the records do not document Feng's receipt of tips for certain periods of time; on the other hand, Feng did not testify that he did not receive tips he should have been paid.  The Court need not resolve this factual issue, however, inasmuch as Defendants did not satisfy the notice requirement.

of pay was $6.00 per hour; and for weeks he worked six days for a total of 66 hours, his regular rate of pay was $9.00 per hour.  After his pay increased to $64 per day on January 1, 2018, Feng's regular rate of pay was $9.60 for a six-day week, $8.00 for a five-day week, and $6.40 for a four-day week.

For comparison, the applicable minimum wage for a delivery worker like Feng working for a large employer (11 or more employees) in New York City was $9.00 per hour for 2016, $11.00 per hour for 2017, and $13.00 per hour for 2018.[16]  12 N.Y.C.R.R. § 146-1.2.  When Feng's regular rate of pay is compared to the applicable minimum wage, it is evident that Feng did not receive minimum wage for any of the weeks he worked at the Restaurant, except during the two weeks he worked six days a week during 2016 (*see* Damages Schedule (Dkt. 105-28), "Minimum Wage Shortfall/Week" column).  Feng is entitled to recover the minimum wage shortfall in his pay from each week of employment other than those two weeks.

## C.   Unpaid Overtime

New York requires employers to pay employees "a wage rate of 1 ½ times the employee's regular rate for hours worked in excess of 40 hours in one workweek."  12 N.Y.C.R.R. § 146-1.4; *see also Nakahata v. New York-Presbyterian Healthcare System, Inc.,* 723 F.3d 192, 200 (2d Cir. 2013) (citing 12 N.Y.C.R.R. § 142-2.2).  A successful claim for unpaid overtime requires proof that the plaintiff performed the work, with the employer's actual or constructive knowledge, and was not properly compensated. *Kuebel*, 643 F.3d at 361.  More particularly, a plaintiff must show that they worked 40

---

[16] In contrast to the NYLL minimum wage rates, the federal minimum wage for the relevant time period was $7.25 each year.  *See* https://www.dol.gov/agencies/whd/state/minimum-wage/history (last visited March 27, 2024).

hours in a given workweek as well as some uncompensated time in excess of the 40 hours. *See Lundy v. Catholic Health System of Long Island Inc.*, 711 F.3d 106, 114 (2d Cir. 2013).

The proof at trial firmly established that Feng worked in excess of 40 hours most every week and that he was not paid for overtime hours. Rather, he received a flat daily rate that was the same regardless of the number of hours worked. Defendants intentionally did not pay him for working during 3:00 p.m. to 6:00 p.m., and even during weeks when he worked in excess of 40 hours – not counting the 3:00 to 6:00 p.m. period – he did not receive overtime pay. Indeed, he did not receive any pay for the extra hours worked. Accordingly, Feng is entitled to damages for non-payment of overtime.

## D.    Unpaid Spread Of Hours

In addition to the minimum wage and overtime requirements, the NYLL permits an employee to receive "spread-of-hours" pay, which is defined as "one hour's pay at the basic minimum hourly wage rate" for any workday that lasts longer than 10 hours. 12 N.Y.C.R.R. § 142-2.4(a); *see also* 12 N.Y.C.R.R. § 146-1.6(a) ("On each day on which the spread of hours exceeds 10, an employee shall receive one additional hour of pay at the basic minimum hourly rate"); *Shahriar v. Smith & Wollensky Restaurant Group, Inc.*, 659 F.3d 234, 242 (2d Cir. 2011) (citing 12 N.Y.C.R.R. § 146-1.6 and its predecessor). Here, Feng has proven through his recollection and testimony that he generally worked eleven hours a day five days a week and was not paid for the spread of hours.

## E.    Damages For Unpaid Wages

### 1.    The Applicable Damages Period

The statute of limitations is six years for claims under the NYLL, three years for claims under the FLSA if a defendant's acts are willful, and two years if they are not. 29

U.S.C. § 255(a); NYLL § 663(3); *see also Angamarca v. Pita Grill 7 Inc.*, No. 11-CV-7777, 2012 WL 3578781, at *4 (S.D.N.Y. Aug. 2, 2012).  The period for which Feng seeks damages begins on August 10, 2016.  Having commenced this case on December 12, 2018, Feng may recover damages for the entirety of his employment at the Restaurant under the NYLL.  Under the FLSA, Feng may also recover damages for the entirety of his employment at the Restaurant in the event of willful violations, and all but August 10, 2016 to December 12, 2016 for non-willful violations.  There are no damages at issue, however, that Feng could recover only under the FLSA and not the NYLL.  As a result, he may recover damages for the entire period of his employment.

**2.   Statute Providing The Greatest Recovery**

Although "plaintiffs may not recover under both the FLSA and the NYLL for the same injury, courts allow plaintiffs to recover under the statute that provides for the greatest relief."  *Ni v. Bat-Yam Food Services. Inc.*, No. 13-CV-7274, 2016 WL 369681, at *1 (S.D.N.Y. Jan. 27, 2016) (internal quotation marks omitted).  The NYLL permits greater or equal recovery than the FLSA at all relevant times during Feng's employment at the Restaurant.  Accordingly, the Court will apply the NYLL for all damages calculations.  *See Burns v. Scott*, 635 F. Supp.3d 258, 274 (S.D.N.Y. 2022) (adopting report and recommendation applying NYLL instead of FLSA because the NYLL "provides for equal or greater recovery" than FLSA); *Gomez v. NYHS Design Inc.*, No. 20-CV-4174, 2022 WL 4284143, at *3 (S.D.N.Y. Sept. 16, 2022) ("Because the NYLL provides for the greater recovery in [this] case, we address only the provisions of the NYLL"), *R. & R. adopted*, 2022 WL 6175174 (S.D.N.Y. Oct. 6, 2022).

### 3.   Calculation Of Unpaid Wages

To ascertain the total amount of Feng's unpaid wages, the Court addresses separately the amount due for each of minimum wage shortfall, unpaid overtime, and spread-of-hours pay.

**Minimum wage underpayments:**  As explained above, Feng did not receive the minimum wage for all but two weeks of his employment.  The minimum wage shortfall is determined by subtracting Feng's regular hourly wage from the minimum wage and multiplying by 40.  For instance, for weeks the minimum wage was $9.00 but Feng received a regular rate of pay of only $7.50, there was a shortfall of $1.50 for each of 40 hours for a total of $60.00.  For weeks the minimum wage was $11.00 but Feng received a regular rate of pay of only $7.50, the shortfall was $140.00.  And during weeks the minimum wage was $13.00 but Feng received a regular rate of pay of only $7.50, the shortfall was $200.  The total minimum wage shortfall, reflected in the Damages Schedule, is $16,964.

**Unpaid overtime:**  For purposes of determining overtime payment, the applicable base rate is the employee's regular rate of pay or the minimum wage, whichever is greater.  *Sanchez v. Ms. Wine Shop Inc.*, 643 F. Supp.3d 355, 377 (E.D.N.Y. 2022)*; see* 29 C.F.R. § 778.107 (requiring use of regular rate of pay not less than statutory minimum); 12 N.Y. C.C.R.R. § 142-2.2 (providing that the regular rate should be calculated "in the manner and methods provided in" the FLSA).  The overtime rate is calculated as one-and-a-half times the regular rate; the overtime rate is then multiplied by the number of unpaid overtime hours each week.  In every week, the New York statutory minimum wage exceeded Feng's regular rate of pay, except for two weeks in which they were equal.  The resulting amount of unpaid overtime for each week of Feng's employment is set forth in

the Damages Schedule ("Overtime Shortfall / Week" column).  The total amount is $28,957.50.

**Spread of hours:**  The preponderance of evidence established that Feng worked more than ten hours each day of his employment.  The damages due for unpaid spread of hours payments is readily calculated by multiplying the number of his days of employment by the minimum hourly wage rate applicable at the time.  *See* 12 N.Y.C.R.R § 142-2.4.  The Damages Schedule calculates Feng's unpaid spread-of-hours pay on a weekly basis, resulting in a total of $6,475.00.  (*See* Damages Schedule, "Spread of Hours Shortfall / Week" column.)

Adding up the total shortfall in minimum wages, unpaid overtime, and unpaid spread-of-hours, the total amount of unpaid wages to which Feng is entitled is $52,396.50.

### 4. Liquidated Damages

Both the FLSA and the NYLL provide for liquidated damages.  Under the FLSA, any employer who violates the minimum wage and overtime provisions of the FLSA is presumptively liable to the affected employees, in addition to back pay, for 100% of the unpaid wages as liquidated damages.  29 U.S.C. § 216(b) ("Any employer who violates the provisions … of this title [relating to minimum wages and overtime compensation] shall be liable to the employee or employees affected in the amount of their unpaid minimum wages, or their unpaid overtime compensation … and in an additional equal amount as liquidated damages.").  Liquidated damages are awarded unless the employer demonstrates that they acted in good faith, in which case the decision to impose liquidated damages is discretionary.  29 U.S.C. §§ 216(b), 260; *Barfield*, 537 F.3d at 150 ("Under the FLSA, a district court is generally required to award a plaintiff liquidated damages

equal in amount to actual damages ... [unless] the employer shows that, despite its failure to pay appropriate wages, it acted in subjective 'good faith' with objectively 'reasonable grounds' for believing its acts or omission did not violate the FLSA"). The employer bears the burden of establishing that liquidated damages should not be awarded. *Reich v. Southern New England Telecommunications. Corp.*, 121 F.3d 58, 71 (2d Cir. 1997). "[B]ut the burden is a difficult one, with double damages being the norm and single damages the exception." *Herman*, 172 F.3d at 142. "To establish good faith, the employer must take active steps to ascertain the dictates of the FLSA and then act to comply with them." *Id*.

The NYLL rules are similar. *See Rana v. Islam*, 887 F.3d 118, 122-23 (2d Cir. 2018) ("While the wording of the FLSA and NYLL liquidated damages provisions are not identical, there are no meaningful differences, and both are designed to deter wage-and-hour violations in a manner calculated to compensate the party harmed." (internal quotation marks and citations omitted); *Garcia v. Giorgio's Brick Oven and Wine Bar*, No. 11-CV-4689, 2012 WL 3339220, at *4 (S.D.N.Y. Aug. 15, 2012) ("Effective April 9, 2011, Sections 198(1-a) and 663(1) of the NYLL were amended to provide for liquidated damages equal to one-hundred percent of the amounts underpaid."), *R. & R. adopted*, 2012 WL 3893537 (S.D.N.Y. Sept. 7, 2012). A plaintiff may recover liquidated damages for unpaid wages under either the FLSA or the NYLL, whichever provides for a greater recovery. *Morales v. Mw Bronx, Inc.*, No. 15-CV-6296, 2016 WL 4084159, at *10 (S.D.N.Y. Aug. 1, 2016). However, a plaintiff is not entitled to double recovery of liquidated damages. *Rana*, 887 F.3d at 123 ("We therefore interpret the NYLL and FLSA as not allowing duplicative liquidated damages for the same course of conduct.").

Here, Defendants have not proven that they acted in good faith; to the contrary, the evidence clearly establishes that Kelai and Yang willfully violated the FLSA and NYLL by failing to pay Feng a minimum wage, overtime, and a spread-of-hours premium.  Their willfulness and lack of good faith is demonstrated by several facts.  Yang was aware of his and Kelai's obligations under the wage and hour laws, as evidenced both by Huang's instructing Yang about them and Yang's apprising Qin about the minimum wage and what employees' "regular" hours should be.  (Tr. 88:2-17, 98:3-5, 103:16-22, 153:21-154:2, 155:2-10.)  Yet, Yang directed Qin not to pay Feng for the hours worked between 3:00 p.m. and 6:00 p.m. (Tr. 82:6-83:7), and knew that the Restaurant did not pay overtime (Tr. 88:18-20).  Yang was responsible for Feng's payroll, and took part in preparing his wage notices, two of which contained Feng's forged signature.  (Tr. 75:4, 110:14-25, 111:17-112:20.)  Additionally, Yang was repeatedly impeached on cross examination by his deposition testimony, which confirmed Yang's having a greater involvement than he initially testified to at trial.  There is no credible evidence that Yang and Kelai acted in good faith to comply with the law.  Feng thus is entitled to liquidated damages in the same amount as his unpaid wages, $52,396.50.

## WAGE NOTICES AND WAGE STATEMENTS

New York's Wage Theft Prevention Act ("WTPA"), part of the NYLL, requires employers to provide employees, at the time of hiring, with a wage notice containing basic information such as rate of pay, whether paid by the hour, day, or otherwise, and deductions taken for any tip credit.  NYLL § 195(1)(a).  The wage notice must be provided both in English and in the employee's native language.  *Id.*  The WTPA provides a private cause of action for statutory damages for an employer's failure to provide the requisite

wage notice within ten business days of the first day of employment; the damages are $50 for each workday that a violation occurs or continues to occur, not to exceed a total of $5,000.  NYLL § 198(1-b).  The WTPA also requires employers to provide, with "every payment of wages," a wage statement identifying the dates covered by the statement, the rate of pay, gross and net wages, and the like.  NYLL § 195(3).  An employee can recover $250 for each workday that a wage statement violation occurs or continues to occur, not to exceed a total of $5,000.  NYLL § 198(1-d).  The regulatory provision accompanying the wage notice and statement requirements clarifies that "[t]he employer has the burden of proving compliance." 12 N.Y.C.R.R. § 146-2.2(d).

The evidence at trial showed that Defendants did not comply with the wage notice and statement requirements.  Although Defendants provided Feng with a wage notice within ten days of being hired, they did not give Feng a copy to keep, and, in any event, the notice contained inaccurate information as described above.  *See Metcalf v. TransPerfect Translations International, Inc.,* No. 19-CV-10104, 2023 WL 2674743, at *6 (S.D.N.Y. March 29, 2023) (denying motion to dismiss where plaintiffs alleged that wage notices and statements were inaccurate); *Swanson v. Manhattan Beer Distributors, LLC*, No. 15-CV-5383, 2020 WL 13560054, at *6 (E.D.N.Y. Oct. 19, 2020) ("The furnishing of accurate information is the legislative objective of NYLL § 195, which creates a cause of action where an employer has provided a notice that inaccurately reflects an employee's wage calculation") (internal quotation marks and citations omitted); *cf. Brito v. Lucky Seven Restaurant & Bar, LLC*, No. 19-CV-3786, 2021 WL 1131506, at *12 (S.D.N.Y. March 24, 2021) (stating in reference to § 195(3) that "courts have held employers liable for wage statements with missing or incorrect information").  And while Defendants

purport to have provided Feng with wage notices in 2017 and 2018, Feng credibly testified that his purported signatures on the forms were not authentic.  In any event, those two notices contain inaccurate information as well.  The record also lacks any evidence that Defendants provided Feng with a wage statement with each payment of his wages.

Nonetheless, Feng may not recover on his wage notice and statement claims in this Court because Feng lacks standing to assert them.  The Supreme Court has "rejected the proposition that 'a plaintiff automatically satisfies standing's injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right.'"[17]  *TransUnion v. Ramirez*, 594 U.S. 413, 426 (2021) (quoting *Spokeo, Inc. v. Robins*, 578 U. S. 330, 341 (2016)).  "Only those plaintiffs who have been *concretely harmed* by a defendant's statutory violation may sue that private defendant over that violation in federal court."  *Id*. at 247 (emphasis in original).  Without a concrete injury fairly traceable to the alleged statutory violation, the plaintiff lacks Article

---

[17]  "The requirements of Article III standing are well established: '[A] plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'"  *Lacewell v. Office of Comptroller of Currency*, 999 F.3d 130, 141 (2d Cir. 2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).  These requirements are "an indispensable part of [a] plaintiff's case" and must be established "with the manner and degree of evidence required at the successive stages of the litigation."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992).  "[A] plaintiff must demonstrate standing for each claim he seeks to press."  *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006).  This principle applies to state law claims under supplemental jurisdiction no less than federal claims.  The court thus cannot "exercise supplemental jurisdiction over a [state law] claim that does not itself satisfy [the] elements of the Article III inquiry."  *Id*. at 351-52; *see Sharehold Representative Services LLC v. Sandoz Inc.*, No. 12-CV-6154, 2013 WL 4015901, at *7 (S.D.N.Y. Aug. 7, 2013) ("The fact that the claims arise from a common set of facts does not relieve the plaintiff of its obligation to demonstrate constitutional standing to sue for each one").

III standing.  *See Sevilla v. House of Salads One LLC*, 20-CV-6072, 2022 WL 954740, at
*7 (E.D.N.Y. March 30, 2022).

In the wake of *Transunion*, decisions in this Circuit have been far from uniform in
what they deem necessary for a plaintiff to establish standing when alleging violation of
the wage notice and statement laws. *Lipstein v. 20X Hospital LLC*, No. 22-CV-4812, 2023
WL 6124048, at *8 (S.D.N.Y. Sept. 19, 2023) (collecting cases and observing that
"[c]ourts within this Circuit, and even within this District, have come to differing
conclusions").  Many courts have dismissed bare claims of an employer's failure to
provide wage notices and statements.  *See*, *e.g.*, *Neor v. Acacia Network, Inc.*, No. 22-
CV-4814, 2023 WL 1797267, at *4 (S.D.N.Y. Feb. 7, 2023) (dismissing wage notice and
statement claim due to failure to plead facts demonstrating employees' standing); *Beh v.
Community Care Companions Inc.*, No. 19-CV-1417, 2022 WL 5039391, at *7-8
(W.D.N.Y. Sept. 29, 2022) (finding that "[w]hile the deficiencies in defendants' provisions
of hiring notices may amount to violations of the labor law, neither plaintiffs nor the record
demonstrates how those technical violations led to either a tangible injury or something
akin to a traditional cause of action, as required by the Supreme Court"); *Sevilla*, 2022
WL 954740, at *7 (finding that "[w]hile Defendants did not provide proper wage notice and
statements to Plaintiffs, Plaintiffs lack standing to maintain these claims").

On the other hand, many courts have found standing.  Some courts have found it
sufficient that a wage notice claim is accompanied by other claims of related harm such
as unpaid wages.  *E.g.*, *Bello v. Pro-Line Pumping Corp.*, No. 22-CV-4081, 2023 WL
8260830, at *9 (E.D.N.Y. June 20, 2023) ("the bare assertion that [plaintiffs] never
received their statutorily required wage statements and notices" was sufficient for

standing purposes because they were accompanied by claims for wage theft), *R.& R. adopted*, (E.D.N.Y. July 19, 2023).  Others have required demonstration of "downstream" harm, such as depriving the employee of information necessary to recognize that the employee is not receiving pay consistent with the wage and hour laws.  *E.g.*, *Stih v. Rockaway Farmers Market, Inc.*, No. 22-CV-3228, 2023 WL 2760492, at *7 (E.D.N.Y. Apr. 3, 2023) (plaintiff alleged that failure to provide him with proper wage notices injured him by "denying him the right to be adequately apprised of the terms and conditions of his employment").  Still others have found the harm self-evident without requiring proof of downstream effects.  *E.g.*, *Bueno v. Buzinover*, No. 22-CV-2216, 2023 WL 2387113, at *2-3 (S.D.N.Y. March 7, 2023) (collecting cases and holding that specific allegations of downstream harm are not necessary because "[d]enying an employee such notices … can impinge on an employee's interests not only in being paid what is owed, but also in being able to advocate for the receipt of proper pay").

Here, Feng has not demonstrated any concrete injury from not having received compliant wage notices and statements.  Feng presented no evidence that he incurred any harm fairly traceable to Defendants' wage notice and statement violations distinct from the harm incurred by having been underpaid.  Feng demonstrated no downstream consequences from either the one inaccurate notice that was shown to him or the notices and statements that he did not receive. He presented no evidence that he relied on the furnishing of such information or the absence of the information required to be provided. Nor did he testify that the 2016 Notice or absence of other notices and statements caused him confusion or any other possible damage.

To the contrary, Feng's testimony indicates that he was not harmed from inaccurate or absent wage notices and statements. Feng testified that he was aware that he was being paid for only eight hours of work on days he worked eleven hours (Tr. 31:16-18, 45:11-14), and that he was being ordered to record his hours to omit the 3:00 to 6:00 period (Tr. 30:11-20), but that he purposefully did not complain about it for fear of losing his job. (Tr. 45:3-10) In other words, he knew he was being underpaid but chose not to do anything about it, albeit due to the not unreasonable concern for keeping his job.[18] Feng provided no reason to believe that he would have done anything different had he known of other misinformation or lack of information associated with wage notices and statements. Because Feng must establish standing for each claim independently and he has failed to do so for his wage notice and statement claims, those claims must be dismissed. *See Chen v. Hunan Manor Enterprise, Inc.* No. 17-CV-802, 2023 WL 5574854, at *13 (S.D.N.Y. Aug. 29, 2023) (even though Defendants' failure to provide plaintiffs with proper wage notices and statements was undisputed, and even though plaintiffs succeeded on unpaid wages claims, their WTPA claims were dismissed following trial due to lack of standing); *House of Salads One*, 2022 WL 954740, at *7 ("Technical statutory violations that do not lead 'to either a tangible injury or something akin to a traditional cause of action' cannot sustain Article III standing in federal court") (citing *TransUnion*, 594 U.S. at 425-26).

---

[18] Feng also testified that "I didn't know I had an issue with my pay because I didn't know the New York State law." (Tr. 43:7-19.) The Court credits Feng's lack of knowledge of the law, but not that he did not know there was an issue with his pay. As explained above, Feng knew he was being paid for only eight hours a day even though he worked eleven hours a day. The Court does not find that Feng's lack of credibility on that particular issue infected any of his testimony on other issues, which is otherwise credible.

## DEFAULT JUDGMENT AGAINST QIN AND LAN

Defendants Qin and Lan did not appear in the case and are in default.  Feng has moved for default judgment against both of them.

"In determining whether to grant a motion for default judgment, a court within this district considers three factors: (1) whether the defendant's default was willful; (2) whether defendant has a meritorious defense to plaintiff's claims; and (3) the level of prejudice the nondefaulting party would suffer as a result of the denial of the motion for default judgment." *Nespresso USA, Inc. v. Africa America Coffee Trading Co. LLC*, No. 15-CV-5553, 2016 WL 3162118, at *2 (S.D.N.Y. June 2, 2016) (quoting *Indymac Bank, F.S.B. v. National Settlement Agency, Inc.*, No. 07-CV-6865, 2007 WL 4468652, at *1 (S.D.N.Y. Dec. 20, 2007).  Ultimately, the entry of a default judgment is entrusted to the sound discretion of the district court. *Enron Oil Corp. v. Diakuhara*, 10 F.3d 90, 95 (2d Cir. 1993).

The court also "must determine whether the plaintiff has pleaded facts supported by evidence sufficient to establish the defendant's liability with respect to each cause of action." *Nespresso*, 2016 WL 3162118 at *2; *accord Finkel v. Romanowicz*, 577 F.3d 79, 84 (2d Cir. 2009) ("[A district court] is also required to determine whether [plaintiff's] allegations establish [defendant's] liability as a matter of law"). "It is an ancient common law axiom that a defendant who defaults thereby admits all well-pleaded factual allegations contained in the complaint." *City of New York v. Mickalis Pawn Shop, LLC*, 645 F.3d 114, 137 (2d Cir. 2011) (internal quotation marks and citation omitted).  A factual allegation will be deemed not well-pled "only in very narrow, exceptional circumstances." *Ideavillage Products Corp. v. Bling Boutique Store*, No. 16-CV-9039, 2018 WL 3559085, at *2 (S.D.N.Y. July 24, 2018) (internal quotation marks and citation omitted). That said,

a court "must still satisfy itself that the plaintiff has established a sound legal basis upon which liability may be imposed." *Finkel*, 577 F.3d at 84; *accord Jemine v. Dennis*, 901 F. Supp.2d 365, 373 (E.D.N.Y. 2012) (citing *Au Bon Pain Corp. v. Artect, Inc.*, 653 F.2d 61, 65 (2d Cir. 1981)).

The predicate requirements for a default judgment are readily met here. Both Qin and Lan acted willfully in regard to default. That is evident from their having defaulted despite being served with process at multiple steps of the proceedings. (*See* Dkts. 10-11 (service of summons and complaint), Dkts. 113-114 (service of default motion papers).); *see also Indymac* 2007 WL 4468652, at *1 ("Both NSA's and Steven Leff's non-appearance in the action and both NSA's and Steven Leff's failure to respond to the Complaint and the instant motion practice indicate willful conduct"). By virtue of their failure to appear, Qin and Lan have likewise failed to present any meritorious defenses. *Nespresso*, 2016 WL 3162118 at *2 n.3; *Indymac*, 2007 WL 4468652, at *1. And, denying Feng's motion for default judgment would be prejudicial to Feng since he would be left without any recourse against two additional individual defendants who, because of joint and several liability, could potentially contribute to satisfying a judgment.

The question of whether there is a sound legal basis for Qin and Lan's liability comes down to whether they were, along with Kelai and Yang, Feng's employers. The Complaint alleges that both Qin and Lan fulfilled each of the *Carter* factors indicative of employer control: power to hire and fire employees, supervision and control of employee work schedules or conditions of employment, determination of the rate and method of payment, and maintenance of records. (Compl. ¶¶ 17, 20.) Those allegations, however, are merely conclusory and thus not "well pleaded." *See E.A. Sween Co. v. A&M Deli*

*Express Inc.,* 787 F. App'x 780, 782 (2d Cir. 2019) ("A defaulting party admits only well-pleaded factual allegations; it does not admit conclusory allegations or legal conclusions."); *Taizhou Zhongneng Import & Export Co. v. Koutsobinas,* 509 F. App'x 54, 57 (2d Cir. 2013) ("plainly legal conclusions, with no specific factual allegations" were insufficient to establish liability for purposes of entry of default judgment).

The evidence at trial, however, largely corroborates those allegations as to Qin but not sufficiently so for Lan.  According to Yang, Qin operated the Restaurant day-to-day and was in charge of hiring and firing employees, and setting rates of pay and hours and schedules.  (Tr. 74:2-11, 87:22-88:1.)  Lan also managed "the business" although she did not have the title of manager.  (Tr. 93:14-17.)  Feng testified that he was interviewed and hired by both Qin and Lan (Tr. 13:19-14:8, 17:22-24), and that both Qin and Lan were his day-to-day supervisors (Tr. 40:25-41:8, 44:15-17).  Qin set Feng's schedule.  (Tr. 20:10-13.)  Qin instructed Feng that he had to work during so-called free time (Tr. 47:9-20), but had to record that he did not work between 3:00 and 6:00 p.m. (Tr. 30:11-16, 55:20-56:8).  If Feng had wanted to discuss his pay, he would have gone to Qin and Lan.  (Tr. 44:18-45:7.)  The Court finds that the preponderance of evidence shows that Qin was one of Feng's employers along with Yang and Kelai.  That is, Qin had the power to hire and fire, set pay, and set schedules.  She also had some role in handling the Restaurant's payroll and accounting records.  (*See* Tr. 75:1-23.)  Accordingly, Qin is jointly and severally liable for the same damages for which Yang and Kelai are responsible.

The Court does not come to the same conclusion regarding Lan.  Merely being a supervisor or manager does not in and of itself make one an employer; to the contrary supervisors and managers may have claims as employees against their employers.  *See,*

*e.g.*, *Giallanzo v. City of New York*, 630 F. Supp.3d 439, 443 (S.D.N.Y. 2022) ("area supervisor" claim for unpaid overtime);  *Lukaszewski v. County of Ulster*, No. 08-CV-483, 2012 WL 13171529, at *2 (N.D.N.Y. March 22, 2011) (claim by "section supervisors" against employer);  *Rubery v. Buth-Na-Bodhaige, Inc.*, 569 F. Supp.2d 334, 336 (W.D.N.Y. 2008) (class action on behalf of store "managers").   That Lan was involved in managing "the business" is vague and insufficient for the Court to make any determination of what she did in that regard.  Lan did participate in hiring, at least with respect to Feng. But there is no evidence of her having other responsibilities that would establish her actual or functional control as an employer.   It is Feng's burden to prove who his employers were.  *See Chen v. DG & S NY, Inc.*, 406 F. Supp.3d 216, 221 (E.D.N.Y. 2016) ("The burden to establish [defendant's] liability as an employer under the FLSA and NYLL indeed rests with Plaintiffs"); *Murphy v. Lajaunie*, No. 13-CV-6503, 2016 WL 1192689, at *7 (S.D.N.Y. Mar. 22, 2016)  (granting summary judgment in favor of defendant and noting "it is Plaintiffs' burden to establish [defendant's] liability as an employer" under the NYLL); *see generally Estate of Hamilton v. City of New York*, 627 F.3d 50, 57 (2d Cir. 2010) ("[A] plaintiff making a Labor Law claim surely has the burden to demonstrate that the defendant is an 'employer'").   He has not met that burden with respect to Lan.

## PRE-JUDGMENT INTEREST

Under the FLSA, awards of federal liquidated damages serve, in part, as a form of compensatory pre-judgment interest.  *See, e.g.*, *Galeana v. Lemongrass On Broadway Corp.*, 120 F. Supp.3d 306, 321 (S.D.N.Y. 2014); *Yu G. Ke v. Saigon Grill, Inc.*, 595 F. Supp.2d 240, 261 (S.D.N.Y. 2008).  A plaintiff who receives FLSA liquidated damages

may not also receive pre-judgment interest.  *Brock v. Superior Care, Inc.*, 840 F.2d 1054, 1064 (2d Cir. 1988).

In contrast, liquidated damages under the NYLL are considered punitive in nature, thus enabling a plaintiff to recover both liquidated damages and pre-judgment interest. *Yu G. Ke,* 595 F. Supp.2d at 262 (citing *Reilly v. NatWest Markets Group, Inc.*, 181 F.3d 253, 265 (2d Cir. 1999)); *Villanueva v. 179 Third Avenue Restaurant Inc.*, 500 F. Supp.3d 219, 243 (S.D.N.Y. 2020 (collecting cases); *Ting Yao Lin v. Hayashi Ya II, Inc.*, No. 08-CV-6071, 2009 WL 289653, at *7 (S.D.N.Y. Jan. 30, 2009), ("The Second Circuit has held that even where a plaintiff is awarded liquidated damages under New York Labor Law, prejudgment interest … is appropriate."), *R. & R. adopted sub nom.*, *Yao Lin v. Hayashi Ya II, Inc.*, 2009 WL 513371 (S.D.N.Y. Feb. 27, 2009).  Accordingly, Plaintiff is eligible to recover pre-judgment interest on his state law claims at the statutory rate of 9% per annum.  *See* NY CPLR §§ 5001, 5004; *see, e.g.*, *Gurung v. Malhotra*, 851 F. Supp.2d 583, 594 (S.D.N.Y. 2012) (applying pre-judgment interest rate to NYLL claims).

"The Court has discretion to choose a reasonable date from which prejudgment interest should accrue."  *Villanueva*, 500 F. Supp.3d at 243; *Junmin Shen v. Number One Fresco Tortillas, Inc.*, No. 16-CV-2015, 2018 WL 6712771, at *14 (S.D.N.Y. Nov. 26, 2018) (citing *Santana v. Latino Express Restaurants, Inc.*, 198 F. Supp.3d 285, 294-95 (S.D.N.Y. 2016)).  Where, as here, multiple periods of employment are involved with different rates of pay, courts "often choose the midpoint of the plaintiff's employment within the limitations period."  *Junmin Shen*, 2018 WL 6712771 at *14 (quoting *Gamero*, 272 F. Supp.3d at 515 (internal quotation marks omitted)).  Here, the midpoint of Feng's

employment with Defendant covered by the NYLL statute of limitations is September 12, 2017.

Accordingly, Feng should be awarded pre-judgment interest on his unpaid wage damages (but not on liquidated damages) – a principal amount of $52,396.50 – running from September 26, 2017 to the date of judgment at the statutory rate of 9% per annum.

## ATTORNEY'S FEES

Feng seeks compensation for $117,327.67 in attorneys' fees.  (Troy Decl. ¶ 64.) The FLSA and NYLL provide for an award of reasonable attorneys' fees and costs to a prevailing plaintiff in a wage-and-hour action such as this one.  29 U.S.C. § 216(b); NYLL § 198-1; *Tambriz v. Taste and Sabor, LLC*, 577 F. Supp.3d 314, 332 (S.D.N.Y. 2021) (quoting *Callari v. Blackman Plumbing Supply, Inc.*, No. 11-CV-3655, 2020 WL 2771008, at *6 (E.D.N.Y. May 4, 2020) ("Both the FLSA and NYLL are fee-shifting statutes which entitle a plaintiff to an award of reasonable attorney's fees and costs in wage-and-hour actions."), *R. & R. adopted*, 2020 WL 2769266 (E.D.N.Y. May 28, 2020)).  Here, Feng is the prevailing party and entitled to recover his reasonable attorney's fees.

The traditional approach to determining a fee award is the "lodestar" calculation, which is the number of hours expended multiplied by a reasonable hourly rate.  *See Healey v. Leavitt*, 485 F.3d 63, 71 (2d Cir. 2007); *Tackie v. Keff Enterprises LLC*, No. 14-CV-2074, 2014 WL 4626229, at *6 (S.D.N.Y. Sept. 16, 2014).  The Second Circuit has held that "the lodestar … creates a 'presumptively reasonable fee.'"  *Millea v. Metro-North Railroad Co.*, 658 F.3d 154, 166 (2d Cir. 2011) (quoting *Arbor Hill Concerned Citizens Neighborhood Association v. County of Albany*, 522 F.3d 182, 183 (2d Cir. 2008); and then citing *Perdue v. Kenny A. ex rel. Winn*, 559 U.S. 542, 552 (2010)); *see also Stanczyk*

*v. City of New York*, 752 F.3d 273, 284-85 (2d Cir. 2014) (reaffirming *Millea*).  To arrive at a lodestar calculation, "[t]he party seeking an award of [attorneys'] fees should submit evidence supporting the hours worked and rates claimed." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).  Feng has submitted such evidence here, including a declaration from counsel and copies of contemporaneous records of time expended by specific attorneys. (Troy Decl. ¶ 64 and Attorney Fee Invoice (Dkt. 107-1).)

## A.     Hourly Rates

Courts assess the reasonableness of a proposed hourly rate by considering the prevailing market rate for lawyers in the district in which the ruling court sits.  *Polk v. New York State Department of Correctional Services*, 722 F.2d 23, 25 (2d Cir. 1983).  "The rates used by the court should be current rather than historic hourly rates."  *Reiter v. Metropolitan Transportation Authority of New York*, 457 F.3d 224, 232 (2d Cir. 2006) (internal quotation marks and citations omitted).  "[C]ourts may conduct an empirical inquiry based on the parties' evidence or may rely on the court's own familiarity with the rates if no such evidence is submitted."  *Wong v. Hunda Glass Corp.*, No. 09-CV-4402, 2010 WL 3452417, at *2 (S.D.N.Y. Sept. 1, 2010) (internal quotation marks omitted). Additionally, "the range of rates that a plaintiff's counsel actually charges their clients … is obviously strong evidence of what the market will bear."  *Rozell v. Ross-Holst*, 576 F. Supp.2d 527, 544 (S.D.N.Y. 2008); *see also Lilly v. County of Orange*, 910 F. Supp. 945, 949 (S.D.N.Y. 1996) ("The actual rate that counsel can command in the market place is evidence of the prevailing market rate").

Feng is represented in this action by Troy Law, PLLC (the "Firm"), a firm that focuses on, and has substantial experience in, wage-and-hour cases such as the instant

one.[19]  (*See* Troy Decl. ¶ 15.)  Plaintiff seeks fee recovery for the work of four timekeepers: John Troy, Aaron Schweitzer, Tiffany Troy, and Preethi Kilaru, who in total expended 263.47 hours on the case.  (*Id.* ¶ 64.)  Mr. Schweitzer performed approximately half of the work for 133.51 of those hours; Mr. Troy expended 86.49 hours; Ms. Troy expended 16.73 hours; and Ms. Kilaru expended 27.09 hours. (*Id.*)  The Court discusses each in turn.

John Troy is the principal of the Firm.  He graduated with an LLM from Dickinson Law School in 1985 and was admitted to the New York bar in 1989.  (Troy Decl. ¶ 13.)  Mr. Troy has been attorney of record for at least 368 wage-and-hour cases in the Southern and Eastern Districts of New York alone.  (*Id.* ¶¶ 16-17.)  Mr. Troy performed approximately one-third of the work on the case, and the hourly rate sought for him is $650.  (*Id.* ¶¶ 27, 64.)  He cites one state court case where he was awarded $650 per hour; one state court case where he was awarded $600 per hour; and approximately 10 cases, including from this District, in which he was awarded either $550 per hour or $400 per hour.  (*Id.* ¶ 26.)

What Mr. Troy does not reveal, however, is that courts in the Southern and Eastern Districts repeatedly have rejected requests by his firm for the magnitude of rates sought here:

> As has been documented on numerous occasions by other courts in this District, courts "have balked at the sort of rates requested" by members of the Troy Law Firm. See *Garcia v.*

---

[19] Mr. Troy asserts that "Troy Law spearheads the nation's wage and hour employment litigation advocacy" and has "one of the largest Fair Labor Standards Act caseloads in the nation, and one of the largest client bases among the Asian-American and Latinx-American, among others, immigrant worker communities."  (Troy Decl. ¶ 15.)  However, he has not presented any comparative data to support those statements.  The Court acknowledges, however, that Troy Law is one of the more active wage-and-hour firms in this District.

> *Francis Gen. Constr. Inc.*, No. 20-CV-4323 (JPC), 2022 WL 2698434 at *7 (S.D.N.Y. July 12, 2022) (collecting cases); *see also Chen v. Marvel Food Servs. LLC*, No. 15-CV-06206, 2022 WL 4226098, at *4-5 (E.D.N.Y. Sept. 9, 2022) (collecting cases). "In light of the consistently poor quality of [John Troy's] work," courts have repeatedly reduced the rates requested by him. *See, e.g., Rodpracha v. Pongsri Thai Rest. Corp.*, No. 14-CV-02451 (DF), 2021 WL 6205861, at *3 (S.D.N.Y. Dec. 29, 2021).

*Yu v. Shanghai Dumpling, Inc.*, 2023 WL 8438669, at *9 (S.D.N.Y. Oct. 5, 2023); *see also Wang v. XBB, Inc.*, No. 18-CV-7341, 2024 WL 184263, at *1, 5 (E.D.N.Y. Jan. 27, 2024) (rejecting request for $650 hourly rate for John Troy, and awarding a rate of $400 instead, and noting that "Troy Law has been reprimanded numerous times for its billing practices"); *De La Cruz Rosas v. Just Salad 60 Third LLC*, No. 18-CV-7342, 2023 WL 5423982, at *7 (S.D.N.Y. Aug. 4, 2023) (rejecting request for $650 hourly rate for John Troy, and awarding $400 instead), *R. & R. adopted*, 2023 WL 5390985 (S.D.N.Y. Aug. 22, 2023); *Yuan v. & Hair Lounge Inc.*, No. 18-CV-11905, 2023 WL 4534872, at *5-*7 (S.D.N.Y. June 28, 2023) (recommending $400 per hour for John Troy, $250 per hour for Schweitzer, $150 per hour for Tiffany Troy, and $75 per hour for Kilaru), *R. & R. adopted*, 2023 WL 4535085 (S.D.N.Y. July 13, 2023); *Garcia*, 2022 WL 2698434, at *8 (awarding $300 per hour for John Troy, $150 per hour for Schweitzer and for Tiffany Troy, and $70 per hour for Kilaru).

This Court similarly finds that an hourly rate of $650 for John Troy in this case is unreasonable.  While the case went to trial – and therefore is more complex and involved than solely moving for default judgment for example – Mr. Troy did not try the case or appear before the Court.  Rather, he met with the client; drafted pleadings, discovery requests, responses, and motions; and communicated with opposing counsel, among

other tasks.  Those certainly are important tasks, but not ones compensated in wage-and-hour cases at the rate sought.  Based on the case law in this and the Eastern District, $650 is not a rate that a reasonable client would pay for the services of the type performed here.  Accordingly, the Court finds, consistent with the overall judgment of courts in the relevant jurisdiction, that a reasonable hourly rate for Mr. Troy's services in this case is $425 per hour.

Aaron Schweitzer, "the managing associate at Troy Law," received his JD with a concentration in employment law from Fordham University School of Law in 2016.  (Troy Decl. ¶¶ 28-29.)  He has been admitted to the New Jersey State Bar since 2017 and the New York State Bar since 2018.  (Id. ¶ 30.)  "Altogether, Mr. Schweitzer has about five … years of legal experience" and has litigated "over" 99 wage-and-hour actions in the federal courts (although the Troy Declaration lists significantly more).  (Id. ¶¶ 33, 38-41.)  The hourly rate sought for Mr. Schweitzer is $400 per hour – the same fee he charges to his clients in non-contingent fee matters.[20]  (Id. ¶ 36.)  Plaintiff cites four cases where courts accepted a $400 hourly rate for Mr. Schweitzer, although three of those are indicated to be oral rulings.  (Id. ¶ 43.)  Other case cited awarded hourly rates of $350 per hour and $225 per hour.  (Id.)  In this particular case, an hourly rate on the higher side is warranted for Mr. Schweitzer's work.  He conducted and defended the depositions, tried the case, and handled all court appearances.  He was, for the most part, thorough and achieved

---

[20] The Troy Declaration actually sets forth multiple billing rates for Mr. Schweitzer.  The $400 hourly rate is for the vast majority of time (124.22 hours).  Additionally, Mr. Schweitzer performed 8.75 hours at $200 per hour, .2 hours at 350 per hour, and .34 hours for no $0 per hour.  (Troy Decl. ¶ 64.)  The $200 "half" rate was applied to hours expended for necessary travel.  There is no explanation for the other two rates.

substantial success for his client.  The quality of his work and command of the facts generally was very good.  Accordingly, the Court finds that a reasonable hourly rate for Schweitzer's services in this case is $400 per hour (and half that for his 8.75 hours of travel time).

Tiffany Troy is a junior associate at Troy Law.  She obtained her JD from Fordham University School of Law and was admitted to the New York State Bar in 2021 and several other State Bars in 2022 and 2023.  (Troy Decl. ¶¶ 45-46.)  She is an "attorney of record" for more than 90 cases in federal courts, although there is no indication of what she has actually done for any of those cases.  (*Id.* ¶¶ 48-50.)  For the instant case, the time records indicate that she communicated with the client and helped prepare client affidavits. Plaintiff asks for an hourly rate of $250 for Ms. Troy's services in this case.  Like her colleagues, hourly rates awarded for Ms. Troy have varied, and despite state court oral rulings cited as granting $250 per hour for her work, federal courts in this District have awarded substantially lesser amounts for Ms. Troy, typically $150 per hour.  *See, e.g.*, *Yuan*, 2023 WL 4534872, at *5-*7 ($150 per hour for Tiffany Troy but only $75 per hour for pre-admission work and translation/interpretation services); *De La Cruz Rosas*, 2023 WL 5423982, at *7 (awarding $150 per hour for Ms. Troy); *Garcia*, 2022 WL 2698434, at *8 (same).  The Court similarly finds that $150 per hour is reasonable for Ms. Troy's services in this case.

Finally, Plaintiff requests $200 per hour for Preethi Kilaru, the Managing Clerk at Troy Law.  (Troy Decl. ¶¶ 60, 63.)  She has worked with the Firm since 2018 and before that was a legal assistant in India.  (*Id.* ¶ 60.)  The time records indicate that for the instant case, Ms. Kilaru performed varied tasks, such as coordinating filings with the Court and

service of process, assisting with preparation of affidavits, communicating with opposing counsel about scheduling, and preparing trial exhibits and binders.  She essentially functioned as a paralegal.  Plaintiff cites cases in which courts awarded $150 to $200 per hour for Ms. Kilaru's services.  But as with the cases cited with respect to Ms. Kilaru's colleagues, they generally are outliers.  Courts in this District generally have awarded amounts far less than that sought here.  *See, e.g.*, *XBB*, 2024 WL 184263, at * (awarding $75 hourly rate for Kilaru); *Yuan*, 2023 WL 4534872, at *5-*7 ($75 per hour for Kilaru); *Garcia*, 2022 WL 2698434, at *7 ($70 per hour for Kilaru).  Here, the Court finds that $100 per hour is a reasonable rate for Ms. Kilaru's services.  *See Rodpracha v. Pongsri Thai Restaurant Corp.*, No. 14-CV-2451, 2021 WL 6205861, at *4 (S.D.N.Y. Dec. 29, 2021) (awarding $100 per hour for Kilaru).

More generally, the rates the Court finds reasonable are in line with those typically approved for litigators experienced in wage-and-hour cases.  "Courts in this district have determined that fees ranging from $250 to $450 [are] appropriate for experienced litigators in wage and hour cases." *Silva v. Legend Upper West LLC*, 590 F. Supp.3d 657, 664 (S.D.N.Y. 2022) (citing cases); *see also Lopez v. Emerald Staffing, Inc.*, No. 18-CV-2788, 2020 WL 915821, at *13 (S.D.N.Y. Feb. 26, 2020) ("In this district, courts generally award experienced wage-and-hour attorneys between $300 to $400 per hour").

## B.   Hours Worked

To determine the compensable hours, "the court must examine the hours expended by counsel and the value of the work product of the particular expenditures to the client's case." *Tlacoapa v. Carregal*, 386 F. Supp.2d 362, 371 (S.D.N.Y. 2005) (citing *Gierlinger v. Gleason*, 160 F.3d 858, 873, 876 (2d Cir. 1998)).  "In making this

examination, the district court does not play the role of an uninformed arbiter but may look to its own familiarity with the case and its experience generally as well as to the evidentiary submissions and arguments of the parties." *Gierlinger*, 160 F.3d at 876. "The relevant issue ... is not whether hindsight vindicates an attorney's time expenditures, but whether, at the time the work was performed, a reasonable attorney would have engaged in similar time expenditures." *Grant v. Martinez*, 973 F.2d 96, 99 (2d Cir. 1992); *see also Mugavero v. Arms Acres, Inc.*, No. 03-CV-5724, 2010 WL 451045, at *6 (S.D.N.Y. Feb. 9, 2010) (same). A court thus should exclude from the lodestar calculation "excessive, redundant or otherwise unnecessary hours." *Quaratino v. Tiffany & Co.*, 166 F.3d 422, 425 (2d Cir. 1999); *see also Luciano v. Olsten Corp.*, 109 F.3d 111, 116 (2d Cir. 1997) ("If the district court concludes that any expenditure of time was unreasonable, it should exclude these hours from the lodestar calculation").

The Court has reviewed the entirety of the time records submitted by Plaintiff. For the most part, the records demonstrate a fair degree of efficiency in time expended on tasks. There are several items, however, that concern the Court. First, some of the tasks performed by John Troy are ones that reasonably should have been performed by someone at a lesser billing rate. These include researching websites and public databases to find information about the Defendants, and filing basic documents electronically with the Court, such as a consent form, summons and civil cover sheet, and request to bring a laptop to Court. The total time for those tasks, which were performed by Mr. Troy on Nov. 2, 2018, December 31, 2018, and March 28, 2019, is 9.2 hours. (Attorney Fee Invoice at 1,3). Additionally, Mr. Troy has entries on March 13, 2019 for reviewing both the Answer to the Complaint (2.10 hours) and the Amended Answer (1

hour) to the complaint, even though the Amended Answer was not filed until May 10, 2019 (Dkt. 23). (*Id.* at 2.)  While there could be an innocent explanation, none is apparent from Plaintiff's submissions.  An additional hour should be deducted from Mr. Troy's time, for a total of 10.2 hours.

Additionally, there are several duplicative entries for Mr. Schweitzer.  For instance, there are two identical entries from Mr. Schweitzer for July 18, 2019 reading "Draft and Send to OC No Objection Letter," each for the same amount of time (.5).  That same day, Mr. Schweitzer recorded identical entries reading "Drafted part of client's MCCC affidavit" each for the same 1.5 hours of time.  (*Id.* at 4.)  There could be an innocent explanation, but Plaintiff's submissions do not reveal any.  Other identical double entries appear on August 7, 2019 (two entries of 1.25 hours for drafting John Troy's affidavit in support of MCCC), August 8, 2019 (two entries of 1 hour for drafting discovery deficiency letter).  (*Id.* at 5.)  The total time that should be deducted from Mr. Schweitzer's time for these unexplained double entries is 4.25 hours.

Additional deductions are merited for an entry by Mr. Schweitzer on January 15, 2020 for .25 hours that simply reads "tel conf" with no information about with whom or what for to determine if it has any relationship to the case, and two non-sensical entries by John Troy (February 25, 2020 for .08 hours) and Tiffany Troy (March 4, 2020 for .05 hours), both of which say "Follow Up with OC as to why some ees in time sheets but in name list."  (*Id.* at 6-7.)  Finally, time must be deducted for preparation of Plaintiff's Proposed Findings of Fact and Conclusions of Law.  In direct violation of the Court's order limiting the submission to 20 pages (Dkt. 93), the Troy Firm filed a 44-page document without asking before filing for an extension of page limits.  The Court denied Defendants'

motion to strike the filing, but ordered that the Court would take the extra pages into account when determining legal fees in the event they were warranted.  (Dkt. 120 at 2.) The time records indicate that Mr. Schweitzer expended 16.66 hours to draft the document.  (Attorney Fee Invoice at 10-11.)  3.33 of those hours will be deducted for another unexplained double entry; i.e., Mr. Schweitzer purported to "begin" drafting the proposed findings of fact and conclusions of law on November 29, 2023, "continue and finish" drafting them on November 30, 2023, yet "begin" drafting them again on that day as well.  Deducting the duplicative entry leaves 13.33 hours dedicated to preparing the proposed findings and conclusions.  The Court will cut that time by half for the Troy Firm's filing a document that was more than twice as long as authorized by the Court. Accordingly, an additional 6.67 hours of Mr. Schweitzer's time will be deducted.

## C.    Calculation Of The Fee Award

Taking all the adjustments explained above into account results in a fee award of $83,307.92.  That number is the result of (1) reducing John Troy's billing rate from $650 to $425; (2) maintaining Mr. Schweitzer's rate at $400 (but half that for travel time); (3) reducing Tiffany Troy's rate from $250 to $150; (4) reducing Ms. Kilaru's rate from $200 to $100; (5) deducting 10.28 hours of John Troy's time; (6) deducting 14.5 hours of Mr. Schweitzer's time; and (7) deducting .05 hours of Tiffany Troy's time.[21]

The Court notes that the fee award is sizeable in relation to the damages award for which the fee was incurred.  However, "courts have repeatedly rejected the notion that

---

[21] For John Troy: 86.49 – 10.28 = 76.21 hours x $425 = $32,389.25.   For Aaron Schweitzer: (124.22 – 14.5 = 109.72 hours x $400 = $43,888.00) + (8.75 travel hours x $200 = $1,750) + (. 2 hours x $350 = $ 70.00) for a total of $45,708.00.  For Tiffany Troy: 16.73 - .05 = 16.68 hours x $150 = $2,502.00.  For Preethi Kilaru:  27.09 hours x $100 = $2,709.

fee awards in wage-and-hour cases must be proportional to the plaintiff's recovery." *Najera v. Kurtishi*, No. 21-CV-01309, 2024 WL 180867, at *4 (S.D.N.Y. Jan. 17, 2024); *see also Fisher v. SD Protection Inc.,* 948 F.3d 593, 603-04 (2d Cir. 2020) (rejecting proportionality limit on attorney's fees in FLSA cases); *Dajbabic v. Rick's Cafe*, 995 F. Supp.2d 210, 211-12 (E.D.N.Y. 2014) ("While the degree of success achieved by the attorney in a statutory fees case is often described as the most critical factor in determining the reasonable fee, the fee need not be proportionate to the success, and fee awards far greater than the damages awarded may be found reasonable."); *Allende v. Unitech Design, Inc.*, 783 F. Supp.2d 509, 511 (S.D.N.Y. 2011) ("While the requested attorneys' fees exceed plaintiffs' own recovery in the case, that is of no matter. In FLSA cases, like other discrimination or civil rights cases, the attorneys' fees need not be proportional to the damages plaintiffs recover, because the award of attorneys' fees in such cases encourages the vindication of Congressionally identified policies and rights").

The Court finds that a reasonable amount of fees in this case is $83,307.92, and that Feng is entitled to a fee award of that amount.

## COSTS

Plaintiff seeks $2,010.35 in costs and has submitted copies of receipts and invoices representing expenses incurred for the following:  (1) $351.75 in transcription costs associated with Plaintiff's deposition; (2) $437.40 for court reporting of the trial transcript; (3) $400 in filing fees for initiating the action; and (4) $600.00 for the services of an English-Mandarin interpreter for trial.  (Troy Decl. ¶ 66; Attorney Fee Invoice at 11; Dkt. 109, 111.)  Those expenses are recoverable, and Plaintiff has submitted sufficient

proof of same.  *See* Local Rule 54.1 (taxable costs).   Plaintiff is awarded $2,010.35 in costs.

## POST-JUDGMENT INTEREST

28 U.S.C. § 1961(a) provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court … [and] shall be calculated from the date of the entry of the judgment."   In light of the statute's imperative language, the Second Circuit has "consistently held that an award of postjudgment interest is mandatory." *Schipani v. McLeod,* 541 F.3d 158, 165 (2d Cir. 2008) (citing *Westinghouse Credit Corp. v. D'Urso*, 371 F.3d 96, 100 (2d Cir. 2004)).  Accordingly, the Court awards post-judgment interest at the rate directed by 28 U.S.C. § 1961(a) and (b).

## MISCELLANEOUS CLAIMS

In their proposed findings and fact and conclusions of law, Defendants argue that Feng had no independent cause of action for Defendants' failure to maintain adequate records, and that Feng had failed to establish that Defendants owe Feng for any equipment necessary for his work (such as a bicycle).  (Def. FFCL at 14.)  Feng did not pursue those claims at trial; to the extent Feng previously made those claims, the Court deems them abandoned.  Defendants also argue that Feng has no private right of action to enforce the NYLL provisions regarding unpaid meal periods.  (*Id.* at 13.)  Feng, however, did not advance such a claim; instead, Feng established that he was not paid for the time he worked, which included being at the Restaurant's disposal even during the five to eight minutes he typically took to eat lunch.

**CONCLUSION**

For the foregoing reasons, judgment is granted in favor of Plaintiff against Defendants Kelai, Yang, and Qin.  Defendants Kelai, Yang, and Qin are jointly and severally liable for paying to Plaintiff:

1. Damages for unpaid wages of $52,396.50, plus pre-judgment interest to be calculated by the Clerk of Court at the rate of 9%, from September 26, 2017, to the date of judgment;

2. $52,396.50 in liquidated damages;

3. Reasonable attorneys' fees in the amount of $83,307.92;

4. Costs in the amount of $2,010.35; and

5. Post-judgment interest pursuant to 28 U.S.C. § 1961.

Plaintiffs claims under the WTFA for failure to comply with wage notice and statement requirements are dismissed without prejudice for lack of standing.

SO ORDERED,

_____
ROBERT W. LEHRBURGER
UNITED STATES MAGISTRATE JUDGE

Dated: March 29, 2024
      New York, New York

Copies transmitted this date to all counsel of record.